**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Nos. 2021-1849, -1875

IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, dba Robert Adkins & Sons Partnership, GERALD SCHNEIDER, dba Buffalo Hollow Farms, Inc.,

*Plaintiffs–Cross-Appellants*

LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, dba Midwest Grain Co., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, individually and, dba Drewes Farms, Inc., PATRICK NEWLON, dba Newlon Farms, Inc., DAVID NEWLON, dba D Double N Farms, Inc., JASON TAYLOR, BRAD TAYLOR, dba H.B.J. Farms, Inc., LYLE HODDE, dba Hodde & Sons Limited Partnership, STEVE CUNNINGHAM, Trustee of the Doris J. Cunningham and Steven K. Cunningham Declaration of Trust, GAIL CUNNINGHAM, dba Cunningham Farms, Inc., CHARLES GARST, individually and, dba Garst Farms, Inc., CONNIE GARST, dba Garst Farms, Inc., RON SCHNEIDER, MARY SCHNEIDER, et al.,

*Plaintiffs*

v.

UNITED STATES,

*Defendant–Appellant.*

Appeals from the United States Court of Federal Claims in No. 1:14-cv-00183-NBF, Senior Judge Nancy B. Firestone

# PRINCIPAL AND RESPONSE BRIEF FOR PLAINTIFFS–CROSS-APPELLANTS

SETH C. WRIGHT
**POLSINELLI, PC**
900 W 48th Place
Suite 900
Kansas City, MO 64112

BENJAMIN J. HORWICH
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street
27th Floor
San Francisco, CA 94105

DONALD B. VERRILLI, JR.
ELAINE GOLDENBERG
JONATHAN S. MELTZER
DAHLIA MIGNOUNA
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Plaintiffs–Cross-Appellants*

## Certificate of Interest

Counsel for Plaintiffs–Cross-Appellants certifies the following:

1. The full name of every party represented by me is:

Ideker Farms, Inc.

Robert Adkins, Jr.

Robert Adkins, Sr.

Estate of Betty Adkins

Estate of Robert Adkins, Sr.

Ken Adkins, dba Robert Adkins & Sons Partnership

Buffalo Hollow Farms, Inc.

Gerald Schneider, dba Buffalo Hollow Farms, Inc.

2. The names of the real party in interest represented by me is:

Not applicable

3. All parent corporations and any publicly held companies that own 10% or more of stock in the party represented by me are:

Not applicable

4. The names of all law firms and the partners or associates that appeared for the party now represented by me before the Court of Federal Claims or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Ronald Dan Boulware

Edwin H. Smith

Benjamin D. Brown

David Schultz

Laura Alexander

R. Todd Ehlert

Sharon Kennedy

Joshua Emberton

Polsinelli PC

Cohen, Milstein Sellers & Toll PLLC

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

*Milne et al. v. United States*, No. 20cv2079 (Fed. Cl.)

*Nolan v. United States*, No. 21cv00122 (Fed. Cl.).

6. Organizational Victims and Bankruptcy Cases:

Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) are not applicable because this is not a criminal or bankruptcy case. *See* Fed. Cir. R. 47.4(a)(6).

Dated: December 16, 2021

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli Jr.

# **Table of Contents**

**Page**


Certificate of Interest .......... i

Statement of Related Cases .......... x

Jurisdictional Statement .......... 1

Statement of Issues .......... 1

Introduction .......... 2

Statement of the Case .......... 4

I. Factual Background .......... 4

A. The Government's Reengineering Of The Missouri River .......... 4

B. System And River Operations Before 2004 .......... 7

C. The Government's 2004 "Paradigm Shift" .......... 8

II. Procedural History .......... 16

A. Phase I Bench Trial .......... 17

B. Reconsideration Denial .......... 20

C. Phase II Bench Trial .......... 21

Summary of Argument .......... 23

Standard of Review .......... 27

Argument .......... 27

I. The CFC Correctly Concluded That Plaintiffs Proved Causation .......... 30

A. The CFC Applied The Correct Causation Test .......... 30

1. Binding Precedent Requires Applying The "*Hardwicke* Rule" Here .......... 31

2. The *Hardwicke* Rule Is A Settled Feature Of Takings Doctrine And Avoids Absurd Results .......... 35

B. The Government's Contrary Arguments Lack Merit .......... 43

**Table of Contents**
**(continued)**

**Page**

C. Under The Correct Test, The CFC's Factual Findings Establish Causation ........ 47

II. The CFC Correctly Held That The Relative-Benefits Doctrine Does Not Bar Plaintiffs' Recovery ........ 49

III. The Government's Arguments As To Other Factors In The Takings Inquiry Lack Merit ........ 54

A. Character Of The Land ........ 54

B. Investment-Backed Expectations ........ 55

C. Severity ........ 57

IV. Plaintiffs' Claims Are Timely ........ 60

V. The CFC's Award Erroneously Omitted Compensation For Damages Suffered While The Taking Was Stabilizing ........ 69

A. Crops Are An Integral Part of the Farmland And Were Directly And Foreseeably Damaged ........ 71

B. The CFC Offered No Sound Reason For Refusing Compensation During The Period Before Stabilization ........ 75

VI. The CFC's Rejection Of Plaintiffs' 2011 Flooding Claims Should Be Vacated ........ 79

A. The 2011 Flooding Was Part Of The Flowage Easement Taken By The Government Because The MRRP Directly And Foreseeably Led To That Severe Flooding ........ 79

B. The CFC's Reasons For Rejecting Plaintiffs' 2011 Flooding Claims Are Erroneous ........ 84

Conclusion ........ 89

Certificate of Compliance ........ 91

Certificate of Service ........ 92

# Table of Authorities

**Page(s)**

**Cases**

*Accardi v. United States*,
599 F.2d 423 (Ct. Cl. 1979) .......... 46, 52

*Alford v. United States*,
961 F.3d 1380 (Fed. Cir. 2020) .......... 51, 52

*Almota Farmers Elevator & Warehouse Co. v. United States*,
409 U.S. 470 (1973) .......... 43

*Applegate v. United States*,
25 F.3d 1579 (Fed. Cir. 1994) .......... 62

*Ark-Mo Farms, Inc. v. United States*,
530 F.2d 1384 (Ct. Cl. 1976) .......... 52

*Arkansas Game & Fish Commission v. United States*,
568 U.S. 23 (2012) .......... *passim*

*Arkansas Game & Fish Commission v. United States*,
736 F.3d 1364 (Fed. Cir. 2013) .......... *passim*

*Armstrong v. United States*,
364 U.S. 40 (1960) .......... 50

*Banks v. United States*,
314 F.3d 1304 (Fed. Cir. 2003) .......... 65

*Banks v. United States*,
741 F.3d 1268 (Fed. Cir. 2014) .......... 59, 66, 68

*Barnes v. United States*,
538 F.2d 865 (Ct. Cl. 1976) .......... 60, 61, 62, 69

*Bartz v. United States*,
633 F.2d 571 (Ct. Cl. 1980) .......... 52

**Table of Authorities**
**(Continued)**

**Page**

*Boling v. United States*,
220 F.3d 1365 (Fed. Cir. 2000) .......... 60

*Cary v. United States*,
552 F.3d 1373 (Fed. Cir. 2009) .......... 46

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .......... 58, 59

*Cienega Gardens v. United States*,
503 F.3d 1266 (Fed. Cir. 2007) .......... 59

*Cooper v. United States*,
827 F.2d 762 (Fed. Cir. 1987) .......... 62

*Cotton Land Co. v. United States*,
75 F. Supp. 232 (Ct. Cl. 1948) .......... 88

*Danforth v. United States*,
105 F.2d 318 (8th Cir. 1939) .......... 38

*Danforth v. United States*,
308 U.S. 271 (1939) .......... 24, 38, 39

*John B. Hardwicke Co. v. United States*,
467 F.2d 488 (Ct. Cl. 1972) .......... *passim*

*Johnson v. United States*,
479 F.2d 1383 (Ct. Cl. 1973) .......... 34

*Lingle v. Chevron*,
544 U.S. 528 (2005) .......... 29

*Love Terminal Partners, L.P. v. United States*,
889 F.3d 1331 (Fed. Cir. 2018) .......... 35

**Table of Authorities**
**(Continued)**

**Page**

*Mildenberger v. United States*,
643 F.3d 938 (Fed. Cir. 2011) .......... 62

*In re Missouri River Sys. Litig.*,
305 F. Supp. 2d 1096 (D. Minn. 2004) .......... 10

*In re Missouri River Sys. Litig.*,
363 F. Supp. 2d 1145 (D. Minn. 2004), *aff'd in part,* 421 F.3d 618 (8th Cir. 2005) .......... 10

*Nw. La. Fish & Game Pres. Comm'n v. United States*,
446 F.3d 1285 (Fed. Cir. 2006) .......... *passim*

*Penn Cent. Transp. Co. v. New York*,
438 U.S. 104 (1978) .......... 48, 56

*Reoforce, Inc. v. United States*,
853 F.3d 1249 (Fed. Cir. 2017) .......... 49

*Ridge Line, Inc. v. United States*,
346 F.3d 1346 (Fed. Cir. 2003) .......... *passim*

*South Corp. v. United States*,
690 F.2d 1368 (Fed. Cir. 1982) .......... 32

*St. Bernard Parish v. United States*,
887 F.3d 1354 (Fed. Cir. 2018) .......... *passim*

*United States v. Central Eureka Mining Co.*,
357 U.S. 155 (1958) .......... 30

*United States v. Dickinson*,
152 F.2d 865 (4th Cir. 1946), *aff'd*, 331 U.S. 745 (1947) .......... 77

*United States v. Dickinson*,
331 U.S. 745 (1947) .......... *passim*

**Table of Authorities**
**(Continued)**

**Page**

*United States v. Fuller*,
409 U.S. 488 (1973) ........ 36

*United States v. Miller*,
317 U.S. 369 (1943) ........ *passim*

*United States v. Petty Motor Co.*,
327 U.S. 372 (1946) ........ 76

*United States v. Reynolds*,
397 U.S. 14 (1970) ........ 36

*United States v. Sponenbarger*,
308 U.S. 256 (1939) ........ *passim*

*United States v. Virginia Elec. & Power Co.*,
365 U.S. 624 (1961) ........ 42, 43

**STATUTES**

16 U.S.C. § 831 ........ 42

28 U.S.C. § 1295(a)(3) ........ 1

28 U.S.C. § 1491(a)(1) ........ 1

28 U.S.C. § 2501 ........ 60

**OTHER AUTHORITIES**

Seth Barron, *Making More Manhattan*, City Journal (Spring 2020), https://www.city-journal.org/de-blasio-plan-to-expand-lower-manhattan ........ 41

Kelly O'Mara, *Large Parts of the Bay Area Are Built on Fill. Why and Where?*, KQED (Feb. 6, 2020) ........ 41

## Table of Authorities
## (Continued)

**Page**

William A. Newman & Wilfred E. Holton, *Boston's Back Bay: The Story of America's Greatest Nineteenth-Century Landfill Project* (2006) .......... 41

Pam Sohn & Kate Belz, *Underground City Beneath Chattanooga is More Than a Curiosity* (Feb. 19, 2012), https://www.timesfreepress.com/news/news/story/2012/feb/19/city-below-chattanooga-is-more-than-a-curiosity/71104/ .......... 42

TVA, *Saving Chattanooga*, https://www.tva.com/about-tva/our-history/built-for-the-people/saving-chattanooga; .......... 42

## Statement of Related Cases

This case has not previously been before this Court. This appeal concerns a Rule 54(b) judgment as to three representative plaintiffs in *Ideker v. United States*, No. 14-cv-00183 (Fed. Cl.). Other plaintiffs in the underlying case, which is still pending, will be affected by this Court's decision. Additionally, counsel for plaintiffs is aware of other pending cases that will directly affect or be affected by this Court's decision: *Milne et al. v. United States*, No. 20-cv-2079 (Fed. Cl.), and *Nolan v. United States*, No. 21-cv-00122 (Fed. Cl.).

## Jurisdictional Statement

This is an appeal and cross-appeal from the Rule 54(b) judgment of the Court of Federal Claims ("CFC") entered on February 9, 2021. Appx418-419. The CFC had jurisdiction over this takings case under 28 U.S.C. § 1491(a)(1). The government appealed on April 8, 2021, and the cross-appeal was filed on April 19, 2021. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## Statement of Issues

1. Whether the CFC correctly held that the United States took a flowage easement over plaintiffs' properties based on recurring and permanent flooding.

2. Whether plaintiffs' claims—brought around the time the CFC found the government's taking stabilized—were timely.

3. Whether, in calculating just compensation, the CFC erred in refusing to include the value of crops destroyed by the government's exercise of its flowage easement.

4. Whether the CFC erred in rejecting plaintiffs' claim for a taking based on flooding in 2011.

## Introduction

In this case, farmers, landowners, and small businesses from six States along the Missouri River seek just compensation from the United States for severe and recurrent flooding of their property. Generations ago, the U.S. Army Corps of Engineers (the "Corps") undertook a massive public-works program to tame the River and make huge swathes of adjacent land suitable for farming and other uses. The United States encouraged investment in that newly available land. Plaintiffs and others took up the challenge of converting the land to productive use—investing millions of dollars and countless hours of labor and ensuring the success of the project.

Beginning in 2004, however, the Corps embarked on a radically different policy, with devastating effects on plaintiffs. Under a judicial ruling that the government resisted, the Corps was forced to prioritize the protection of endangered species whose habitat had been affected by the Corps' decades-long flood control efforts. To that end, the Corps undertook over the course of several years to systematically dismantle the flood-control protections it had previously put in place. The effect of the new policy was to subject plaintiffs' lands to severe and recurrent

flooding that was orders of magnitude worse than they had previously experienced. That flooding inflicted massive crop losses and has sharply decreased the value of plaintiffs' land.

Based on those facts—established in two trial proceedings that included many weeks of witness testimony, thousands of exhibits, and extensive briefing—the CFC found that plaintiffs were entitled to just compensation for the government's taking of their property. This is, as the CFC concluded, exactly the kind of case in which the Fifth Amendment requires just compensation. The government chose to sacrifice the value of plaintiffs' land by taking a flowage easement in order to prioritize the protection of endangered species. Fairness and justice require that the cost of that dramatic policy change be borne by the people as a whole, not visited on those who have made it their lives' work to fulfill the government's prior objective of making the land along the River suitable for productive use.

## Statement of the Case

### I. Factual Background

#### A. The Government's Reengineering Of The Missouri River

The Missouri River ("the River") is the nation's longest river, and it drains a basin ("the Basin") covering one-sixth of the continental United States. Appx50886. Until the mid-20th century, the River was in many places a multichannel, braided system that migrated freely across a wide floodplain. Appx50886-50899; Appx4. The River was known for frequent flooding, both in the spring (due to rainfall and snowmelt in the Great Plains) and summer (due to snowmelt in the Rocky Mountains). Appx50742; Appx4. Consequently, land in the River's floodplain was largely unsuitable for agricultural use. Appx50886. As the Corps reported in 1947, "[a]long the [River's] main stem and its tributaries are millions of acres of farm lands ravaged by floods which erode valuable top soil and cover the bottom lands with worthless sand. These floods destroy or prevent planting of crops." Appx52926.

Congress enacted two laws in the 1940s authorizing the construction of dams and bank stabilization projects in order to

"increase investment in the Missouri River Basin, including for agricultural use." Appx24036 (Corps official); *see* Appx50886. The Flood Control Act of 1944 ("FCA") established the Missouri River Mainstem Reservoir System ("System"), a series of six dams and reservoirs intended to reduce flood risk, improve irrigation and water quality, and protect fish and wildlife. Appx6-7; Appx50715-50734. The FCA also authorized the Pick-Sloan Plan, which directed the Corps to "provide a steady and reliable 9-foot deep navigation channel." Appx50692; Appx6.

The 1945 Rivers and Harbors Act established the Missouri River Bank Stabilization and Navigation Project ("BSNP"), which significantly changed the River's shape. Appx10; Appx50887. Under the BSNP, the Corps constructed numerous dikes, revetments, and other structures on and around the River to create the navigation channel, increase the flow of water down its center, and eliminate side channels. Appx50887; Appx51707; Appx10. The channelization stabilized the River's banks, ending the River's "meander[ing]" and controlling flooding. Appx51724; *see* Appx10-12. And the narrowing of the River produced accretion of sediment, creating arable land that was

previously part of the River itself—including land at issue here. Appx11-12; Appx51170. After decades of construction, the BSNP was completed in 1981. Appx50904.

Together, the System and the BSNP created a River that was narrower, more stable, and less prone to flooding. As the government's Rule 30(b)(6) witness explained, the government wanted "invest[ment] in the region because there was more navigation and commerce, and there was going to be more stability in the River and therefore, people can farm and build around that." Appx53478; *see, e.g.*, Appx53334. Corps reports demonstrate that the "Government envisioned and encouraged farming along the River as a result of the flood protection it offered." Appx30056; *see* Appx51755 ("Bottomland Cleared and Leveed for Farming").

Those efforts succeeded. The Department of the Interior reported that "vast lands were cleared for agricultural production…. As time passed, the idea that these lands were flood-free caused developers to move-in." Appx52886. Over decades, generations of farmers invested millions of dollars in purchasing, improving, and farming the land in

the Basin, relying on the government's representations that the BSNP and system management would continue to provide flood protection.

Consider the plaintiffs before this Court: The Adkins family began investing in 1948 and "relied in good faith on the Federal Government's public representations that the flooding would abate." *E.g.*, Appx30019-30020. The Ideker family began investing in 1952 and "relied upon those [government] publications and representations that flooding would be substantially reduced" and on the fact that "[t]he Government encouraged investment in the Basin, including the clearing and farming of land." Appx30056-30057. The Schneider family began investing in 1962 and "relied in good faith on the Government's public representations, and there were many, that flooding would be abated." Appx30037-30038 (discussing Buffalo Hollow Farms).

By the mid-2000s, 95 percent of the floodplain had been developed for agricultural and other uses. Appx52862.

### B. System And River Operations Before 2004

The Corps operates the System under a Master Manual, which prescribes water-storage allocations and procedures for releasing water from reservoirs. Appx50726-50727; Appx51770; Appx8. The 1979

Manual, largely continuing pre-1979 policy, listed eight congressionally authorized purposes, giving top priority to flood control and lowest priority to fish and wildlife. Appx51868-51869; Appx9; *see* Appx50727. In particular, the 1979 Manual required maintaining large reservoir capacity in the early flooding season, included mandatory water releases, and required timing the releases to avoid aggravating "flood conditions." Appx51868; *see* Appx8.

The Corps operated the System with the BSNP flood-control structures in mind. Appx22935, Appx23617; Appx9. Together, those measures successfully kept the River disconnected from its prior floodplain to protect the farmland along the River from flooding. Appx11-13.

### C. The Government's 2004 "Paradigm Shift"

**1.** By design, the System and the BSNP limited periods of "extreme high and extreme low flows," which led to sediment being scoured from the riverbed and trapped behind dams and BSNP structures. Appx50748; *see* Appx50688-50689, Appx50771; Appx52044; Appx13-14. That led to changes in habitat for fish and birds, including

the interior least tern, the piping plover, and the pallid sturgeon. Appx50688-50689; Appx14-15.

In the 1980s and 1990s, the government took limited environmental measures—but never wavered from giving flood control top priority. The 1986 Water Resources Development Act gave the Corps some authority to mitigate habitat losses. Appx51026; Appx15. In 1999, Congress authorized the Corps to purchase 166,750 acres of land along the River from willing sellers and convert that land into habitat. Appx16-17. The Corps purchased only approximately one third of the authorized acreage, however; few owners wanted to sell. Appx53288; Appx53316; Appx16.

In addition, the U.S. Fish and Wildlife Service recommended that the Corps take certain measures to address wildlife—but the Corps refused to do so because the measures would lead to increased flooding. Appx17-19, Appx41-42; Appx53325; Appx52000-52835. For example, in a 2002 Study, the National Research Council explained that the measures would risk "flood damage on properties that are near the [River] channel" and "drainage problems on some floodplains that have been converted to agricultural, industrial, or domestic uses."

Appx50790; *see* Appx50689. The Council even acknowledged that the government might well need to "compensate[]" property owners who experienced such flooding. Appx50792.

Meanwhile, beginning in 2002, third parties sued the Corps over its management of the River, claiming that the Corps was not complying with the Endangered Species Act ("ESA"). Appx20. The government fought those claims, and the district court found that benefiting endangered species would result in flooding that would damage property owners. *In re Missouri River Sys. Litig.*, 363 F. Supp. 2d 1145, 1175 (D. Minn. 2004), *aff'd in part*, 421 F.3d 618 (8th Cir. 2005). The court nonetheless ordered the Corps to revise the 1979 Manual by March 2004 to protect endangered species. *See In re Missouri River Sys. Litig.*, 305 F. Supp. 2d 1096, 1100 (D. Minn. 2004).

**2.** To comply with that order, the government fundamentally changed its approach, aiming to revert the River and Basin to their natural state. Appx52952; Appx21. The government's actions comprised both changes to the River ("River Changes") and changes to the management of the System ("System Changes")—and this brief

refers to both sets of changes, taken together, as the Missouri River Recovery Program ("MRRP").

The River Changes extensively modified BSNP structures and opened previously closed River "chutes" to create shallow-water habitats. Appx25-26. Through 2014, the Corps undertook more than 1,500 dike-notching, dike-lowering, and dike-extension actions and numerous other modifications to widen the River's channel. Appx53012; Appx26. As the Corps acknowledged, those actions destabilized riverbanks, raised water-surface elevations during high-flow periods, and increased flooding. Appx52948; Appx51695; Appx53356; Appx24277, Appx24342, Appx24352, Appx24693; Appx26-28.

The System Changes were equally dramatic. The Corps implemented those changes in a revised 2004 Manual (and an additional 2006 revision). The new Manual no longer gives top priority to flood control and last priority to fish and wildlife; instead, fish and wildlife is elevated in importance and flood control is deemphasized. Appx50117; Appx52994; Appx22-24. The new Manual also authorizes the Corps to store more water in reservoirs to protect fish and wildlife,

making certain water releases discretionary rather than mandatory. Appx52962; Appx53330; Appx24. As a result, the reservoirs are fuller at the beginning of flood season; if there is substantial early runoff, the need to protect fish and wildlife means that the Corps must refrain from releasing water at that time, thus increasing the risk of flooding later in the year when there is no water-storage capacity in the reservoirs. Appx52539; Appx23097-23099; Appx24. Moreover, the Corps now makes Threatened and Endangered ("T&E") releases of water to aid animals' nesting and spawning—including at times when those releases cause flooding that would not otherwise occur. Appx23692, Appx23693-23694; Appx24-25.

**3.** As a Corps official explained, the changes required by the 2004 court order represented a "paradigm shift" away from flood control. Appx23556; *see* Appx53327; Appx30210. Essentially, the Corps undid much of the work it had done for so many decades: it sought to *reconnect* the River to the prior floodplain, without regard for property owners' rights. *E.g.*, Appx52944 (government acknowledging shift made it "necessary to erode" River-side property); Appx23-Appx28.

For instance, in 2007, amidst record rainfall in the Basin, the Corps conducted T&E releases to benefit fish and wildlife, which increased the water-surface elevation of the River. Appx29-30; Appx23082; Appx41604; Appx41603. The same pattern repeated in 2008, 2010, 2013, and 2014. Appx30-31; Appx24674; Appx23086; Appx41605; Appx23088; Appx23755. And throughout that period, the Corps removed or damaged structures that had previously helped hold back the waters. Appx26-27; Appx85-89.

Those actions caused repeated and catastrophic flooding. Following a drought that ended in 2006, substantial flooding occurred in 2007 and in every subsequent year through 2014 except for two drought years (2009 and 2012). Appx28. Indeed, the years from 2007 to 2014 saw among the most severe floods in the River's history. Appx28; Appx53487.[1] When flooding occurred, the water ran higher, rose faster, and stayed on the land longer than it had previously. Appx30015; Appx30066; Appx30042-30043. Experts concluded that "all

[1] Similarly severe flooding occurred after 2014 and will continue into the future. Appx323-351. Because the CFC ultimately concluded that the taking here stabilized at the end of 2014, this brief focuses on flooding through that date.

or almost all of the flooding was the result of the Corps' changes." Appx23255; *see* Appx23153; Appx30228.

Flooding in 2011 was especially severe. Unprecedented rainfall and runoff in the upper Basin caused record water-surface elevations and flooding from June through August 2011. Appx31-32. Although there were no T&E releases, the Corps made "massive" releases starting in May because it had left itself no choice—the System was at capacity, in part due to the higher water levels in the reservoirs at the start of flood season that the Corps maintained under its new regime. Appx32; Appx23090-23091; Appx41307-41308.

As the CFC found, the resulting damage to plaintiffs' land during those years was catastrophic. For example, the Ideker property flooded to some degree in 1952, 1962, and 1967—all before the government's System was fully operational—and then in 1984 and 1993. Appx30066. But after the MRRP, that property flooded in 2007, 2008, and virtually *every* year thereafter (including after 2014). *E.g.*, Appx30061-30062. That post-MRRP flooding was severe: the property flooded for one to two months in 2007, three months in 2010, over 100 days in 2011, more than a month in 2013, and a month in 2014. Appx219-223. Each time,

floodwaters reached ten feet in places and destroyed crops and farm equipment. Appx30058-30061. As Roger Ideker testified, the flooding since 2007 has made "farming of the land," which the Ideker family has done since 1952, "difficult or impossible at times." Appx30058; *see* Appx22968. The flooding also "substantially adversely impacted [the Idekers'] use and enjoyment of the property for hunting, fishing, boating, [and] family events," "forced evacuation of the farm home," and prevented use of a river cabin. Appx30058. In 2010, flooding left "a 90-foot deep scour hole destroying farmland," and in 2011, flooding destroyed the cabin and resulted in complete crop loss. Appx221-222. Other plaintiffs suffered similar effects. Appx173-176 (Adkins); Appx243-247 (Buffalo Hollow).




2010 Flooding on the Ideker Farms Property

## II. Procedural History

Plaintiffs here own and farm land near the River. They brought suit in the CFC in 2014, contending that the government had taken a permanent flowage easement on their properties when it foreseeably caused severe and recurring flooding in 2007, 2008, 2010, 2011, 2013, and 2014.

The CFC bifurcated the litigation. In Phase I, the CFC evaluated as to 44 bellwether plaintiffs three of the factors necessary under *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012)

("*AGFC II*"), to establish the taking of a flowage easement: whether (1) the MRRP caused some or all the flooding on plaintiffs' property, (2) the flooding was foreseeable, and (3) the flooding was sufficiently severe to give rise to a taking. Appx307. In Phase II, the parties selected three representative plaintiffs—Ideker Farms, the Adkins family, and Buffalo Hollow Farms—to try the remaining *AGFC II* factors, the date of the taking, and just compensation. Appx310-311.[2]

### A. Phase I Bench Trial

The 55-day Phase I trial involved testimony from almost 100 witnesses, including plaintiffs and experts, and more than 3,250 exhibits. Appx3. In its 259-page Phase I opinion, full of detailed factual findings, the CFC ruled that 14 of the 44 representative plaintiffs proved causation, foreseeability, and severity as to flooding in some of the years at issue.[3]

Crediting the testimony of plaintiffs' experts, the CFC found that "the Corps' River Changes have, together with the Corps' System

---

[2] In Phase I, the CFC permitted evidence on flooding through 2014; in Phase II, the CFC permitted evidence on flooding in 2015, 2016, and 2017.

[3] The CFC found that 16 plaintiffs could not demonstrate causation and 14 had not yet demonstrated severity. Appx255-259; Appx309-310.

Changes, caused [water-surface elevations] to rise higher than they would have risen without these Changes and that this rise…has led to more flooding or more severe or longer flooding than would have occurred had these Changes not been made." Appx93; *see* Appx113 (government-caused flooding was foreseeable by Corps); Appx53-54; Appx60-162 (discussing conclusions of plaintiffs' experts); Appx93-94, Appx116, Appx119-120, Appx123, Appx128, Appx151-152 (rejecting testimony of government's experts as "unreliable").

As to the three representative plaintiffs before this Court, the CFC found that the government had caused severe flood damage to plaintiffs' farmland in certain years other than 2011. The CFC found that in 2007, 2008, and 2014, hundreds of acres flooded on the Adkins property for several weeks, and 50-60 percent of the property inside the levees flooded. Appx173-177. The CFC found that in 2007, 2008, 2010, 2013, and 2014, the Ideker property sustained extensive damage from weeks-long flooding, including inundation of the entire farm that deposited up to five feet of sand on the property. Appx218-224. And the CFC found that the Buffalo Hollow Farms property experienced severe

flooding in 2007, 2008, 2010, 2013, and 2014, with most of the property inundated for weeks and multiple sand deposits. Appx243-248.

That flooding, the CFC concluded, interfered with plaintiffs' use and enjoyment of their property. *E.g.*, Appx51, Appx177. The flooding made farming difficult or impossible; severely damaged or destroyed crops, buildings, and equipment; and required "significant clean-up and restoration." *E.g.*, Appx175-177, Appx219-224, Appx244-248. In short, the flooding compromised plaintiffs' very way of life.

But as to 2011 flooding, the CFC deemed causation lacking. It addressed only the effect of the System Changes and ruled that plaintiffs' claim failed for two principal reasons. Appx77. First, in the CFC's view, the government did not release water in 2011 for the same "single purpose" as the T&E water releases made in other years, which were intended to benefit endangered species. Appx48, Appx80-82. Second, the CFC believed that the model created by plaintiffs' expert Dr. Christensen depended on a comparison between 1997 and 2011, two high-flooding years that the court found distinguishable. Appx82-83.

### B. Reconsideration Denial

All parties sought reconsideration and addressed the intervening decision in *St. Bernard Parish v. United States,* 887 F.3d 1354 (Fed. Cir. 2018) ("*SBP*"). Appx267-268.

The CFC declined to reconsider its rulings. Appx271, Appx278 & n.5. The CFC considered *SBP* and explained that when the government first takes a risk-reducing action (such as its mid-century engineering of the River) and then later takes a risk-increasing action (such as its 2004 "paradigm shift"), the earlier, risk-reducing action is relevant to causation *only if* the later, risk-increasing action was "contemplated" at the time of the risk-reducing action. Appx279-281 (citing *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490-91 (Ct. Cl. 1972) (citing *United States v. Miller*, 317 U.S. 369 (1943))); Appx271 (*SBP* did not decide *Hardwicke* factual scenario). Applying that rule, the CFC explained that its "findings of fact establish that the changes made to the Corps' River and Mainstem system after the [2004] court order…increased flooding to a degree that would not have been contemplated when the River and Mainstem System structures were planned." Appx282. Thus, *Hardwicke* calls for exactly the comparison

the CFC had used in Phase I: a comparison between the world as it existed before the 2004 paradigm shift and "the current post-2004 world." *Id.*

For similar reasons, the CFC denied the government's motion to amend its answer to add a defense based on the "relative benefits" doctrine discussed in *United States v. Sponenbarger*, 308 U.S. 256 (1939). Appx285-306. The CFC concluded that "*Sponenbarger* does not mandate that this court look to every flood control benefit the government has conferred on a plaintiff in deciding whether there has been a taking." Appx300.

**C. Phase II Bench Trial**

The three-week Phase II trial included 19 witnesses' testimony and over 1,000 exhibits. Appx311. In its 108-page opinion, the CFC ruled that the three representative plaintiffs whose claims are at issue in this appeal had satisfied the *AGFC II* criteria as to flooding in specified years. *See* 568 U.S. at 39-40. The CFC again made detailed factual findings, credited plaintiffs' experts but not the government's (*e.g.*, Appx348-349), and concluded that the representative plaintiffs had established:

- Severity: flooding was "increased," more "severe," and more "frequent and damaging" than before the MRRP and "had considerable effects on the plaintiffs' crop yields." Appx337, 352-353.
- Duration: the recurring flooding was permanent and of substantial enough duration to cause loss of "crops that [plaintiffs] would not have otherwise lost." Appx353-354.
- Foreseeability: the CFC had found this factor satisfied in Phase I and found no basis for altering that conclusion. Appx355-356.
- Change to character of the land: the "increased frequency, severity, and duration of flooding post-MRRP" changed the character of plaintiffs' land. Appx359.
- Reasonable investment-backed expectations: plaintiffs made substantial investments in farming their properties "in reliance on the flood protection provided by the Mainstem System and BSNP," investing "millions of dollars," Appx363-364; those expectations were reasonable given the government's own pre-2004 expectations and "many" assurances to plaintiffs that they

would be protected from flooding, Appx364-368; and "the Corps' MRRP actions have interfered with the representative plaintiffs' reasonable investment-backed expectations to be able to farm and invest in their property," Appx371.

The CFC concluded that the taking began in 2007 and stabilized on December 31, 2014, at which point the plaintiffs' takings claims accrued. Appx372-386. The CFC also determined just compensation. The CFC awarded $7,098,083 for diminution in the market value of plaintiffs' property as of December 2014 and $1,032,338 for the 2010 repair of a levee. Appx393-410. But the CFC declined to compensate plaintiffs for the value of crops destroyed in the years that the taking was stabilizing, deeming those "consequential" damages. Appx407-408.

The CFC entered a Rule 54(b) judgment in favor of the three representative plaintiffs only. Appx415-419. Because only those plaintiffs' claims are at issue in this appeal, the remainder of this brief refers to the three representative plaintiffs simply as "plaintiffs."

## <u>Summary of Argument</u>

**I.** The CFC correctly concluded that the government caused the flooding on plaintiffs' properties. Under long-standing takings law, as

reflected in *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972), where the government first takes an action that reduces the risk of flooding and later takes an action that increases the risk of flooding, the baseline for assessing causation depends on whether the later, risk-increasing action was "contemplated" at the time of the prior, risk-reducing action. *Id.* at 490-91. If there was no "sufficient probability" that the risk-increasing action would occur, then property owners are entitled to rely on an existing risk reduction, *id.*, and the proper causation inquiry is whether the government's risk-increasing action—here, the government's "paradigm shift" in management of the River, Appx23556—caused injury that would not otherwise have occurred.

That commonsense rule, which protects property owners' reasonable, investment-backed expectations, is binding on this Court and derives from bedrock principles of takings law. It follows the principles laid down in *United States v. Miller*, 317 U.S. 369 (1943), and respects the Supreme Court's mode of analysis in other cases where the government provided flood protection. *See Danforth v. United States*, 308 U.S. 271 (1939); *United States v. Sponenbarger*, 308 U.S. 256

(1939). And it avoids the extreme and outrageous results that the government's radical approach to causation would produce.

The CFC properly applied that rule here, finding that the MRRP was a "paradigm" shift not previously contemplated and that it caused severe flooding that plaintiffs would not otherwise have experienced. The government does not meaningfully challenge those factual findings.

**II.** The government's relative-benefits argument likewise lacks merit. Contrary to the government's contention, the CFC's ruling does not require the government to act as a universal insurer against flooding. *See Sponenbarger*, 308 U.S. at 266-67. Rather, that ruling reflects the uncontroversial principle that when the government intentionally or foreseeably causes flooding to accomplish the public goal of environmental protection, the government cannot avoid paying just compensation simply because it long ago conferred some benefit on a plaintiff's property.

**III.** The government's challenge to the CFC's application of the takings factors—the character of the land, the owners' reasonable, investment-backed expectations, and the severity of the flooding—simply recycle the government's erroneous baseline argument and

disagree with the CFC's factual findings. The government has not established clear error, and the CFC's findings therefore must stand.

**IV.** The government finally contends that plaintiffs' claims were untimely. But under the accrual rule known as the "stabilization doctrine," a takings claim does not accrue until "the situation becomes stabilized" and "the consequences of inundation have so manifested themselves that a final account may be struck." *United States v. Dickinson*, 331 U.S. 745, 749 (1947). That doctrine applies in flooding cases like this one. And the CFC properly conducted the fact-intensive stabilization inquiry here, finding as fact that no "final account" could be struck until the end of 2014.

**V.** The CFC's award of just compensation properly included *prospective* damages caused by the government's taking of a flowage easement, in the form of the diminution in market value of plaintiffs' properties as of the day the taking stabilized. But the CFC erred in refusing to award damages for crop losses caused by the MRRP flooding *while* the taking was stabilizing. *See Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1359 (Fed. Cir. 2003) (holding that "just compensation

includes a recovery for all damages, past, present and prospective") (citation omitted). A remand to award that compensation is warranted.

**VI.** The CFC also erred in rejecting plaintiffs' takings claims with respect to the severe flooding on their properties in 2011. That flooding was caused by the same package of MRRP changes responsible for flooding in the years in which the court did find a taking, and the CFC erred in treating 2011 differently. A remand on that issue is warranted as well.

## Standard of Review

"Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings." *SBP*, 887 F.3d at 1359. This Court reviews the CFC's legal determinations de novo and its factual findings for clear error. *Id.*

## Argument

The government's actions in this case are as clear an example as this Court will ever see of a taking that requires just compensation under the Fifth Amendment. The government implemented the Mainstem System and BSNP for the express purpose of creating arable land in a floodplain and encouraging the private investment needed to put that land to productive use. For decades, that is what happened.

Plaintiffs and others made it their lives' work to improve and farm the land made available by the government's massive river-management projects. Much later, and only because of a court order in 2004, the government thoroughly reversed course. It destroyed flood-protective structures along the River, deprioritized flood control, released water to create fish and bird habitat, and took other steps that changed the River channel and moved the River beyond its existing banks—all with the goal of protecting endangered species.

The government was, of course, within its rights to prioritize the protection of endangered species and sacrifice the interests of landowners who farmed alongside the River. But it was not within its rights to saddle those farmers—whose land was now subject to severe recurrent flooding that routinely destroyed crops, considerably reducing property values—with the costs of its dramatic policy shift. The very point of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *AGFC II*, 568 U.S. at 31 (citation omitted). That is precisely what the government is attempting to do here. The CFC was therefore correct to order the government to

compensate plaintiffs for the losses caused by the flooding that resulted—and continues to result—from the government's post-2004 policies.

Indeed, this is a textbook case for just compensation under existing law. The Supreme Court has unanimously and unambiguously held that "government-induced flooding can constitute a taking." *AGFC II*, 568 U.S. at 32. There is no doubt that the government's post-2004 actions caused the flooding of plaintiffs' lands. The severe and recurrent nature of that flooding certainly qualifies as a "physical invasion of private property," *Lingle v. Chevron,* 544 U.S. 528, 537 (2005), that constitutes "a direct and immediate interference with the enjoyment and use" of plaintiffs' land, and is fully actionable even though the flooding is recurrent and not permanent, *AGFC II*, 568 U.S. at 33 (citation omitted). The increased flooding was more than merely the foreseeable result of the government's policy change: freeing the waters to flow over the floodplain once more was the means by which the government sought to enhance protection for endangered species. *See id*. at 38. And the interference with plaintiffs' "distinct investment-backed expectations" was both severe and enduring. *Id.* Plaintiffs

suffered serious crop losses and significantly reduced property values. As the CFC concluded, the plaintiffs have easily established their constitutional entitlement to just compensation.

Nothing in the government's brief provides a basis for questioning the soundness of the CFC's judgment. The government offers abstruse categorical arguments about causation (and related matters) drawn from cases that involve factual scenarios entirely distinct from the facts of this case. And the government ignores the Supreme Court's clear instruction in *AGFC II* that "[f]looding cases, like other takings cases, should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules." *Id.* at 37 (quoting *United States* v. *Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958)). As will be shown, the government's arguments all lack merit.

## I. The CFC Correctly Concluded That Plaintiffs Proved Causation

### A. The CFC Applied The Correct Causation Test

To establish takings liability, a plaintiff must prove that "in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." *SBP*, 887 F.3d at 1362. The CFC correctly concluded that "a comparison between" the "current post-2004

world" and "the 'but for' world before the Corps began to undertake significant actions to return the River to a more natural state in 2004" is "the appropriate comparison" in assessing causation. Appx282.

The government says that this Court's decision in *SBP* requires a different comparison: between the post-2004 world and a world where the government never took *any* action to remake the River. *See* U.S.Br.27-35. But *SBP* disclaims its own application to facts like those here. *See* 887 F.3d at 1367 & n.14. Instead, the rule that governs this case traces to bedrock Supreme Court takings cases like *Miller*, *Sponenbarger*, and *AGFC II*. That rule is set forth in *Hardwicke*, a binding precedential decision that *SBP* discusses: where a risk-decreasing government action precedes a risk-increasing government action, the later action can cause a taking unless the property owner "could have reasonably supposed" that there was a "probability" that the risk-increasing action would occur. 467 F.2d at 490-91.

### 1. Binding Precedent Requires Applying The "*Hardwicke* Rule" Here

The government's reliance on *SBP* is refuted by *SBP* itself, which involved precisely the opposite of the scenario presented here. There, the government first "create[d] a risk of flooding" by constructing and

operating an "MRGO channel," and later mitigated that risk by constructing "LPV levees." *SBP*, 887 F.3d at 1363, 1367; *see id.* at 1358. In that circumstance, this Court held, assessing causation requires "consider[ing] all government actions"—including the ultimate mitigating action—to determine whether the flooding under the combined government actions was worse than the flooding that would have occurred had the government never acted at all. *Id.* at 1364-65.

Here, the government *first* took what *SBP* calls a "risk-reducing" action, and *later* (indeed, a half-century later) took what *SBP* calls a "risk-increasing" action. *SBP*, 887 F.3d at 1367 n.14. As *SBP* states, and the government grudgingly acknowledges (U.S.Br.34), the *SBP* holding does not cover that situation. *SBP*, 887 F.3d at 1367 & n.14.

Instead, the rule that governs this case is found in the binding decision in *Hardwicke*. *See SBP*, 887 F.3d at 1364, 1367 n.14; *South Corp. v. United States*, 690 F.2d 1368, 1369-71 (Fed. Cir. 1982) (U.S. Court of Claims decisions bind this Court). There, plaintiffs' property, located in the Rio Grande River floodplain, was affected by two dams. 467 F.2d at 488-90. The government had planned both dams together and memorialized the entire plan in a 1944 treaty with Mexico. *Id.* at

489. The first dam—called Falcon—was a storage dam put into operation in 1952, and it decreased the flooding experienced by the property. *Id.* at 489, 491. The second dam—called Anzalduas—was a diversion dam put into operation in 1960, and it increased the flooding experienced by the property. *Id.* at 489. Plaintiffs purchased the property in 1961, at which point the second dam was already "completed and in plain sight." *Id.* at 491.

The Court of Claims did not ask whether the property was subject to less flooding after both dams were in operation than the property would have experienced if neither dam had ever been constructed. That opinion would have been a short one, because the property was obviously less flood-prone after both dams were in operation than the property had been before the first dam existed. *See* 467 F.2d at 491.

Instead, the Court explained that, where a risk-decreasing government action precedes a risk-increasing government action, a court should ask whether a property owner "could have reasonably supposed" that there was no "sufficient probability" that the risk-*increasing* action would occur. 467 F.2d at 490-91; *see id.* at 490 (discussing whether both dams were originally "contemplated"). The

*Hardwicke* plaintiffs could not meet that standard: "a buyer of land" in their area "knew or should have known" that "both storage and diversion dams" were being constructed, and "[t]here was no time when plaintiffs or their predecessors in title could have reasonably supposed that land…could benefit from the impoundment of water at [the first dam], yet be free of the disadvantages that might arise from the [second] dam, when built and in use." *Id.* at 490-91. But *Hardwicke* left no doubt that, had the facts been otherwise, the existence of the first dam would have served as the causation-analysis baseline—that is, the court would have compared the level of flooding experienced by plaintiffs as a result of the second (risk-increasing) dam to the level of flooding experienced by the plaintiffs after the first (risk-reducing) dam was already in existence. *See id.*; *see also, e.g.*, *Johnson v. United States*, 479 F.2d 1383, 1392-93 (Ct. Cl. 1973) (applying *Hardwicke*).

Here, the government's risk-increasing action followed its earlier risk-decreasing action. Thus, the CFC was correct—indeed, was bound, as is this Court—to analyze causation under the established *Hardwicke* standard, not to extend the *SBP* standard to a wholly distinct fact pattern. That means that the CFC correctly used the state of affairs in

2003 as the baseline for the causation analysis, once plaintiffs proved that the risk-increasing "paradigm shift" that began in 2004 was not contemplated when the government earlier undertook to engineer the River. Appx23556; Appx53327; *see* Appx19-21.

### 2. The *Hardwicke* Rule Is A Settled Feature Of Takings Doctrine And Avoids Absurd Results

*Hardwicke*'s rule is, moreover, the only approach that makes sense. It is deeply rooted in core principles of takings law. And—unlike the government's preferred approach—it avoids extreme and untenable results.

**a.** *Hardwicke* anchors itself in the law governing the amount of just compensation that a property owner should receive in the event of a taking—known as the "*Miller* rule," after the Supreme Court's decision in *United States v. Miller*, 317 U.S. 369 (1943). This Court recently explained that the *Miller* rule "applies to the question of whether property has been taken in the first place." *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1347 (Fed. Cir. 2018) (citing *Hardwicke*, 467 F.2d at 490-91); *see* U.S.Br.29-30 (accepting that *Miller* bears on causation analysis).

Under the *Miller* rule, an owner whose property has been taken receives just compensation for the value added to the property by a prior government action, so long as there was no probability that the property would be taken as the direct result of that prior action. For example, if the government takes parcels of land to construct a park, just compensation for those parcels does not include the increased value arising from the fact that the government needs all of the parcels to complete the construction. *See Miller*, 317 U.S. at 376-77. But if the government later takes other property near the park—property that was not "probably" going to be taken at the time the park was created—just compensation *does* include any added value resulting from the property's "proximity" to the park. *Id.* That is true even though the government itself "at one time" undertook the action resulting in that added value. *United States v. Fuller*, 409 U.S. 488, 492-93 (1973); *see, e.g.*, *United States v. Reynolds*, 397 U.S. 14, 16-17 (1970).

Like the *Miller* rule, *Hardwicke* recognizes that prior value-enhancing action by the government can reset the baseline against which future takings are measured. And like the *Miller* rule, *Hardwicke* recognizes that it is not "just," U.S. Const. amend. V, to

reflexively treat every past value-enhancing action the government has ever taken with respect to the relevant property as a credit in the government's column. The *Hardwicke* rule dovetails with *Miller* by design. *See Hardwicke*, 467 F.2d at 490-91 (analyzing *Miller*).

In contrast, repurposing *SBP* to apply where a risk-decreasing government action is followed by a risk-increasing government action that was not previously contemplated would clash with *Miller*. *Miller* would look for comparison purposes to the world as it stood *after* the government had taken its risk-decreasing steps—and yet the government's approach here would look to the world as it stood *before* the government took those steps. Often, that approach would conclude that no taking existed at all even though *Miller* would deem the very same events to demand more compensation. Such a takings doctrine verges on incoherence—and would ignore this Court's instruction to treat *Miller* as informing the analysis of whether a taking has occurred.

**b.** The *Hardwicke* rule also aligns with the Supreme Court's analysis in flooding cases where a risk-reducing government action preceded a risk-increasing government action.

For example, in *Danforth v. United States*, 308 U.S. 271 (1939), *cited in* U.S.Br.33, the Supreme Court considered a case in which the government first contributed to the construction of a flood-reducing levee and then later constructed a new, second levee that was flood-increasing. *See* 308 U.S. at 276-87; *Danforth v. United States*, 105 F.2d 318, 319 (8th Cir. 1939) (discussing first levee and explaining that "levees have been constructed under the supervision of the Mississippi River Commission created by the Act of Congress of 1879, and the United States has contributed a share of the necessary expense as an aid in achieving a continuous levee system where needed"). The Court compared the damage caused to the plaintiff's land by the second levee to the damage that would have occurred if only the first levee had been in place—and *not* to the damage that would have occurred if the government had never assisted with the construction of the first levee at all. 308 U.S. at 286-87 (stating that taking would exist if construction of the second levee "put upon this land a burden, actually experienced, of caring for floods greater than it bore prior to the construction" of that second levee).

*Sponenbarger*, on which *Hardwicke* relied, is similar. *See* 308 U.S. at 266. There, beginning in 1883, the United States "undertook to cooperate with, and to coordinate the efforts of the people and authorities of the various river localities in order to effect a continuous line of levees along both banks of the Mississippi." *Id.* at 261. Later, under a 1928 Act, the government undertook a "general bank protection scheme, channel stabilization and river regulation." *Id.* at 262. When a plaintiff complained that her property had been harmed by actions taken under the 1928 Act, the Court did not compare the effects of the 1928 Act on plaintiff's land to what would have happened had the government never taken *any* action on the Mississippi River. Instead, the Court compared the effects of the 1928 Act only to the pre-1928 baseline. *See id.* at 266-67 (discussing effects of "the program" of "the 1928 Act" against the backdrop of the pre-1928 state of affairs); *id.* at 265 (referring to the "program of…the 1928 Act" when asking what would have happened if government had "undertaken no work of any kind"—*i.e.*, no work under that program); *see also Hardwicke*, 467 F.2d at 490 (agreeing with that reading); Appx299-300. Indeed, the government argued in the Supreme Court for exactly that comparison,

contending that "the activity of the United States" since the 1928 Act "has not increased…the flood hazard" that existed before 1928—when the risk-reducing 1800s levees were already in place. *Sponenbarger*, U.S.Br.30-31, 48, 1939 WL 48668.

**c.** *Hardwicke* rests on the same bedrock principle of takings law as *Miller*, *Danforth*, and *Sponenbarger*: consideration of a property owner's reasonable, investment-backed expectations. Even for *temporary* flooding, such "expectations" are critical to "[t]he determination whether a taking has occurred." *AGFC II*, 568 U.S. at 38. By asking what a property owner could have contemplated when the government's initial, risk-reducing action took place, *Hardwicke* looks to the property owner's reasonable expectations about how the property would be treated by the government in the future. *Hardwicke*, 467 F.2d at 490-91.

In contrast, the government's approach ignores the property owner's reasonable expectations altogether, generating untenable results. In the government's view, if any government entity has *ever* taken action that turns land from unusable wetland into property usable for a farm, home, or business, then that entity is free in

perpetuity to render that property unusable once again without liability—no matter how long-settled the property owner's expectations. Astonishingly, the government trumpets this as a virtue, insisting that it can undo *any* federally created reduction in "flooding risk to private property" at *any* time without compensating affected property owners. U.S.Br.31.

The implications of such a limitless government power would be vast and frightening. Large portions of major American cities were once underwater or wetlands and became usable land only because of risk-reducing government actions. *See* William A. Newman & Wilfred E. Holton, *Boston's Back Bay: The Story of America's Greatest Nineteenth-Century Landfill Project* vii-xiii (2006) (Boston); Seth Barron, *Making More Manhattan*, City Journal (Spring 2020) (Manhattan), https://www.city-journal.org/de-blasio-plan-to-expand-lower-manhattan; Kelly O'Mara, *Large Parts of the Bay Area Are Built on Fill. Why and Where?*, KQED (Feb. 6, 2020) (San Francisco Bay Area). If the government's causation argument were correct, then the relevant government entities could re-inundate those lands and compensate no

one, for no one would be worse off than if the government never reclaimed the land in the first place.

Property along the nation's rivers could suffer the same fate. For example, Congress created the Tennessee Valley Authority ("TVA") in 1933 "to control the destructive flood waters in the Tennessee River and Mississippi River Basins." 16 U.S.C. § 831. On the government's view, the TVA could dismantle its engineered reservoir system and freely inundate Chattanooga up to the level of an 1867 flood in which the river crested over 50 feet and flattened the city. *See* TVA, *Saving Chattanooga* ("Without the TVA reservoir system that is in place today, much of Chattanooga would be underwater much of the time."), https://www.tva.com/about-tva/our-history/built-for-the-people/saving-chattanooga; Pam Sohn & Kate Belz, *Underground City Beneath Chattanooga is More Than a Curiosity* (Feb. 19, 2012), https://www.timesfreepress.com/news/news/story/2012/feb/19/city-below-chattanooga-is-more-than-a-curiosity/71104/.

The *Hardwicke* rule avoids those outrageous results. In so doing, it keeps faith with the Fifth Amendment, which is textually focused on justice. *See, e.g.*, *United States v. Virginia Elec. & Power Co.*, 365 U.S.

624, 631 (1961) (noting that "[t]he word 'just' in the Fifth Amendment evokes ideas of 'fairness' and 'equity,'" and refusing to adopt a rule that would "destroy the entire property interest in fast lands without compensation" (citation omitted)); *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478 (1973).

### B. The Government's Contrary Arguments Lack Merit

The government tries to rewrite, attack, and distinguish *Hardwicke*. Those efforts are unavailing—not least because the government cannot battle with *Hardwicke* without also going to war with all the Supreme Court cases discussed above.

**1.** The government offers a garbled account of *Hardwicke*. According to the government, "*Hardwicke* contains no suggestion that" the correct test "depends upon the order in which" the government's risk-decreasing and risk-increasing actions occur. U.S.Br.28. But this Court has already said the opposite: "*Hardwicke* suggested that if the risk-reducing government action preceded the risk-increasing action, the risk-reducing action would only be considered in assessing causation if the risk-increasing action was 'contemplated' at the time of the risk-reducing action." *SBP*, 887 F.3d at 1367 n.14.

The government also misstates *Hardwicke*'s facts, repeatedly suggesting that the "first dam" constructed in that case "increased the risk of flooding," *e.g.*, U.S.Br.28, and the "second dam" benefited the property owners, *e.g.*, U.S.Br.29. But exactly the opposite occurred in *Hardwicke*. Because the first dam decreased flooding and the second dam increased flooding, *Hardwicke* focused on the reasonableness of *reliance* on the protection afforded by the first dam. *Hardwicke* found no such reliance because the dams were constructed close in time and the plaintiffs knew about the plan for the second dam. The facts here could not be more different.

The government compounds its error by giving only a partial account of *Miller*. According to the government, *Miller* says that landowners need not receive compensation "for value which the [government] creates by the establishment of the project for which" the land is taken. U.S.Br.29. But that is only half of what *Miller* stands for, and the *other* half is what applies here: if the government takes property that has had its value enhanced by earlier government action, and that later taking was not contemplated at the time of the earlier action, then the government *does* have to compensate the landowner for

the enhanced value. *See* pp. 35-37, *supra*. That is precisely why *Hardwicke* relied on *Miller* in asking whether at the time the first (risk-reducing) dam went into operation it was contemplated that the later (risk-increasing) dam would go into operation as well.

**2.** The government also asserts that the *Hardwicke* rule is "contrary to the principles underlying" *SBP* and other decisions. U.S.Br.32. But that cannot be correct. As noted, *SBP* expressly declines to apply its holding to a factual scenario like that presented in *Hardwicke* (and this case). *See* pp. 31-32, *supra*. Where the government takes a beneficial action first, there will certainly be circumstances, like those here, in which a property owner can reasonably expect that the government will not later take harmful action.

The other decisions on which the government relies (U.S.Br.33) are no more helpful to its cause. *Danforth* and *Sponenbarger*, discussed above (at pp. 38-40), support the CFC's causation analysis, not the government's. The discussion in *Arkansas Game & Fish Commission v. United States*, 736 F.3d 1364 (Fed. Cir. 2013) ("*AGFC III*"), on which the government relies is dicta, as the government concedes, *see*

U.S.Br.32.n.4; that decision expressly notes that "the parties' choice" of "baseline" period "had no effect on the outcome of this case," 736 F.3d at 1372 n.2. In *Cary v. United States*, 552 F.3d 1373 (Fed. Cir. 2009), this Court relied on the fact that the government had taken risk-decreasing actions *after* risk-increasing actions. *Id.* at 1379 ("each risk-decreasing action in the Forest Service's policies is an *intervening* act breaking whatever causal chain would lead from an accused risk-increasing action to the conflagration") (emphasis added). And *Accardi v. United States*, 599 F.2d 423 (Ct. Cl. 1979), did not involve separate risk-decreasing and risk-increasing government action: it involved one government action (construction of the "Trinity River division") that the Court concluded had decreased flooding on plaintiffs' property. *See id.* at 429-30.

**3.** As a last resort, the government tries to wipe *Hardwicke* off the books. The government asserts that "[f]or any federal project that reduces a flooding risk to private property, an eventual return to the pre-project status quo must be deemed 'contemplated' as that concept was understood in *Hardwicke*." U.S.Br.31-32. If that were correct, then the analysis conducted by the Court in *Hardwicke* would have been

irrelevant. The word "contemplated" means nothing if the federal project and its removal—and everything in between—are all "deemed" to be contemplated. The Takings Clause does not give the government such an indefinite license to "deem" property owners' reasonable expectations out of existence.[4]

### C. Under The Correct Test, The CFC's Factual Findings Establish Causation

The government attacks the CFC's causation ruling only on the legal grounds discussed above. Because that attack lacks merit, the CFC's causation ruling must stand.

In any event, the CFC's factual findings establish that "the changes made to the Corps' River and Mainstem system after the court order requiring the Corps' compliance with [environmental law]

[4] The government also advances a narrower version of that argument, contending that when an initial risk-reducing action and a later risk-increasing action are part of the same "project[]" (in some undefined sense) then the later action should be deemed to have always been contemplated. Because *Hardwicke* stands as an obstacle to that contention, the government claims that case involved "altogether separate projects." U.S.Br.34-35. But *Hardwicke* emphasizes that the two dams at issue in that case were planned together and always intended to operate together. *See* 467 F.2d at 489-91. That is much more like a single project than the risk-reducing action and the risk-increasing action at issue here, which had opposing goals and were separated by long stretches of time.

increased flooding to a degree that would not have been contemplated" previously. Appx282; *see* Appx72-75; *cf. Penn Cent. Transp. Co. v. New York*, 438 U.S. 104, 124 (1978) (in regulatory takings context, reasonable expectation is fact question). As the CFC found, "government publications…demonstrate that the United States expected people to be protected from flooding along the River following the construction of the Mainstem System and BSNP." Appx367-368. Indeed, prior to 2004 the government *induced* farmers to cultivate the land in question with those protections in mind—and plaintiffs here reasonably invested "in reliance on the flood protection provided by the Mainstem System and BSNP." Appx363 (capitalization altered); *see* Appx364-367. Moreover, the government steadfastly refused to lift those protections until, after a battle, a 2004 court order "mandat[ed] that the Corps give priority to threatened and endangered species." Appx282. The government thus had no intention before 2004 to take the "series of very specific actions within the River and in its System releases" that upended the settled expectations of property owners near the River. Appx282; *see* Appx371-372 (MRRP "interfered with the

representative plaintiffs' reasonable investment-backed expectations to be able to farm and invest in their property"); Appx23556, Appx53327.

The government's brief suggests a different view of the facts. *See* U.S.Br.46-50. But the government does not challenge the CFC's findings as clearly erroneous, and no selected bit of evidence to which the government points comes close to establishing clear error. *See, e.g.*, *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1267 (Fed. Cir. 2017).

## II. The CFC Correctly Held That The Relative-Benefits Doctrine Does Not Bar Plaintiffs' Recovery

The government argues that, even if the causation analysis does not require a baseline that looks to the world as it would have been if the government had never taken any action with respect to the River, the relative-benefits doctrine does. That contention is meritless.

**A.** The government's substantive argument is triply flawed. First, the government misconceives the relative-benefits doctrine. That doctrine says that the government does not take property merely because it tries to protect property from flooding but falls short, "despite" the "Government's best efforts." *Sponenbarger*, 308 U.S. at 266. "[T]he Fifth Amendment does not make the Government an

insurer that the evil of floods be stamped out *universally* before the evil can be attacked at all." *Id.* at 266-67 (emphasis added).

That principle is irrelevant here. Plaintiffs do not contend that the government tried but failed in protecting them from floods. The government knew that its post-2004 actions would *harm* property owners by increasing flooding. Where, as here, the government intentionally or foreseeably causes flooding because it prioritizes preserving endangered species (or some other public purpose) over flood control, requiring the government to bear the costs of its decision to make a policy change does not make the government an "insurer" against flooding. *Id.* at 266-67. To the contrary, it honors the principle that the Takings Clause "bar[s] [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Second, the cases on which the government relies do not actually ask about the benefits conferred by all government action that was ever—at any time in history—directed at the risk of flooding on the relevant property. Rather, those cases look at whether particular

government action taken at a particular time provided more help than harm.

*Sponenbarger* exemplifies that more focused analysis. That decision looked only at the benefits conferred by the 1928 flood control program, and not the benefits of earlier government actions. *See* pp. 39-40, *supra*. Contrary to the government's suggestion (U.S.Br.40-42), it is not relevant to the "relative benefits" analysis whether in *Sponenbarger* the plaintiff's land was in a natural floodway, whether certain levees or plugs planned as part of the 1928 program were actually constructed, or whether certain older levees offered protection against an earlier flood. All that matters is the Court's conclusion: no taking occurred because "the program of the 1928 Act," considered alone, provided relative benefits to the plaintiff by "greatly reduc[ing] the flood menace to [her] land." 308 U.S. at 267.

The other decisions on which the government relies are inapposite for the same reason. Appx302-303 (discussing those cases). *Alford* assesses the relative benefits of a single government decision: a "2011 decision to raise the water level of Eagle Lake." *Alford v. United States*, 961 F.3d 1380, 1384 (Fed. Cir. 2020). Because the affected property

benefited more from that decision than it "suffered," this Court had no need to decide whether pre-2011 government actions were relevant. *Id.* at 1384-85; *see Bartz v. United States*, 633 F.2d 571, 572-77 (Ct. Cl. 1980) (considering effects of a single dam, not flood control plan as a whole); *Accardi*, 599 F.2d at 424, 429-30 (assessing benefits of "Trinity River division" operations and not of earlier or additional government action); *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384, 1386 (Ct. Cl. 1976) (rejecting claim that closing of Dam No. 2 caused flooding, noting lack of proof that "Dam No. 2 or any other consequence of the project was the cause of the floods").

Third, the government does not even try to justify using a different baseline for relative benefits than for causation. Indeed, the government never even affirmatively argues that the two baselines should differ—confirming that its "relative benefits" argument is just a retread of its misconceived causation argument. *See Alford*, 961 F.3d at 1383 (causation issue and relative-benefits issue are "closely related").

**B.** The government's procedural objections also lack merit. The government asserts that the CFC "prohibit[ed] the United States from presenting evidence that the relative benefits of the government action

to Plaintiffs exceed its detriments." U.S.Br.37. But that is just another way of arguing for a different substantive baseline, and the CFC correctly rejected it. Evidence addressing the benefits conferred by the Mainstem System and BSNP before the 2004 "paradigm shift" does not aid the government. And the government presented extensive evidence during both trial phases, without restriction, addressing the effect of the government's actions on the River beginning in 2004. *E.g.*, Appx25 n.15; Appx116-129; Appx146-152; Appx329-331; Appx338-351.

Finally, the government asserts that the CFC erred in referring to the law-of-the-case doctrine. U.S.Br.37-39. The CFC's use of that term was imprecise, but its trial management was sound. The CFC explained that "the court has already determined that the 'but for' world for deciding whether the government caused the flooding on plaintiffs' properties is a 'but for' world without the MRRP but with the rest of the Mainstem System and the BSNP in place." Appx297. But the CFC also independently analyzed the issue a second time and decided that the same baseline applied to the relative-benefits issue as to causation. Appx297-298. Accordingly, the reference to the "law of the case" had no effect on the CFC's decisionmaking.

## III. The Government's Arguments As To Other Factors In The Takings Inquiry Lack Merit

The government challenges the CFC's rulings as to three of the factors governing the existence of a taking: (1) the "character of the land," (2) the "owner's 'reasonable investment-backed expectations' regarding the land's use," and (3) the "[s]everity of the interference." *AGFC II,* 568 U.S. at 38-39 (citation omitted). As to all three, the government once again recycles its causation-baseline argument, contending that the CFC erred by not accounting for flooding that occurred in the nineteenth and early twentieth centuries. *See* U.S.Br.45-53. For all of the reasons described above (pp. 30-53, *supra*), however, the CFC identified the correct baseline—and it would be nonsensical to use one baseline in assessing causation and a different baseline in considering whether government-caused flooding interfered with plaintiffs' use of the land. What remains of the government's contentions does not come close to establishing clear error in the CFC's detailed factual findings.

### A. Character Of The Land

The CFC was tasked with determining whether "the increase in flooding was great enough to change the character" of the land by

"interfer[ing] with the [landowner's] ability to use the property in the manner it had been used for many years." *AGFC III*, 736 F.3d at 1371. The CFC found "that the changes implemented by the Corps under the MRRP caused more severe and frequent flooding than the representative plaintiffs have historically experienced," thus seriously interfering with the properties' long-time use as productive farmland and "chang[ing]" the properties' "character." Appx358; *see* Appx359 ("new and ongoing pattern of increased flooding"); App23079, Appx23104-App23105 (plaintiffs' expert testifying that MRRP caused increased flooding in 2007, 2008, 2010, 2013, and 2014); Appx67-77 (CFC crediting testimony). Other than recycling its erroneous baseline argument, the government has no response. *See* U.S.Br.45-46.

### B. Investment-Backed Expectations

The CFC found that plaintiffs "had reasonable investment-backed expectations that the pre-MRRP flooding pattern would continue, and that the Corps' actions under the MRRP interfered with those expectations." Appx362; *see* Appx368-369 (it was "reasonable for the representative plaintiffs to view the post-MRRP flooding as 'unexpected' given the Corps' significant priority change from flood protection to

species protection after 2004"); Appx282 ("[T]he Corps' actions designed to return the Missouri River to a more natural state was outside the contemplation of the Corps."); *cf. Penn Cent.*, 438 U.S. at 124. That finding itself relied on numerous subsidiary findings about the government's decades-long determination to protect farmers by prioritizing flood protection and the plaintiffs' reliance on the government's assurances. *See* pp. 47-49, *supra*.

The government would now disown its assurances, to the point of faulting plaintiffs for being so naïve as to rely on them. But the government does not even attempt to argue that the CFC's findings are clearly erroneous. And for every factual contention that the government advances, *see* U.S.Br.48-49, there is a CFC factual finding, well supported by contrary evidence, that reaches the opposite conclusion. For instance, although the government insists that preservation of wildlife was a priority all along, the CFC found that the 2004 "paradigm shift," Appx23556; Appx53327, elevated environmental concerns and no longer placed flood control in the top-priority position. Appx9, Appx22-24; Appx51868-51869. And although the government notes that Congress enacted environmental statutes in 1973 and 1986,

the CFC found that the government understood that giving greater priority to environmental issues in managing the River would cause "more and different types of flooding," and refused to undertake any of the actions challenged here until a court forced it to do so in 2004. Appx19-21.

### C. Severity

In *AGFC III*, this Court found severity established by findings that flooding was "significantly longer" and "more serious" than it had been at baseline, thus depriving the landholder "of the customary use" of the land. 736 F.3d at 1374-75 (citation omitted). The severity findings here are strikingly similar.

The CFC found, based partly on "uncontroverted testimony from each plaintiff," Appx51, that "flooding on the plaintiffs' representative tracts is far more frequent and damaging than they had experienced before implementation of the MRRP" and "is outside the 'range that [they] could have reasonably expected.'" Appx353 (quoting *AGFC III*, 736 F.3d at 1375); *see* Appx30226 (expert noting that due to MRRP, all three representative plaintiffs should expect substantial flooding at least every two years). The court found that 400 acres of the Adkins

property, including 50 to 60 percent of property inside protective levees, experienced weeks-long flooding in multiple years after 2004. Appx173-177; *see* Appx22368-22374. The court found extensive damage from weeks-long flooding of the Ideker Farms property in multiple years after 2004, including floodwaters up to 13 feet deep that deposited up to five feet of sand on the property. Appx218-224; *see, e.g.*, Appx22974-22977. And the court found flooding in multiple years after 2004 that caused the majority of the Buffalo Hollow Farms property to be inundated for weeks at a time. Appx243-248; *see, e.g.*, Appx22591-22598. Moreover, as "further evidenc[e]" of severity, the court noted the flooding's "considerable effects on the plaintiffs' crop yields." Appx353.

Unable to challenge the CFC's factual findings, the government tries to manufacture legal error. First, the government argues that no taking occurs unless property suffers a diminution in value of at least 50%. U.S.Br.53. That conflates the rules about *regulatory* takings and those about physical invasions (including temporary invasions). *See, e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2074-75 (2021); *see also AGFC II*, 568 U.S. at 32, 38. *Every decision* cited by the government in support of the supposed "50% diminution" rule is a

regulatory takings case—and those decisions simply reflect that "economic impact on the regulated part[y]" is a factor in assessing whether a regulation restricting a property owner's own actions constitutes a taking. *Cienega Gardens v. United States*, 503 F.3d 1266, 1279 (Fed. Cir. 2007). But that factor has no place in a case about a "physical invasion" like floodwater. *AGFC II*, 568 U.S. at 32, 38-40; *see Cedar Point*, 141 S. Ct. at 2074, 2078-79. Thus, for example, *AGFC III* contains no suggestion of the government's 50% rule. *See* 736 F.3d at 1375; *see also Banks v. United States*, 741 F.3d 1268, 1274, 1283 (Fed. Cir. 2014) (allowing takings claim for 30% of property erosion to proceed).

Second, the government argues that plaintiffs could not establish the requisite severity without presenting evidence of the *precise* portion of flooding attributable to the challenged government action. U.S.Br.52-53. The government cites nothing to support that assertion, and it too is absent from *AGFC III.* 736 F.3d at 1375. That the government-caused flooding was "far more frequent and damaging" than "before implementation of the MRRP" establishes severity under *AGFC III.* Appx353. And, more generally, the suggestion that

plaintiffs—whose whole way of life has been upended, Appx352-353—have not experienced anything "severe" is untenable.

## IV. Plaintiffs' Claims Are Timely

**A.** A takings claim before the CFC must be filed "within six years after such claim first accrues." 28 U.S.C. § 2501. An accrual rule known as the "stabilization doctrine" applies where, as here, "the damages from a taking only gradually emerge, e.g., as in recurrent flooding." *Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1290-91 (Fed. Cir. 2006) (citing *Dickinson*, 331 U.S. at 749). In such a case, a takings claim does not accrue "until 'the situation becomes stabilized' and 'the consequences of inundation have so manifested themselves that a final account may be struck.'" *Id.* (quoting *Dickinson*); *see, e.g.*, *Barnes v. United States*, 538 F.2d 865, 873 (Ct. Cl. 1976). The rule ensures that, when the government chooses to "bring about a taking by a continuing process of physical events," a property owner "is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Dickinson*, 331 U.S. at 749; *see Boling v. United States*, 220 F.3d 1365, 1372 (Fed. Cir. 2000).

Stabilization occurs when "all events which fix the [g]overnment's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Nw. La. Fish*, 446 F.3d at 1290 (citation omitted). Determining the stabilization date is highly fact-intensive—"a practical matter and not a technical rule of law," *Dickinson*, 331 U.S. at 749, and "in the nature of a jury verdict," *Barnes*, 538 F.2d at 873.

**B.** The CFC correctly applied the stabilization doctrine to find, as a matter of fact, that stabilization occurred at the end of 2014, Appx381-383—fewer than six years before plaintiffs filed suit. The government challenges the CFC's decision to apply the doctrine at all as well as the court's factual determination about when stabilization occurred. Neither challenge has merit.

**1.** The government asserts that the stabilization doctrine is inapplicable because this is not a case in which "the damages from a taking only gradually emerge, e.g., as in recurrent flooding." *Nw. La. Fish*, 446 F.3d at 1290-91. In the government's view, the recurrent flooding at issue here was "near immediate[]" because it followed on the heels of the Corps' releases of water from "the most downstream dam, Gavins Point, during high river flows." U.S.Br.58-59.

That is incorrect. Nothing about the fact that flooding was precipitated by government water releases distinguishes this case from the many flooding cases in which this Court has applied the stabilization doctrine. There, as here, recurring flooding represented a "continuous physical process[]," *Applegate v. United States*, 25 F.3d 1579, 1582 (Fed. Cir. 1994), the damages from the recurring flooding "only gradually emerge[d]," *Nw. La. Fish*, 446 F.3d at 1290-91, and stabilization occurred only when the nature of the flooding "became clearly apparent by the passage of time," *Barnes*, 538 F.2d at 873; *see also, e.g.*, *Dickinson*, 331 U.S. at 749 ("[t]he source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous"); *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011) (takings claim does not accrue "immediately upon the first inundation of the property because at that point, the frequency and permanency of the flooding were still undeterminable"); *Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir. 1987) (although abnormal intermittent flooding caused trees to begin to die in 1979, "extent of the destruction was not ascertainable until 1984").

Moreover, the factual premise of the government's argument is incorrect, because a gradual process of physical change—akin to erosion—was indeed at work here. The CFC found that the government's actions gradually reshaped the submerged riverbed and riverbanks and led to "more severe or longer flooding than would have occurred had these Changes not been made by the Corps." Appx93. Between 2004 and 2014, the Corps undertook "1,697 dike notching actions, 354 major modification actions, 63 dike lowering actions, 36 dike extension actions, 39 side-channel chute actions, 20 revetment chute actions, 14 backwater actions, and 3 channel widening actions," as well as other similar actions. Appx26-27. Those changes over the course of a decade gradually altered the River channel, which affected how water flowed downriver. And that alteration, *together with* changes in the way the government released water, caused water-surface elevations "to rise higher than they would have risen" otherwise and flood the plaintiffs' properties. Appx93.

**2.** The government also contends that the CFC committed a factual error by finding December 31, 2014, to be the stabilization date. US.Br.57. But there is no clear error; the government simply disagrees

with the CFC's "practical" assessment of when stabilization occurred. *Dickinson*, 331 U.S. at 749.

The CFC's assessment is amply supported. For instance, as the CFC found, certain large-scale Corps projects under the MRRP, which exacerbated the flooding of plaintiffs' properties, began after 2007 and continued into 2014, so that the permanency of the flooding was not clear until the end of that year. Appx378-379, Appx381, Appx24-28; *see* Appx22466; Appx24232; Appx24293. Plaintiffs' expert Dr. Hromadka explained how those projects produced ongoing changes in the River's geomorphology that were in progress in 2014, explaining that at that time the River was "metamorphosing…. And until total equilibrium is reached under this new state,…they're going to continue to have a geomorphologic change." Appx23328-23329; *see* Appx382.

Moreover, as the CFC explained, Corps studies conducted during the relevant period showed that the river bottom changed substantially between 2003 and the end of 2014 in the sections of the River next to the representative plaintiffs' properties. Those bathymetric and water-surface profile studies of the river bottom, which measured "roughness"—a predictor of how high and how fast the River would rise

during flooding—found "increased 'roughness' in the River adjacent to the Adkins and Ideker properties" from 2003 to 2015. Appx378-379; Appx53488. Between 2015 and 2018, there was no meaningful change in roughness. Appx53488-53490.

The CFC also found that it was "reasonable for the representative plaintiffs not to have known the cause of the flooding on their properties" sooner. Appx382; *see, e.g.*, *id.* (noting "complex[ity]" of MRRP-caused "changes to the [R]iver"). Underscoring that finding is the "justifiable uncertainty" created *by the government itself* regarding the cause and nature of plaintiffs' injury. *Banks v. United States*, 314 F.3d 1304, 1310 (Fed. Cir. 2003). Here, the government steadfastly denied throughout the relevant period that the MRRP increased flooding on plaintiffs' land or caused any permanent changes to the River. *See, e.g.*, Appx30361 (Corps official acknowledging that the Corps has never publicly admitted that MRRP changes caused flooding); Appx41567, Appx41595 (2004 and 2009 Corps reports stating that MRRP was not likely to affect flood stages or base flood elevation); Appx41387, Appx41361 (similar Corps studies); Appx41552; Appx117-119; Appx123-126. When the government has denied the true state of

affairs in that way, it would be "erroneous to hold Plaintiffs responsible for knowledge that the Government itself had disclaimed." *Banks*, 741 F.3d at 1282.

**C.** The government insists that the CFC should have chosen 2007—the date of the first "atypical flood[]" at issue, Appx377, Appx384—as the date of stabilization. Because there was no clear error in the CFC's finding that stabilization occurred in 2014, there can be no clear error in the CFC's rejection of a 2007 accrual date. And it is most peculiar for the government to argue that plaintiffs' claims accrued after a single flood in 2007 when the government has consistently urged that "[i]t is clear, pursuant to all precedential authorities, [that] the flooding of private land on one occasion does not constitute a taking." Def's Mot. to Dismiss at 6, *Big Oak Farms, Inc. v. United States*, No. 11-275 (Ct. Cl. Sept. 9, 2011), ECF No. 19. Regardless, the government's argument has numerous additional flaws on the record here.

The government focuses entirely on what plaintiffs knew or anticipated by 2007. *See* U.S.Br.54-57, 61-62. But that is only half of the inquiry. Stabilization also requires that "all events which fix the [g]overnment's alleged liability have occurred," *Nw. La. Fish*, 446 F.3d

at 1290 (emphasis added, citation omitted), and the CFC found that the events that fixed the government's liability were still ongoing in 2007, *see* pp. 63-65, *supra*.

Even as to plaintiffs' knowledge, however, the government is wrong. The government purports to see inconsistency between the CFC's ruling that the MRRP-caused flooding in 2007 was foreseeable and the CFC's ruling that the taking had not stabilized by that date. *See* U.S.Br.53-56, 57-59. Not so. The CFC's foreseeability determination is about whether the *government* could have foreseen that its actions would lead to increased *flooding*. Appx47-48; *see AGFC III*, 736 F.3d at 1372-73; *Ridge Line*, 346 F.3d at 1356 (foreseeability requirement met where damage was "within the contemplation of or reasonably to be anticipated by the government" (citation omitted)). The accrual inquiry, in contrast, asks whether "the *plaintiff* was or should have been aware" that the taking had *stabilized*. *Nw. La. Fish*, 446 F.3d at 1290 (emphasis added, citation omitted). That flooding was foreseeable to the government does not establish plaintiffs' level of awareness of eventual stabilization.

In addition, when it comes to plaintiffs' awareness, the government presents a one-sided view of the evidence. The CFC found that, although plaintiffs began to see changes to flood patterns in the years leading up to 2014, they were unaware until 2014 of the extent of the changes or that the MRRP was the cause of that flooding. Appx379-380, Appx382; *see* Appx30021-30022, Appx30036, App30057-30066 (plaintiffs' testimony). Because the River occasionally flooded before 2007 for reasons unrelated to government action, the mere fact of *a single flood year* in 2007 was not a clear sign that the government's actions caused the River to change. *See Banks II*, 741 F.3d at 1281-82 (unreasonable to expect property owner to know the difference between natural and government-caused erosion). The CFC thus "reject[ed] the government's contention that the evidence demonstrates that the representative plaintiffs should have known of the cause of the increased flooding in 2007." Appx380. Indeed, given the justifiable uncertainty created by the government itself long past 2007, it would have been erroneous for the CFC to rule that stabilization occurred in that year. *See* pp. 65-66, *supra*.

**D.** Finally, the government contends that as "a consequence of holding that the date of taking occurred on December 31, 2014, property losses incurred before that date should have been treated merely as torts." U.S.Br.60-62. That contention is contrary to *AGFC III*. As the government notes, the Court of Claims concluded in *Barnes* that repeated flooding prior to the taking date represented distinct "tortious invasions." 538 F.2d at 873-74. But in *AGCF III*, this Court discarded the *Barnes* approach, holding that single-purpose recurring flooding like that at issue here constitutes one flood that occurred over several years, not a series of separate trespassing floods followed by a final flood. *See AGFC III*, 736 F.3d at 1370. The government's actions here constituted one multi-year taking of a permanent flowage easement. Accordingly, the government is responsible *both* for the decreased value of the land resulting from the flowage easement *and* for the property damage caused during the years when its taking was stabilizing. *See* pp. 69-79*, infra*.

## V. The CFC's Award Erroneously Omitted Compensation For Damages Suffered While The Taking Was Stabilizing

The CFC found that, from 2007 to 2014, the government repeatedly flooded plaintiffs' farmlands to pursue its plan to revert the

River to its natural state. That recurring flooding "appropriate[d] a benefit to the government" at plaintiffs' expense and "preempt[ed] the [plaintiffs'] right to enjoy [their] property for an extended period." *Ridge Line*, 346 F.3d at 1356. In particular, in flood years, the government's program prevented plaintiffs from fully using their property for growing crops. The government thus took a flowage easement that led to floods that began in 2007 and stabilized in 2014.

The CFC recognized that just compensation was due for that flowage easement, which the government will hold permanently. But the CFC erred in measuring just compensation. Although the CFC awarded damages measured by the diminution in value of plaintiffs' land encumbered by the stabilized flowage easement *as of the end of 2014*, the CFC did not compensate plaintiffs for damages their land suffered during the time it took the taking to stabilize. The CFC's award of diminished property value compensates plaintiffs for the land's *prospective* reduced agricultural productivity—but no more than that. And the CFC's refusal to compensate plaintiffs for the *past* period, when the taking was stabilizing, was legal error under the settled principle that "just compensation includes a recovery for all damages,

past, present and prospective." *Ridge Line*, 346 F.3d at 1359 (citation omitted). The requisite compensation is easily measurable: the government's choice to use plaintiffs' land for its own environmental purposes rather than plaintiffs' agricultural purposes destroyed or damaged plaintiffs' crops in flood years. The case should be remanded for the CFC to determine the amount due.

### A. Crops Are An Integral Part of the Farmland And Were Directly And Foreseeably Damaged

**1.** Plaintiffs' method for measuring compensation follows from the nature of the flowage easement the government took. The CFC correctly found that, as part of the MRRP, the government caused flooding to plaintiffs' farmlands in 2007, 2008, 2010, 2013, and 2014. Appx309-310. The CFC recognized that those events constituted *one* taking of a flowage easement over each plaintiff's land, for the single purpose of implementing the MRRP. Appx383-384. As the CFC explained, "[t]he atypical flooding caused by the MRRP began in 2007, as part of a series of floods caused by the Corps' actions under the MRRP that is continuing today. Under [*AGFC III*], the court treats this series of intermittent floods collectively in…evaluating just compensation." Appx384.

Once the taking stabilized at the end of 2014, Appx377-386, it was reasonable to identify the diminution in value of plaintiffs' properties, which plaintiffs established by showing that the market value of flooded properties on the River's mainstem lagged behind the value of properties on a River tributary unaffected by the MRRP. Appx393-397; Appx30265-30271. But that computation measures only how the government's flowage easement reduces the *future* value of the plaintiffs' properties; market value reflects what someone will pay to own a property *prospectively*, not the harms that property suffered in the past. Accordingly, plaintiffs also sought compensation for *past* damages caused by the government's exercise of its flowage easement while the taking was stabilizing. Some of those damages reflected damages to physical structures. Appx409-410 (2010 levee repair). But the principal measure plaintiffs proposed—which the CFC rejected—was the value of crops destroyed by floods during the stabilization.

Crop losses are a natural measure of past damages. As the CFC found, "the increased flooding attributable to the MRRP caused the representative plaintiffs to lose crops that they would not have otherwise lost absent the incremental effects of the MRRP." Appx354.

The flooding was foreseeable, Appx355-356, making it equally foreseeable that the MRRP changes would damage or destroy plaintiffs' crops. Moreover, confining crop-loss claims to the period of stabilization avoided any over-recovery (plaintiffs did not seek crop losses for the period before 2007) as well as any double-recovery (crop losses *prior* to 2014 measure a distinct harm from diminished *future* value of land as of 2014).

**2.** This Court's decisions in *AGFC* and *Ridge Line* make clear that separate compensation should be paid for past and future damages caused by a single taking.

The flowage easement in *AGFC* existed for a finite period (in contrast to the perpetual flowage easement here). But even that seven-year easement, *see AGFC III*, 736 F.3d at 1370, led to compensation in two parts: the value of already lost timber *plus* the value of timber that would be lost after the flowage easement terminated (as some trees slowly died). *See AGFC*, 87 Fed. Cl. 594, 636, 638-40 (2009), *aff'd*, 736 F.3d 1364.

*Ridge Line* expressly states that both past and future damages must be compensated. There, the government had potentially taken a

flowage easement by increasing stormwater drainage onto the plaintiff's land—a gradual process that completed in 1993. This Court held that "just compensation includes a recovery for all damages, past, present and prospective," and that "the damages analysis" therefore "is not to be limited to 1993, the time of the alleged taking." *Ridge Line*, 346 F.3d at 1359 (citation omitted). Under those principles, the CFC's award is obviously missing a piece.

**3.** Finally, the stabilization doctrine itself (*see* pp. 60-61, *supra*) makes little sense unless compensation is awarded for damages suffered *during* the stabilization period. The Supreme Court's decision in *Dickinson* reasons that accrual should be delayed until a taking stabilizes, lest the government be rewarded for effectuating an uncompensated taking incrementally over time instead of instituting a condemnation action up front. *See* 331 U.S. at 747-49; *see also* p. 60, *supra*.

*Dickinson*'s sensible approach would be undone if the government could escape paying compensation for the period before a taking stabilizes. If that were right, then the government would have every reason to avoid bringing condemnation actions up front and then to

drag out the stabilization process. Property owners would predictably respond by rushing to bring "piecemeal" or "premature litigation" to receive compensation. *Dickinson*, 331 U.S. at 749. Refusing compensation for past damages thus would generate precisely the bad incentives that the Supreme Court intended the stabilization doctrine to prevent.

### B. The CFC Offered No Sound Reason For Refusing Compensation During The Period Before Stabilization

Significantly, the CFC did not hold that compensation was categorically unavailable for past damages while the government's taking was stabilizing. Rather, the CFC said that crop losses are consequential damages. Appx406-409; *see* U.S.Br.62. The CFC also implied that awarding damages for crop losses would be an impermissible windfall, Appx408, or unsupported by evidence, Appx409 n.30. None of those points is correct.

**1.** The CFC offered no substantive analysis for its erroneous conclusion that plaintiffs' crop losses are consequential damages. Appx407-408.

Consequential damages are those that are incidental to a taking—typically, "loss of profits, damage to good will, [and] the expense of

relocation." *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78 (1946). That does not describe destroyed crops. As discussed above, plaintiffs' property is *farmland*. The crops are the defining feature of the land itself. And the connection between the government's taking of a flowage easement and the destruction of those crops was not indirect at all—to the contrary, the government's use of the land for the MRRP's purposes directly conflicted with the crops' growth, to the point of destroying or materially damaging them.

*AGFC* is again instructive. There, the government argued in its Supreme Court brief that harms to trees on the plaintiff's forestland "reflected only consequential damage," asserting that "petitioner's true quarrel with the Corps' operational decisions is not that they substantially affected some intrinsic attribute of the land itself…but rather that they harmed petitioner's trees." U.S.Br.52-53, *AGFC II*, 2012 WL 3680423 (U.S. Aug. 27, 2012). The Supreme Court implicitly rejected that argument—not even mentioning it in the opinion—and on remand this Court affirmed the CFC's award of compensation, which included the value of lost timber. *AGFC III*, 736 F.3d at 1378. The

crops here are as integral to the property at issue as the timber was to the land in *AGFC*.

*Dickinson* underscores that conclusion. The trial court there had awarded compensation not only for the land inundated by a government-built dam but also for erosion of trees and soil on neighboring property. *See Dickinson* S.Ct.Transcript.of.Record.39, 42. The Fourth Circuit rejected the government's argument that the erosion was mere "consequential damages." *United States v. Dickinson*, 152 F.2d 865, 868-69 (4th Cir. 1946), *aff'd*, 331 U.S. 745 (1947). In affirming, the Supreme Court explained that "for all that the Government takes it must pay. When it takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away …. If the Government cannot take the acreage it wants without also washing away more, that more becomes part of the taking." *Dickinson*, 331 U.S. at 750. That logic applies with *greater* force here: if the government must pay compensation for erosion and tree destruction on land that *adjoins* the property it has flooded, then surely it must pay compensation for similar losses associated with property that *is actually flooded*.

**2.** The CFC's suggestion that measuring compensation by crop losses would give plaintiffs a windfall is baseless. Appx408. Crop losses and diminution in value measure compensation for two different time periods. Diminution in value reflects the decreased *future* agricultural productivity of plaintiffs' lands *after* 2014 due to the flowage easement—the equivalent of the government "buying" a flowage easement at the end of 2014. Plaintiffs offered crop losses as the measure of compensation for *prior* years (2007 to 2014) during which the taking was undisputedly occurring.

**3.** Finally, the CFC suggested—in a footnote—that plaintiffs cannot recover for crop losses because they failed to apportion such losses based on the "increment of flooding" caused by the government. Appx409 n.30. That is not a sufficient alternative basis to affirm the denial of compensation. Plaintiffs maintained, and their experts testified, that *all* of the flooding (in flood years aside from 2011) was caused by the government's MRRP program. Appx23065, Appx23255.

Even if apportionment evidence were required, the record contained the *government*'s evidence of the relevant apportionment. Appx409 n.30; Appx30596-30597. At the least, then, the CFC should

have apportioned plaintiffs' crop losses based on those figures. Although those damages would be modest, they are not zero. Moreover, this Court's decision not only affects the plaintiffs whose claims are at issue in this appeal but also will serve as a necessary guide for the pending crop-loss claims of the remaining plaintiffs.

## VI. The CFC's Rejection Of Plaintiffs' 2011 Flooding Claims Should Be Vacated

The CFC correctly recognized that the actions taken by the government to deprioritize flood control directly and foreseeably caused severe flooding in 2007, 2008, 2010, 2013, and 2014, reflecting the taking of a flowage easement in plaintiffs' properties. Yet the CFC rejected plaintiffs' claims with respect to the severe flooding in 2011. That was error, because the 2011 flooding traced to the same package of changes that was responsible for flooding in other years.

### A. The 2011 Flooding Was Part Of The Flowage Easement Taken By The Government Because The MRRP Directly And Foreseeably Led To That Severe Flooding

A plaintiff seeking to establish that the government has taken a flowage easement must demonstrate causation, foreseeability, and severity. The takings analysis also involves assessing the duration of the flooding, character of the land, and whether the plaintiff had

reasonable, investment-backed expectations regarding the land's use. *See AGFC II*, 568 U.S. at 38-40.

The extraordinary level of flooding in 2011 qualifies under that standard because it arose from one of the System Changes that began in 2004: a switch from mandatory releases of water from upstream reservoirs to merely advisory guidance on releases. Appx23093-23095. That decision led directly to a significantly increased risk of flooding: without the mandatory releases, reservoirs would fill, reducing the system's capacity to absorb rainfall and snowmelt. By putting the system in that precarious state, the government created a new and obvious risk that the system would quickly reach capacity in wet years, forcing massive water releases and, in turn, catastrophic flooding. That is exactly what occurred in 2011. Appx32.

**1.** As discussed above, in its 1979 Master Manual, "the Corps expressly provided that flood control was its first priority and that fish and wildlife were the last priority." Appx9. Beginning in 2004, however, the government changed course and began to implement the MRRP. Appx15.

The post-2004 System Changes were reflected in a revised 2004 Master Manual and a subsequent 2006 revision of that Manual. Appx23-24. Three major System Changes are relevant here: the Corps (1) "deprioritized flood control"; (2) "replaced Plate 44 in the 1979 Master Manual with Plate VI-1 in the new Master Manual, which meant that release minimums were replaced by advisory guidance"; and (3) "increased the frequency of T&E releases." Appx60 n.32 (citations omitted).

The only thing that distinguishes 2011 from the other flooding years is that the causal link to the MRRP in 2011 differed from the causal link in other years. For the years in which the CFC awarded relief, the change that created the flooding was the change in approach to T&E releases. Appx77. For 2011, the elimination of mandatory-minimum releases in the new Manual proved to be the key change. But both mechanisms were part of the System Changes that the government implemented to reconnect the River to the floodplain. And just as the predictable and actual effect of T&E releases was severe flooding, the predictable and actual effect of the government's 2004

decision to change the prior system of mandatory-minimum releases was severe flooding in wet years like 2011.

**2.** A closer examination of what happened in 2011 proves the point. Under the pre-2004 system of mandatory-minimum releases, the government would have released the required amounts from reservoirs early in the year, leaving ample capacity to absorb increased water flows into the reservoirs later. Appx23092-23093. Switching to advisory guidance on releases increases the risk that, in a high-runoff or high-rainfall year, the System as a whole will be inundated and massive releases of catastrophic floodwaters will be necessary in a concentrated period of time. That is particularly so because the Corps had to give fish and wildlife an elevated priority under the new Manual, and higher early releases would have benefited flood control *at the expense* of environmental (and other) priorities. Appx23095; *see* Appx23092. Thus, the switch to advisory guidance meant that the Corps did not implement the preventative early releases it would have made under the pre-2004 system. Appx23095.

Notably, the clear risk that the System would be inundated was foreseeable *in 2004*, when the government decided to replace mandatory

releases with advisory guidance. Plaintiffs' argument does not hinge on ad hoc decisions made during any single wet year, because the whole point of the 2004 changes was to establish an advance protocol. The relevant question is whether the decision to adopt that protocol in the new Manual increased flooding risk once a wet year inevitably arrived.

As Dr. Christiansen's expert testimony shows, 2011 was the inevitable year in which the 2004 choices came home to roost—and so the switch to a different Plate for system releases was the but-for cause of significantly increased 2011 flooding. Dr. Christensen's model of the but-for world applied Plate 44's mandatory-minimum releases (*i.e.*, what would have been in place but for the System Changes) to the events of 2011, while avoiding hindsight by keeping the "same forecasts and the same storage levels that the Corps [had]" in 2011. Appx23103; *see* Appx23102-23103. He concluded that the System Changes significantly contributed to the unprecedented and catastrophic level of the 2011 flooding. Appx23092, Appx23096. Dr. Christensen also looked to the releases in 1997 to confirm the accuracy of his model and to illustrate how a pre-2004 year with high water inflows did not lead to

downstream flooding (although his model did not depend on 1997 being identical to 2011). Appx23102-23103.

Finally, nobody doubts the severity of 2011 flooding. Appx31-32 ("record" water levels). And the other factors that the CFC found established a taking in other flooding years, such as reasonable, investment-backed expectations, are equally applicable here. Appx351-372. In sum, the 2011 flooding was just another exercise of the flowage easement the government took as it implemented the MRRP.

### B. The CFC's Reasons For Rejecting Plaintiffs' 2011 Flooding Claims Are Erroneous

Broadly speaking, the CFC rejected the takings claims for 2011 because 2011 was a wet year—which it was. But the relevant question is whether the MRRP's departure from prioritizing flood control caused 2011 flooding to be significantly more severe than it would have been otherwise. Because the CFC erred in analyzing the 2011 flooding claims, this Court should vacate and remand that aspect of the case.

**1.** The "foremost" basis on which the CFC rejected plaintiffs' 2011 flooding claims was that "the plaintiffs have not established how the Corps' System releases in 2011 can be considered part of the 'single purpose' it has relied upon to establish causation for the other flood

years. The Corps' System releases in 2011 had nothing to do with ESA compliance." Appx80.

The CFC's premise is wrong. *All* the Corps' efforts to revert the Missouri River to its natural state were related to protecting endangered species; it was ESA litigation, and the resulting court order, that prompted the Corps' System and River Changes in the first place. Indeed, plaintiffs' central theory—which the CFC accepted for all other years—was that the government made a set of System and River Changes as part of its effort to revert the River, and those changes foreseeably caused flooding on plaintiffs' farmlands. That the 2011 flooding was caused by a different System Change *mechanism* than the mechanism at play in other years hardly refutes the conclusion that the 2011 flooding was part of the same single purpose. Accordingly, it was legal error for the CFC to demand some other proof of connection between 2011 flooding and ESA compliance.

**2.** The CFC suggested that plaintiffs' challenge was to the Corps' failures to make early water releases in 2011 and that such a challenge sounded in tort or addressed government inaction rather than action. *E.g.*, Appx85, Appx265. That is incorrect. Plaintiffs' claim is *not* about

the Corps' precise actions in 2011; it is about the government's 2004 decision to implement the MRRP, including a release plan that would predictably lead to what happened in 2011. *See* pp. 80-84, *supra*. Plaintiffs do not argue that the Corps mismanaged the System reservoirs under the new Manual in 2011, or that the government violated some duty of care by failing to make releases earlier in 2011. Quite the contrary: the government is entitled to act to prioritize fish and wildlife. But when doing so causes recurring flooding, as here, the government must provide just compensation.

For similar reasons, the CFC erred in stating that the "2011 flood does not meet the criteria for the *Hardwicke*" rule because it was always contemplated that the Corps would make "extreme releases" if the System reservoirs were at capacity. Appx278 n.5. Nobody doubts that extreme releases are required when the system is extremely full of water. But the relevant question is *why* the system was extremely full of water in 2011. A straight line runs from conditions in 2011 back to the government's 2004 decision to implement the MRRP and the concomitant plate changes and priority changes, which left far less system capacity to handle wet years when they came.

**3.** The CFC also misunderstood plaintiffs' expert's testimony about causation—and, in doing so, clearly erred.

The relevant causation inquiry is whether the System Changes caused more flooding in 2011 than would have occurred without the MRRP. As noted above, Dr. Christensen prepared a but-for model comparing the 2011 flooding under the new Manual with the flooding that would have occurred in 2011 if the 1979 Manual had been in effect. The CFC nonetheless concluded that the 2011 flood does not "meet[] the causation and foreseeability tests" on the ground that Dr. Christensen's model "depended upon finding that upper Basin runoff in 2011 was virtually the same as 1997." Appx81-83. And because the CFC noted two differences in inflows in those years, it rejected that model. Appx82-83.

That finding was clearly erroneous because the comparison between 1997 and 2011 was not the basis for Dr. Christensen's model. Rather, as noted above, Dr. Christensen applied Plate 44's mandatory-minimum releases (*i.e.*, the rules that would have governed but for the System Changes) to the 2011 flood—even when those releases were *less* than what the Corps released in 1997, Appx23102-23103—while

keeping the "same forecasts and the same storage levels that the Corps [had]." Appx23103. He offered a comparison to conditions in 1997 only to illustrate that record runoffs do not necessarily lead to flooding. The CFC should not have rejected his conclusions—key evidence supporting plaintiffs' but-for causation theory.

**4.** Finally, although the CFC nominally rejected plaintiffs' foreseeability arguments, its principal basis for doing so was its conclusion that plaintiffs had failed to establish causation as to 2011. Appx83-84; Appx278 n.5. Accordingly, the CFC's treatment of foreseeability in 2011 is flawed for the same reasons that its causation reasoning is flawed.

To the extent the CFC's evaluation of what the Corps knew in March and April 2011 supplies an independent basis for the CFC's foreseeability determination, Appx83-84, the CFC's analysis is legally erroneous. To evaluate foreseeability, this Court has asked whether it was predictable to the government that injury would result, not about whether particular government officials subjectively *believed* that injury would result. *See, e.g.*, *Ridge Line*, 346 F.3d at 1356; *Cotton Land Co. v. United States*, 75 F. Supp. 232, 233-34 (Ct. Cl. 1948). Accordingly, it is

legally irrelevant whether the Corps predicted the exact circumstances of the 2011 flooding or whether the Corps' 2011 decisions were in the moment aimed at "sav[ing] the mainstem system." Appx84-85. Rather, the question is what harm to downstream property would predictably follow from the changes starting in 2004 that reduced system capacity to absorb inflows in wet years. Because the CFC failed to grapple with that question, this Court should vacate the CFC's analysis as to 2011 and remand the issue.[5]

## Conclusion

The CFC's judgment concluding that the government took a flowage easement over plaintiffs' properties and awarding compensation for that taking should be affirmed. The CFC's exclusion of crop losses from the measure of just compensation, and its rejection of plaintiffs' 2011 flooding claims, should be vacated and remanded.

[5] The CFC found that lack of evidence precluded it from finding that River Changes were a foreseeable cause of 2011 flooding on the bellwether plaintiffs' property, Appx129, and the three representative plaintiffs do not appeal that determination. But if this Court were to affirm the CFC's ruling on 2011 flooding, the Court should make clear that plaintiffs whose claims are being tried in the CFC are not foreclosed from offering their own evidence that River Changes were a foreseeable cause of their 2011 flooding.

Respectfully submitted.

Dated: December 16, 2021

/s/ *Donald B. Verrilli, Jr.*
DONALD B. VERRILLI, JR.
ELAINE GOLDENBERG
JONATHAN S. MELTZER
DAHLIA MIGNOUNA
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

BENJAMIN J. HORWICH
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street
27th Floor
San Francisco, CA 94105

SETH C. WRIGHT
**POLSINELLI, PC**
900 W 48th Place
Suite 900
Kansas City, MO 64112

*Counsel for Plaintiffs–Appellees-Cross-Appellants*

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b), because it contains 16,475 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface in 14-point font.

Dated: December 16, 2021

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

**Certificate of Service**

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on December 16, 2021.

I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.