Nos. 21-1849, 21-1875

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, dba Robert Adkins & Sons Partnership,
GERALD SCHNEIDER, dba Buffalo Hollow Farms, Inc.,
*Plaintiffs–Cross-Appellants,*

LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, dba Midwest Grain Co., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, individually and, dba Drewes Farms, Inc., PATRICK NEWLON, dba Newlon Farms, Inc., DAVID NEWLON, dba D Double N Farms, Inc., JASON TAYLOR, BRAD TAYLOR, dba H.B.J. Farms, Inc., LYLE HODDE, dba Hodde & Sons Limited Partnership, STEVE CUNNINGHAM, Trustee of the Doris J. Cunningham and Steven K. Cunningham Declaration of Trust, GAIL CUNNINGHAM, dba Cunningham Farms, Inc., CHARLES GARST, individually and, dba Garst Farms, Inc., CONNIE GARST, dba Garst Farms, Inc., RON SCHNEIDER, MARY SCHNEIDER, et al.,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant–Appellant.*

---

Appeals from the United States Court of Federal Claims in
No. 1:14-cv-00183-NBF (Hon. Nancy B. Firestone)

---

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* SUPPORTING PLAINTIFFS–CROSS-APPELLANTS AND AFFIRMANCE ON CAUSATION ISSUES**

(Counsel information on next page)

Benjamin H. Moss
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
Telephone: (713) 758-2069
benmoss@velaw.com

Jeremy C. Marwell
*Principal Attorney of Record*
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6507
jmarwell@velaw.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTEREST

Counsel for *amicus curiae* certifies the following:

1. Full name of party represented by me:

   Chamber of Commerce of the United States of America

2. Name of real party in interest represented by me:

   Not applicable.

3. Parent corporations and publicly held companies that own 10% or more of stock in the party:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case):

   None.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   a) *Nolan v. United States,* No. 1:21-cv-00122 (Fed. Cl.)

   b) *Milne v. United States*, No. 1:20-cv-02079 (Fed. Cl.)

   c) *Ideker v. United States*, No. 1:14-cv-00183 (Fed. Cl.)

The undersigned counsel certify that the information in this Certificate of Interest is accurate and complete to the best of their knowledge.

Benjamin H. Moss
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
Telephone: (713) 758-2069
benmoss@velaw.com

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
*Principal Attorney of Record*
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6507
jmarwell@velaw.com

*Counsel for* Amicus Curiae

Dated: December 23, 2021

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........ i
TABLE OF AUTHORITIES ........ iv
STATEMENT OF INTEREST ........ 1
INTRODUCTION AND SUMMARY OF ARGUMENT ........ 3
ARGUMENT ........ 5
I. The Government's Position Would Expose Landowners in Many Regions to Uncompensated Takings and Would Conflict with Long-Established Condemnation Principles. ........ 5
A. The government's rule would exclude large portions of the country, including portions of several major urban areas, from protection under the Takings Clause. ........ 6
B. The government's position conflicts with long-established condemnation principles. ........ 11
1. The government's position undermines the Supreme Court's *Miller* decision and its progeny. ........ 11
2. The government's position is inconsistent with *Hardwicke*'s application of *Miller* to flood-control measures. ........ 15
3. The government's position violates the settled principle that just compensation must be assessed at the time of the taking. ........ 17
II. The Government's Rule Would Deter a Broad Range of Private Investment, Undermining Both the Investment-Backed Expectations of Property Owners and the Government's Own Interests. ........ 19
III. The Government's Proposed Rule Is Unadministrable, in Contrast to the Clear, Workable Causation Standard Applied Below. ........ 23
CONCLUSION ........ 27
CERTIFICATE OF SERVICE ........ 1
CERTIFICATE OF COMPLIANCE ........ 2

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*815 Assocs., Inc. v. State*,
271 A.D.2d 398, 705 N.Y.S.2d 630 (2d Dep't 2000)........................................13

*Arkansas v. Tennessee*,
310 U.S. 563 (1940)..........................................................................................24

*Berman v. Parker*,
348 U.S. 26 (1954)............................................................................................22

*City of Kenai v. Burnett*,
860 P.2d 1233 (Alaska 1993) ...........................................................................12

*Danforth v. United States*,
308 U.S. 271 (1939)..........................................................................................18

*ETSI Pipeline Project v. Missouri*,
484 U.S. 495 (1988)..........................................................................................20

*First Eng. Evangelical Lutheran Church v. Cty. of Los Angeles*,
482 U.S. 304 (1987)............................................................................ 17, 18, 19

*Horne v. Dep't of Agriculture*,
576 U.S. 350 (2015)..........................................................................................23

*John B. Hardwicke Co. v. United States*,
467 F.2d 488 (Ct. Cl. 1972)............................................................... 15, 16, 17

*Kelo v. City of New London*,
545 U.S. 469 (2005)..........................................................................................22

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)............................................................................................3

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)............................................................................................20

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)..........................................................................................21

**Cases—Continued:** **Page(s)**

*St. Bernard Parish Gov't v. United States*,
887 F.3d 1354 (Fed. Cir. 2018) .......................................... 5, 14, 15, 26

*United States v. 13.20 Acres of Land, More or Less, in Lincoln Cty.*,
629 F. Supp. 242 (E.D. Wash. 1986)..................................................12

*United States v. 320.0 Acres of Land, More or Less in Monroe Cty.*,
605 F.2d 762 (5th Cir. 1979) .................................................... 12, 14

*United States v. 49.01 Acres of Land, More or Less, Situate in Osage Cty.*,
669 F.2d 1364 (10th Cir. 1982) ..........................................................22

*United States v. Eastman*,
714 F.2d 76 (9th Cir. 1983) ..............................................................14

*United States v. Eastman*,
528 F. Supp. 1177 (D. Or. 1981) .......................................................12

*United States v. Fuller*,
409 U.S. 488 (1973)........................................................................ 10, 21

*United States v. Miller*,
317 U.S. 369 (1943)....................................................................... *passim*

*United States v. Reynolds*,
397 U.S. 14 (1970)................................................................... 13, 14, 16

*United States v. Sponenbarger*,
308 U.S. 256 (1939)..............................................................................5

**Statutes**

River and Harbor Act of 1948, Pub. L. No. 80-858 62 Stat. 1171 ..........................10

**Other Authorities**

26 Am. Jur. 2d *Eminent Domain* § 229 (2021)..................................................25

26 Am. Jur. 2d *Eminent Domain* § 233 (2021)..................................................18

**Other Authorities—Continued:** **Page(s)**

Richard Campanella, *How Humans Sank New Orleans*, THE ATLANTIC (FEB. 6, 2018), *available at* bit.ly/3DVIEva ....................6

*Everglades-History*, FLA. FISH & WILDLIFE COMM'N, *available at* bit.ly/evergladeshistory ....................9, 10

Betsy Mason, *How Boston Made Itself Bigger*, NAT'L GEOGRAPHIC (June 13, 2017), *available at* on.natgeo.com/3E1ufxu ....................7

Susan Rose-Ackerman, *Against Ad Hocery: A Comment on Michelman*, 88 Colum. L. Rev. 1697 (1988) .................... 21, 23

NANCY S. SEASHOLES, GAINING GROUND: A HISTORY OF LANDMAKING IN BOSTON (1st. ed. 2018) ....................7, 24

TED STEINBERG, GOTHAM UNBOUND: THE ECOLOGICAL HISTORY OF GREATER NEW YORK (1st ed. 2014) ....................9

Patrick Wiseman, *When the End Justifies the Means: Understanding Takings Jurisprudence in a Legal System with Integrity*, 63 S. John's L. Rev. 433 (1988) ....................21

## STATEMENT OF INTEREST

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.[1] It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber is particularly interested in defending constitutional protections for private property rights and promoting the stability, fairness, and predictability of the legal regime governing private property in the United States. In this case, the property rights of businesses across the country, including many Chamber members, would be imperiled if this Court were to adopt the government's position concerning the causation element of a Fifth Amendment takings claim. If the government's litigating position were accepted, no government, including state and local governments, could ever cause a Fifth Amendment "taking" if other actions taken

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

by that government, years or even decades earlier, had increased the value of the property in question enough to offset any subsequent devaluation caused by the later action. That would be so even if the later action was never contemplated at the time the earlier benefits were conferred.

The Chamber has a substantial interest in, and can offer a unique perspective on, that central issue in this case. American businesses routinely make investments and other business decisions in reasonable reliance on the protections that the Takings Clause provides against government expropriation of private property, even where the property in question benefitted from historical government-conferred improvements. It does not risk overstatement to observe that much of modern U.S. economic activity depends on the private property protections assured by the Takings Clause. The Chamber seeks to participate as amicus in this case to help explain why the rule advocated by the government in this Court, in addition to being unlawful and inconsistent with fundamental Takings Clause doctrines, would sharply undermine the predictability and stability of private property protections nationwide, with negative effects on investment and economic development.

By contrast, the approach to a Takings Clause causation inquiry adopted by the Court of Federal Claims below, and defended by landowners in this Court, provides a doctrinally and practically sound "baseline" for a takings claim that respects reasonable investment-backed expectations and ensures that Takings

Clause doctrine appropriately provides meaningful protection against government expropriation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The crux of the government's position is that governments at all levels, including federal, state, and local governments, can avoid paying compensation for taking real property rights if, decades earlier, they took action increasing the value of the property in question—even where the later taking was not contemplated at the time of the original improvements. If accepted, that radical theory would sharply undermine the stability, fairness, and predictability of the rules protecting private property, on which depend a wide range of investment and economic activity by American businesses. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994) ("predictability and stability are of prime importance" for the protection of property rights). Indeed, taken at face value, the government's position would leave large swaths of the country vulnerable to uncompensated takings by federal, state, or local governments. All or part of major cities such as Boston, New York, and New Orleans sit on government-constructed landfill or depend on government-built levees. The government's position here would effectively exempt public entities from takings liability in those urban areas and many other parts of the country.

As discussed below, the government's rule is unlawful, unworkable, and unwise. The government's reimagination of key Takings Clause concepts conflicts

with long-established condemnation principles, such as the familiar rule that the government must pay fair market value that *includes* a tract's "proximity" to preexisting public improvements. *United States v. Miller*, 317 U.S. 369, 376 (1943); *infra* Section I. The government's position will deter a broad range of private investment, hurting both private parties and various federal, state, and local government entities—which often seek to encourage private investment by making improvements to land, or public investments in other infrastructure. *Infra* Section II. Finally, the government's rule is unadministrable. Not only would it entangle courts and litigants in complex, time-wasting litigation involving efforts to reconstruct the status of real property decades or even centuries ago, but the difficulty of proving such anti-historical counterfactuals would make the Takings Clause an illusory guarantee for many landowners. *Infra* Section III.

This Court should thus affirm the Court of Federal Claims on the key question of Takings Clause causation, reject the rule proposed by the government, and embrace the doctrinally sound, clear, and administrable common-sense standard that the landowners advocate in this appeal: where a government historically made improvements that benefitted real property, but subsequently takes action that infringes on private property rights and that was not contemplated at the time of the original improvements, the proper "baseline" for a takings claim is the period immediately before the allegedly infringing action.

# ARGUMENT

## I. The Government's Position Would Expose Landowners in Many Regions to Uncompensated Takings and Would Conflict with Long-Established Condemnation Principles.

The government contends that, in assessing the causation element of a takings claim, government-caused diminutions in the value of the plaintiff's property should be "assessed against the [value of the] plaintiff's property in a natural state." Gov. Br. 41 (citing *United States v. Sponenbarger*, 308 U.S. 256, 265 (1939)). Misinterpreting this Court's decision in *St. Bernard Parish Government v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018), the government asserts that courts must factor in the "entirety" of the "government actions [addressing] the relevant risk," including actions that are decades or even centuries old, and that were undertaken for purposes wholly distinct from those that motivate more recent government actions. Gov. Br. 27 (quoting *St. Bernard Parish*, 887 F.3d at 1364). The government insists, in other words, that condemnees must take (today's) bitter with the (age-old) sweet: government harm to a condemnee's property today can be offset by benefits conferred in the distant past, with the effect of immunizing the government from takings liability in a wide range of cases.

It is difficult to overstate the troubling legal and practical implications of the government's position. The government's rule disregards the fact that, in many parts of the country, private development is possible only because of prior public

investments—in many instances, investments undertaken by federal, state, or local governments precisely to encourage private economic development. In those places, a rule that requires courts to compare current property values to those in a hypothetical "natural state" preceding public investment would effectively nullify the Takings Clause as a meaningful guarantee of just compensation. Courts have never recognized a rule like the one proposed by the government here. On the contrary, the government's rule would upset settled principles of takings law, and would eviscerate billions of dollars of reasonable, investment-backed expectations.

### A. The government's rule would exclude large portions of the country, including portions of several major urban areas, from protection under the Takings Clause.

Much of what today comprises greater New Orleans began as uninhabitable "canebrake [and] impenetrable marsh."[2] Publicly constructed "levees, embankments, floodwalls, and . . . barriers" have proven "essential to the viability" of the region as an urban center.[3] After "300 years" of improvements, "more than 30,000 acres were converted from swamp to dry land," thus enabling the region's development.[4] Measured in its "natural state," however, much of the land

---

[2] Richard Campanella, *How Humans Sank New Orleans*, THE ATLANTIC (Feb. 6, 2018), *available at* bit.ly/3DVIEva (brackets in original).

[3] *Id.*

[4] Sara Sneath, *Half of New Orleans is below sea level, humans sank it: Report*, NOLA.com (Feb. 6, 2018, updated July 12, 2019), *available at* https://bit.ly/3spS7J5.

comprising the New Orleans metropolitan area, including miles of waterfront property along Lake Pontchartrain, is all but worthless. Given that baseline, on the government's view, actions taken by government condemnors in these areas, up to and including the inundation of the entire region, would not cause a Fifth Amendment "taking."

New Orleans is not unique in this respect. Other major American cities depend heavily on public works, including government-created landfill and government-built flood protection infrastructure. Consider Boston. When the city was founded, "much of the land that underlies some of the oldest parts of Boston didn't exist."[5] "The Quincy Market area, the Bulfinch Triangle, and the airport, for example, were . . . once under water."[6] Only after centuries of publicly financed and publicly constructed infrastructure projects did Boston take on its current dimensions.[7] Without these improvements, entire neighborhoods of Boston would today be submerged in the Massachusetts Bay.[8]

---

[5] Betsy Mason, *How Boston Made Itself Bigger*, NAT'L GEOGRAPHIC (June 12, 2017), *available at* on.natgeo.com/3E1ufxu.

[6] NANCY S. SEASHOLES, GAINING GROUND: A HISTORY OF LANDMAKING IN BOSTON 2 (1st. ed. 2018).

[7] *See, e.g.*, *id.* at 8-9 (describing the public construction of landfill to host public parks in the late nineteenth century).

[8] Mason, *supra* n.5. The map reproduced in-text is courtesy of the Norman B. Leventhal Map & Education Center at the Boston Public Library and represents original cartography by Herb Heidt and Eliza McClennan of Mapworks.




The causation rule that the government advances in this case suggests that municipal, state, or federal government officials could flood those neighborhoods, causing billions of dollars of economic damage to homes, businesses, and other infrastructure, without triggering the Fifth Amendment and its requirement of just compensation. After all, Boston's public landfill projects mitigated precisely the "risk" that new government-initiated flooding would exacerbate: the risk that land will be immersed in water and consequently unusable. Gov. Br. 30 (existing case law does not "permit[] a court to ignore government action that reduces flooding risk on a claimant's property when determining whether a taking occurred").

Boston and New Orleans are just two examples, but there are many more. The borough of Manhattan is "seventeen hundred football fields" larger than it was in the seventeenth century, and much of that expansion is the result of landfill projects financed and constructed by state and local government entities.[9] The area around the Battery (formerly known as "Battery Park") on the southern tip of Manhattan is a notable example. "In 1969 the city and state [of New York] released a joint plan to fill in almost seventy football fields' worth of the Hudson River."[10] Although some of this government-constructed land is today owned by the public, some is not. After New York filled in the Hudson River to make way for Battery Park, "housing, office buildings, and plazas would arise on top of the newly made ground."[11]

Meanwhile, "a century ago the southern third of Florida was an unwelcoming wet wilderness."[12] At that time, "[t]he only dry areas [in southern Florida] were on the Atlantic coastal ridge and the Everglades hammocks."[13] But actions taken by the public sector, including the federal government's Central and Southern Florida

---

[9] TED STEINBERG, GOTHAM UNBOUND: THE ECOLOGICAL HISTORY OF GREATER NEW YORK 23, 288 (1st ed. 2014).

[10] *Id.* at 288.

[11] *Id.*

[12] *Everglades-History*, FLA. FISH & WILDLIFE COMM'N, *available at* bit.ly/evergladeshistory (last visited Dec. 22, 2021).

[13] *Id.*

Project, drained vast swamps and cleared land for private settlement and development.[14] Federal action not only created new communities, it also sustained them. One function of the Central and Southern Florida Project was to secure "fresh water for what was fast becoming the heavily populated Gold Coast."[15]

As these examples illustrate, public investment and private development are deeply intertwined. Often, the latter is not possible or economically viable without the former. The problem is especially clear in flooding cases like this one, but the government's rule would be no more sensible in any other context.

In many places, land would lack its present utility (and thus its present value) but for the public improvements (*i.e.*, infrastructure), that support it, including roads, bridges, railroads, airports, public schools, stadiums, parks, levees, and much more. *Cf. United States v. Fuller*, 409 U.S. 488, 492-93 (1973) ("The Government may not demand that a jury be arbitrarily precluded from considering as an element of value the proximity of a parcel to a post office building, simply because the Government at one time built the post office."). Thus, although framed as a modest doctrinal shift, the position advocated by the government is in fact a striking effort effectively to exempt large areas of the country from the normal rules of takings jurisprudence.

---

[14] *Id.*; *see* River and Harbor Act of 1948, Pub. L. No. 80-858, § 203, 62 Stat. 1171, 1176.

[15] FLA. FISH & WILDLIFE COMM'N, *supra* note 11.

### B. The government's position conflicts with long-established condemnation principles.

The government's proposed rule conflicts with long-established condemnation doctrines both in the specific context of government-caused flooding and in the broader context of takings jurisprudence writ large. The landowners discuss in detail the ways in which the rule advocated by the government here would conflict with precedents that this Court and the Supreme Court developed in the specific context of government flood-control measures for the Missouri River and other major waterbodies. Pl. Resp. Br. 30-47. Not only is the landowners' analysis of these precedents correct, but the government's rule would be equally disruptive in other contexts, and to other legal doctrines, that implicate the Takings Clause.

#### 1. The government's position undermines the Supreme Court's *Miller* decision and its progeny.

The government's proposed rule—*i.e.*, that benefits conferred on landowners by historical public improvements can offset the government's present infringement of property rights—is inconsistent with the settled principle that, in determining fair market value, courts should allow landowners the benefit of earlier public improvements not within the sweep of the government project presently occasioning condemnation. As the Supreme Court put it in *United States v. Miller*, 317 U.S. 369 (1943): "If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public

improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity." *Id.* at 376.

Courts have continued to apply and endorse *Miller*. *See United States v. 320.0 Acres of Land, More or Less in Monroe Cty.*, 605 F.2d 762, 786 (5th Cir. 1979). *Miller* has been regularly applied to afford landowners the benefit of prior public improvements. *E.g.*, *United States v. Eastman*, 528 F. Supp. 1177, 1178-79 (D. Or. 1981) (where it was "natural[ly] assum[ed]" that a government reservoir caused an "increase[] in value" to the subject property, and where the government had represented that the reservoir project would not require condemnation of the lands in question, the landowner was permitted to adduce evidence that value of subject property was enhanced by the reservoir), *opinion adopted by* 714 F.2d 76, 77 (9th Cir. 1983); *United States v. 13.20 Acres of Land, More or Less, in Lincoln Cty.*, 629 F. Supp. 242, 246-47 (E.D. Wash. 1986) (where 50 years passed between construction of a reservoir and subsequent condemnation, "property owners [could] not be charged with being able to foresee" that subsequent condemnation would occur, so the "just compensation valuation must include [the] current market value of the condemned parcels, taking into consideration" the benefit conferred on landowners from access to the reservoir); *City of Kenai v. Burnett*, 860 P.2d 1233, 1243 (Alaska 1993) (where city did not "envision the destruction of" landowners'

access road when it began constructing a municipal golf course, the landowners were "likely entitled to *some* project-enhanced value"); *815 Assocs., Inc. v. State*, 271 A.D.2d 398, 399, 705 N.Y.S.2d 630, 631-32 (2d Dep't 2000) (a "lapse of 31 years" between a first highway expansion and the taking of landowner's property for a second highway expansion "warrant[ed] payment by the State of the enhanced value of the land by virtue of its proximity to the highway").

As the Supreme Court has explained, under *Miller* and its progeny,

> the development of a public project may . . . lead to enhancement in the market value of neighboring land that is not covered by the project itself. And if that land is later condemned, whether for an extension of the existing project *or for some other public purpose*, the general rule of just compensation requires that such enhancement in value be *wholly taken into account*.

*United States v. Reynolds*, 397 U.S. 14, 16-17 (1970) (emphasis added).

*Miller* recognizes that landowners' reasonable, investment-backed expectations usually include preexisting public investments, particularly when those preexisting investments were made decades (or longer) ago, and particularly where the original improvements did not contemplate subsequent changes that might diminish property values. Courts have at times struggled to distinguish cases for which "the property in question can be viewed as part of the project 'from the beginning,'" in which case "any increment in value attributable to the project is *not* compensable," from borderline cases where "the property in question is taken pursuant to a [s]ubsequent decision to [e]nlarge the project," in which case "the

owner *is* entitled to compensation for 'the value added in the meantime by the proximity of the improvement.'" *320.0 Acres of Land*, 605 F.2d at 786 (emphasis added) (quoting *Reynolds*, 397 U.S. at 17).

But there has never been much doubt that landowners may benefit from appreciation caused by a first project when a second project is not contemplated at the time of the first, serves a distinct purpose, and occurs much later in time. *See Eastman*, 714 F.2d at 77. After all, the ultimate question in this context "is to be answered essentially by determining the reasonable expectations of the ordinary landowner." *Id.* And no ordinary landowner expects longstanding public improvements on which it relies to be withdrawn.

As the landowners in this case have explained, an ordinary application of *Miller* and its progeny precludes the government's position that the "baseline" for a takings claim excludes improvements undertaken decades ago for purposes unrelated to the present taking. Pl. Resp. Br. 35-37. The government's attempt to sidestep *Miller* relies heavily on *St. Bernard Parish*. Gov. Br. 27-35. But *Miller* and its progeny are entirely consistent with this Court's decision in *St. Bernard Parish.*

In *St. Bernard Parish*, this Court merely recognized that, "where the government has taken action that creates a risk of flooding and [also] subsequent . . . action designed to mitigate that risk," the subsequent action cannot "be ignored

in the causation analysis" for a takings claim. 887 F.3d at 1367. *St. Bernard Parish* left open the question whether, under *Miller*, "if [a] risk-reducing government action precede[s] [a] risk-increasing action, the risk-reducing action . . . only [needs to] be considered in assessing causation if the risk-increasing action was 'contemplated' at the time of the risk-reducing action." *Id.* at 1367 n.14.

In resolving this appeal, the Court should clarify that the causation analysis set forth in *St. Bernard Parish* in no way departs from *Miller* or subsequent cases applying *Miller*. *Miller* bears directly on the causation element of a takings claim. Contrary to the government's proposed rule here, *Miller* stands for the proposition that government action effects a compensable "taking" if it causes a diminution in value relative to the property's value "enhanced by [its] proximity" to an earlier public improvement, where the later government action was not contemplated at the time of the original improvements. *Miller*, 317 U.S. at 376. If the government prevails in this case, no taking will occur where the benefit of "proximity" to a decades-old public improvement offsets harm done by government action in the present. That result would be incompatible with *Miller*.

#### 2. The government's position is inconsistent with *Hardwicke*'s application of *Miller* to flood-control measures.

As the landowners persuasively explain, the rule of decision for this appeal is found in *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490-91 (Ct. Cl. 1972), and its application of *Miller* in the flooding context. *See* Pl. Resp. Br. 31-35.

In *Hardwicke*, the federal government built two dams along the Rio Grande River. 467 F.2d at 488-90. The first "reduced the anticipated incidence of flooding on the land at issue" and opened that land up to farming. *Id.* at 489. The second "increased the incidence of flooding on the land in question," but not as much as the first dam had decreased flooding. *Id.* at 489-90.

The *Hardwicke* court explained that the proper analysis in those circumstances follows from *Miller* and its progeny. Rather than reflexively measuring the value of the land in a "natural state" prior to any federal flood-control program, the court considered and applied *Miller* and *Reynolds* to determine whether the construction of a second dam was "contemplated" with construction of the first. *Id.* at 489-91. Thus, *Hardwicke* establishes that *Miller* applies in the flood-control context. On the particular facts of *Hardwicke*, the second (risk-increasing) dam *was* contemplated when the first (risk-decreasing) dam was constructed. *Id.* at 490-91. But the rationale and governing legal principles from *Hardwicke* demonstrate why the government's proposed causation analysis here—which requires reconstructing a "natural state" prior to any public improvement—clashes with longstanding condemnation principles like those embodied in *Miller*.

Although the facts of *Hardwicke* supported a conclusion that no taking had occurred, the circumstances here are vastly different. In *Hardwicke*, the federal government established a plan to build both dams in a single treaty, only eight years

passed between the construction of the first dam and the construction of the second, and landowners acquired their property interests after the second dam was built. *Id.* at 488-90; *see also id.* at 491 ("[t]here was no time when plaintiff [landowners] or their predecessors in title could have reasonably supposed that land [in question] . . . could benefit from [the first dam] . . . yet be free of the disadvantages that might arise from the [second] dam").

Here, by sharp contrast, the government's risk-reducing actions occurred roughly half a century before the government later changed policy and took steps increasing the risk of flooding on the landowners' property. Pl. Resp. Br. 5-6, 8-16. The infringing actions reflected a change in the government's longstanding policy, deemphasizing flood-control measures and emphasizing other aspects of environmental protection. *Id.* Thus, on these facts, landowners would not have reasonably "contemplated" the infringing actions that would occur in the decades after the government took risk-mitigating actions in part to encourage private development of land.

### 3. The government's position violates the settled principle that just compensation must be assessed at the time of the taking.

The Supreme Court has confirmed in numerous cases the "unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking." *First Eng. Evangelical Lutheran Church v. Cty. of Los Angeles*, 482 U.S. 304, 320 (1987). In applying this rule, courts have established

that the time of the "taking" is often the time at which a condemnor takes a concrete action that infringes on property rights, not necessarily the time at which a court concludes that a taking has occurred or the time at which condemnation proceedings begin. *Id.* at 306-07; *see also* 26 Am. Jur. 2d *Eminent Domain* § 233 (2021) (time of taking may be the moment condemnor takes possession of property without consent).

Courts have consistently applied the principle that just compensation is measured against the moment of the taking, both to the benefit and detriment of condemnors. For example, and on the one hand, the Supreme Court held in *First English Evangelical* that, because just compensation is measured against the moment of the taking, an owner of taken property may recover damages for injury sustained between the moment of the infringing government action and "the time . . . it is finally determined that the [government action] constitutes a 'taking' of his property." *Id.* at 306-07. On the other hand, in *Danforth v. United States,* the Supreme Court held that a diminution in property value that occurs prior to the taking, *e.g.*, a diminution occurring because Congress has passed a law that will foreseeably require a taking, is non-compensable as an "incident[] of ownership" for which property owners must bear the risk. 308 U.S. 271, 283-85 (1939).

The government's position in this case—that courts determining whether a taking has occurred and thus whether just compensation is owed must consider the

value of the land in its "natural state" prior to any public improvements—threatens to upset this settled principle of law and the reasonable expectations and investments that flow from it. Such a disruption would be harmful to condemnors and condemnees alike. Both condemnors and condemnees, after all, rely on the expectation that courts will measure the need for and amount of just compensation against the present condition of the land, rather than by attempting to reconstruct some bygone or counterfactual state. *First Eng. Evangelical*, 482 U.S. at 320 (courts assessing just compensation for a taking will not reconstruct value of the land prior to "the process of governmental decisionmaking" and the "fluctuations in value" that such a process may yield (citation omitted)).

## II. The Government's Rule Would Deter a Broad Range of Private Investment, Undermining Both the Investment-Backed Expectations of Property Owners and the Government's Own Interests.

The government effectively invites this Court to incorporate into its takings jurisprudence an extreme version of the *caveat emptor* principle. The government contends that, "[f]or any federal project that reduces a . . . risk to private property, an eventual return to the pre-project status quo must be deemed 'contemplated'" at the time of the risk-reducing project, no matter how many years or decades may pass between the risk-reducing project and the return to the status quo ante. Gov. Br. 31-32. But the Takings Clause—far from embracing such a principle—recognizes and protects the reasonable, investment-backed expectations of property owners.

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980) (holding that "interference with reasonable investment-backed expectations" suggests a Fifth Amendment taking).

The government's proposed rule would eviscerate landowners' reasonable investment-backed expectations. As the record here demonstrates, the landowners bought their properties with the reasonable expectation that the Missouri River Mainstem Reservoir System (the "System")—which had been constructed nearly 60 years earlier and which had operated consistently since that time—would prevent recurrent flooding. *See* Pl. Resp. Br. 22-23, 55-57 (discussing factual finding of the Court of Federal Claims that the landowners in this case made investments "in reliance on the flood protection provided by the . . . System").

Nothing about the System would have given stakeholders the impression that its benefits were transient or reversible. On the contrary, the System was built pursuant to a nearly 80-year-old Act of Congress, and the Supreme Court has recognized that, under the statute, flood control is a "dominant" function of the System. *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 512 (1988); Gov. Br. 4. Accordingly, landowners' reasonable expectation that flood protection provided by the System would be maintained was reflected in the purchase price of the properties and the landowners' subsequent enjoyment of the same pursuant to their state-law

property rights. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (Takings Clause protects property rights protected by state law).

"Insofar as property is conceptually a set of expectations, any rule which tends to settle expectations is, in that respect at least, a good rule." Patrick Wiseman, *When the End Justifies the Means: Understanding Takings Jurisprudence in a Legal System with Integrity*, 63 S. John's L. Rev. 433, 457-58 (1988). Indeed, "[t]akings law should be predictable . . . so that private individuals confidently can commit resources to capital projects." Susan Rose-Ackerman, *Against Ad Hocery: A Comment on Michelman*, 88 Colum. L. Rev. 1697, 1700 (1988).

From a property owner's perspective, the rule proposed by the government in this appeal tends to *upend* expectations rather than settle them. As previously discussed, it is not unusual for the value and utility of real property to depend on public investment in nearby infrastructure, including (but not limited to) highly developed urban areas where government flood control measures enable economic development. *Supra* Section I.A. Buyers and sellers of real property have long considered the existence of nearby public infrastructure in setting a fair-market price for particular transactions. *Fuller*, 409 U.S. at 492-93 (recognizing "the value [usually] added to property by a completed public works project" in "proximity" to privately owned land). The government's rule would turn assets into liabilities, and investment opportunities into dead zones for investment, by exposing owners of land

that is dependent on nearby public infrastructure to the danger of uncompensated takings.

Indeed, from the long-term perspective of federal, state, and local governments, it is hardly clear that a rule upsetting landowners' expectations about preexisting public improvements would serve the public interest. Courts have recognized the public "policy favoring development of private lands adjacent to public projects." *See, e.g.*, *United States v. 49.01 Acres of Land, More or Less, Situate in Osage Cty.*, 669 F.2d 1364, 1368 (10th Cir. 1982). And, indeed, governments often choose to invest in public improvements to spur private investment in adjacent lands. *See Kelo v. City of New London*, 545 U.S. 469, 473-77 & n.6 (2005) (describing use of public investments and eminent domain power to "revitalize" city and attract private investment, including creation of a pharmaceutical research facility); *Berman v. Parker*, 348 U.S. 26, 28-31 (1954) (describing District of Columbia's plan "to develop a better balanced, more attractive community" through a mixture of public and private investment).

The position advocated by the government in this case would effectively create a disfavored "second class" of real property subject to flooding, easements, and other encroachments upon a mere government caprice—a risk that would be doubtless increased by the government's expectation that it will be immune from takings liability for damage caused to that real property. Weakening core property

rights protections in that manner would chill private investment in those kinds of property—even if the existence of public improvements or other public infrastructure in the area would otherwise create a compelling incentive to invest.

## III. The Government's Proposed Rule Is Unadministrable, in Contrast to the Clear, Workable Causation Standard Applied Below.

For the Takings Clause to be a meaningful source of protection for private property rights, condemnation principles should be clear and easy to administer. *Horne v. Dep't of Agriculture*, 576 U.S. 350, 368-69 (2015) (expressing support for "clear and administrable rule[s]" in the takings context); *see also* Rose-Ackerman, 88 Colum. L. Rev. at 1700 (without "clear standards to determine when compensation will be paid," property investors will lack the power to make "informed choices"). A takings jurisprudence built on "shifting doctrines" leaves private "investors [to bear] the costs of an uninsurable risk"—*i.e.*, the uncertain risk that property rights will be infringed without compensation. Rose-Ackerman, 88 Colum. L. Rev. at 1700. That is why, particularly in the context of a right designed to protect reasonable investment-backed expectations and encourage private investment, uncertain protections too often prove to be no protection at all. *Id.*

In addition to being wrong on the law, the government's proposed rule will lead to the sort of undesirable "shifting" doctrinal landscape that undermines the protections of the Takings Clause. If adopted, the government's rule will prove unclear and unadministrable, and will often erect an insurmountable barrier for

property owners seeking compensation for an adverse government action. By requiring landowners to attempt to reconstruct and prove in court property values in a "natural state," the government's rule would entangle courts and litigants in expensive, time-consuming counterfactual and historical litigation for which necessary evidence will often be difficult or impossible to obtain. *Cf. Arkansas v. Tennessee*, 310 U.S. 563, 569 (1940) (in context of respecting property rights and reasonable expectations in boundary dispute between states, noting difficulties of proof for "matters which rest in memory, and which consequently fade with the lapse of time, and fall with the lives of individuals").

Particularly for historical improvements that date back decades or more, including the government's construction of the System in this case, courts (and parties) will struggle to determine what condition real property would have been in if the government had not undertaken prior improvements. Similarly, courts will face a host of practical difficulties of evidence, causation, and proof, such as disaggregating public and private improvements to real property, *e.g.*, where a series of similar improvements have been made by both private and public entities over decades or even centuries.[16] In light of these difficulties, litigants will likely struggle to develop the evidence needed to support their claims, particularly (as here) where

[16] *Cf.* SEASHOLES, *supra* note 5, at 2-11 (describing the long history of public and private landfill projects in the Boston area).

the government relies on benefits attributed to improvements undertaken half a century earlier.

Consider the litigant who attempts to show that a government action constituted a taking, even though earlier government improvements increased the value of the litigant's property or mitigated the risk later exacerbated by the adverse government action. To prove his case, the litigant would need to prove that the land in question had become less valuable than it was in the "natural state" prior to any risk-mitigating public project.

Proving a diminution in value relative to this "natural state," in turn, would presumably require adducing comparable sales, expert appraisals, and other forms of traditional condemnation proof. *See* 26 Am. Jur. 2d *Eminent Domain* § 229. But the government improvement may have occurred long ago, and it may even have preceded private settlement or development in the area. *See* Section I.A, *supra* (describing public investments enabling the development of central and southern Florida). In that case, proof of the land's value in a "natural state" may simply not exist, leaving the landowner with no means of establishing the "baseline" for his takings claim. In light of the practical problems associated with obtaining necessary evidence, the rule that the government has proposed could pose an insuperable obstacle to recovery for landowners *even when* a government action causes a

diminution in property values relative to the value of the land in a "natural state" before any relevant public investments.

In sharp contrast to the government's rule, the rule advocated by the landowners here (and applied by the Court of Federal Claims) would provide a clear and far more administrable standard, benefitting both courts and litigants. As the Court of Federal Claims correctly concluded, where the government has historically made improvements that benefitted real property, but subsequently takes an action not contemplated at the time of the original improvements that infringes on private property rights, the proper "baseline" for a takings claim is the period immediately before the allegedly infringing action.

That principle is consistent with *St. Bernard Parish* and other precedents of this Court concerning government flood-control measures. Pl. Resp. Br. 31-35. It is also consistent with broader takings principles. For example, because the rule applied by the Court of Federal Claims does not exclude from the baseline for a takings claim preexisting public projects that benefit adjacent lands, the rule is in harmony with *Miller* and its conclusion that property owners may benefit from government projects that "enhance[]" the market value of their property. 317 U.S. at 376.

Similarly, the decision of the Court of Federal Claims accords with the elementary principle of takings law that the need for just compensation should be

measured against the value of the property at the time of the taking. At the time of the takings alleged here, the landowners (and the market more generally) had come to expect that the flood protection provided by the System would be maintained. The lower court's causation analysis, which measures present harms against the condition of the landowners' property after the construction of the System, reflects a more accurate picture of the property's value at the time of the adverse government actions disputed in this appeal.

## CONCLUSION

This Court should reject the government's position concerning the "baseline" for a Fifth Amendment takings claim and should hold that where a government historically made improvements that benefitted real property, but subsequently takes action that infringes on private property rights but was not contemplated at the time of the historical improvements, the proper "baseline" for a takings claim is the period immediately before the allegedly infringing action.

Dated: December 23, 2021

Respectfully submitted,

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
*Principal Attorney of Record*
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6507
jmarwell@velaw.com

Benjamin H. Moss
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
Telephone: (713) 758-2069
benmoss@velaw.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of *Amicus Curiae* The Chamber of Commerce of the United States of America with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on December 23, 2021.

All counsel of record in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: December 23, 2021

Respectfully submitted,

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
*Principal Attorney of Record*
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6507
jmarwell@velaw.com

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,139 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: December 23, 2021

Respectfully submitted,

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
*Principal Attorney of Record*
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6507
jmarwell@velaw.com

*Counsel for* Amicus Curiae