**Nos. 2021-1849, -1875**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, dba Robert Adkins & Sons Partnership, GERALD SCHNEIDER, dba Buffalo Hollow Farms, Inc.,
*Plaintiffs-Cross-Appellants,*

v.

LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, dba Midwest Grain Co., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, individually and, dba Drewes Farms, Inc., PATRICK NEWLON, dba Newlon Farms, Inc., DAVID NEWLON, dba D Double N Farms, Inc., JASON TAYLOR, BRAD TAYLOR, dba H.B.J. Farms, Inc., LYLE HODDE, dba Hodde & Sons Limited Partnership, STEVE CUNNINGHAM, Trustee of the Doris J. Cunningham and Steven K. Cunningham Declaration of Trust, GAIL CUNNINGHAM, dba Cunningham Farms, Inc., CHARLES GARST, individually and, dba Garst Farms, Inc., CONNIE GARST, dba Garst Farms, Inc., RON SCHNEIDER, MARY SCHNEIDER, *et al.*,
*Plaintiffs,*

v.

UNITED STATES,
*Defendant-Appellant*.

---

Appeals from the United States Court of Federal Claims
No. 1:14-cv-00183-NBF (Hon. Nancy B. Firestone)

---

# CORRECTED *AMICUS CURIAE* BRIEF OF AMERICAN FARM BUREAU FEDERATION IN SUPPORT OF PLAINTIFFS-CROSS-APPELLANTS AND REVERSAL ON CROP-LOSS ISSUE

---

David Y. Chung
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2587
dchung@crowell.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* certifies the following:

1. The full name of every party represented by me is:

   American Farm Bureau Federation

2. The name of the real party in interest represented by me is:

   Not applicable

3. All parent corporations and any publicly held companies that own 10% or more of stock in the party represented by me are:

   Not applicable

4. The names of all law firms and the partners or associates that appeared for the party now represented by me before the Court of Federal Claims or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   Not applicable

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   *Milne et al. v. United States*, No. 20cv2079 (Fed. Cl.)

   *Nolan v. United States*, No. 21cv00122 (Fed. Cl.).

6. Organizational Victims and Bankruptcy Cases

Neither Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) nor 26.1(c) (bankruptcy case debtors and trustees) are applicable because this is not a criminal or bankruptcy case. *See* Fed. Cir. R. 47.4(a)(6).

Dated: December 23, 2021

*/s/ David Y. Chung*
David Y. Chung

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..... i

STATEMENT OF INTEREST ..... 1

SUMMARY OF ARGUMENT ..... 4

ARGUMENT ..... 7

I. Compensation Cannot Be "Just" Unless It Makes the Property Owner Whole. ..... 7

II. Just Compensation for a Taking of Cropland by a Single-Purpose Flood Must Include Actual Losses Incurred During the Stabilization of the Taking. ..... 9

A. Farmers Cannot Be Made Whole If the Value of Crop Losses Sustained During the Period of Taking Is Unrecoverable. ..... 12

B. The Holding Below Creates Perverse Incentives for the Government. ..... 17

CONCLUSION ..... 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) ........ 8, 10, 16

*Ark. Game & Fish Comm'n v. United States*,
736 F.3d 1364 (Fed. Cir. 2013) ........ 4, 10

*Armstrong v. United States*,
364 U.S. 40 (1960) ........ 8

*Barnes v. United States*,
538 F.2d 865 (Ct. Cl. 1976) ........ 10, 11

*Brown v. Legal Found. of Wash.*,
538 U.S. 216 (2003) ........ 8

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999) ........ 2

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) ........ 2

*Hughes v. State of Wash.*,
389 U.S. 290 (1967) ........ 9

*Kelo v. City of New London, Conn.*,
545 U.S. 469 (2005) ........ 1

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949) ........ 15

*Knick v. Twp. of Scott, Pa.*,
139 S. Ct. 2162 (2019) ........ 1

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........ 2

*Nat'l Food & Beverage Co. v. United States*,
105 Fed. Cl. 679 (2012) .......... 10

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) .......... 2

*Ridge Line, Inc. v. United States*,
346 F.3d 1346 (Fed. Cir. 2003) .......... 6, 10, 12

*United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Cntys., Pa.*,
441 U.S. 506 (1979) .......... 5, 9, 12

*United States v. Commodities Trading Corp.*,
339 U.S. 121 (1950) .......... 8

*United States v. Gen. Motors Corp.*,
323 U.S. 373 (1945) .......... 15

*United States v. Miller*,
317 U.S. 369 (1943) .......... 8

*In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*,
146 Fed. Cl. 219 (2019) .......... 9

**Rules**

Fed. R. App. P. 29(a)(4)(E) .......... 1

**U.S. Constitution**

U.S. Const. amend. V .......... 1, 2, 7, 8

U.S. Const. amend. XIV .......... 8

**Other Authorities**

J. Nedelsky, *Private Property and the Limits of American Constitutionalism* 9 (1990) .......... 7

Jason Clark, *Managing Soil and Soil Fertility After Flooding* (Aug. 26, 2020) .......... 15

Michael W. McConnell, *Contract Rights and Property Rights: A Case Study in the Relationship between Individual Liberties and Constitutional Structure*, 76 Cal. L. Rev. 267 (1988) .......... 7

N. Hamilton, *Farmer's Legal Guide to Production Contracts*, Univ. of Ark., The Nat'l Agric. Law Ctr., 3 (Jan. 1995) .......... 15

U.S. Dep't of Agric., Econ. Research Serv., *Agriculture and its related industries provide 10.3 percent of U.S. employment* (Oct. 12, 2021) .......... 3

U.S. Dep't of Agric., Econ. Research Serv., *Commodity Costs and Returns: Corn production costs and returns per planted acre, excluding Government payments* (Oct. 1, 2021) .......... 13

U.S. Dep't of Agric., Econ. Research Serv., *What is agriculture's share of the overall U.S. economy?* (Oct. 15, 2020) .......... 3

## STATEMENT OF INTEREST

The American Farm Bureau Federation ("Farm Bureau") submits this brief as *amicus curiae* in support of Plaintiffs-Cross-Appellants ("Plaintiffs") in this case about the United States' constitutional duty to make farmers whole when it takes their land and livelihoods.[1]

Farm Bureau is a voluntary general farm organization formed in 1919 to protect, promote, and represent the interests and betterment of farming and ranching; the farming, ranching, and rural community; and the individual families engaged in farming and ranching. Through its state and county Farm Bureau organizations, AFBF represents about six million member-families in all 50 States and Puerto Rico. An important function of Farm Bureau is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. Farm Bureau regularly participates as *amicus curiae* in cases involving the interpretation of the Takings Clause of the Fifth Amendment to the Constitution. *E.g.*, *Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162 (2019); *Kelo*

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties consent to the filing of this brief. See Fed. R. App. P. 29(a)(4)(E).

*v. City of New London, Conn.*, 545 U.S. 469 (2005); *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999); *Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992).

Farm Bureau's members own or lease substantial amounts of land, on which they depend for their livelihoods and on which all Americans depend for the supply of high quality, affordable food, fiber, and other basic necessities. Because that land is subject to increasingly onerous regulation from all levels of state and local government—as well as the sort of competing uses that resulted in a physical invasion of Plaintiffs' farmlands in this case—Farm Bureau and its members are vitally interested in ensuring that the rights of agricultural landowners are protected against destruction and invasion by government-induced flooding without payment of just compensation as the Fifth Amendment requires. American farmers and ranchers need the protection of the Fifth Amendment if they are to find economically feasible ways to remain in the agriculture business—the business of feeding the American populace.

Agriculture is critical to the national economy and American way of life. More than two million farms and ranches across the American

landscape account for roughly $136 billion in annual economic output,[2] employing over 2.5 million hard-working people.[3] Agriculture is also critical to the nation's abundant, safe, and affordable food supply—the importance of which cannot be overstated. Beyond the invaluable benefits it provides the American people, for millions of Americans their farms and ranches are not only their places of business, but also their homes—where they raise their families and live their lives. The investments farmers make in their land are undoubtedly business investments, but perhaps more so than in any other commercial enterprise, they are also personal investments.

Farm Bureau is participating in this case as *amicus curiae* to provide this Court additional context regarding farm economics and the importance of not just the land, but also its yields to the farmer. This context is essential for the Court to appreciate the far-reaching

[2] U.S. Dep't of Agric., Econ. Research Serv., *What is agriculture's share of the overall U.S. economy?* (Oct. 15, 2020), *available at* https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=58270.

[3] U.S. Dep't of Agric., Econ. Research Serv., *Agriculture and its related industries provide 10.3 percent of U.S. employment* (Oct. 12, 2021), *available at* https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=58282.

consequences of the Court of Federal Claims's ("CFC") holding that farmers are not entitled to *any* compensation for crop losses sustained during multiple years of government-induced flooding for the "single purpose" of implementing the Missouri River Recovery Plan. *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1370 (Fed. Cir. 2013).

## SUMMARY OF ARGUMENT

The CFC correctly found that the government took Plaintiffs' property and that Plaintiffs were entitled to just compensation for the taking. The CFC erred, however, by excluding the value of Plaintiffs' destroyed crops from its determination of just compensation. This Court should reverse the CFC's erroneous and fundamentally unfair conclusion that property owners may not recover for crop losses the government caused during a years-long campaign of tacit eminent domain. The United States Constitution's prohibition of the taking of private property without just compensation demands no less.

I. The protection of private property as an extension of respect for individual liberty was foundational to the Framers' conception of the purpose of government—indeed, to some, it was the whole point. Accordingly, the policy behind "just compensation" is to make private

property owners whole when the government appropriates private property of whatever sort. Regardless of the type or extent of property taken, the private individual must be returned to as good a place as she enjoyed prior to the taking. While over time various doctrines have developed to aid the courts in determining how to evaluate takings of different types, the "guiding principle of just compensation" that the owner "must be made whole" remains. *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Cntys., Pa.*, 441 U.S. 506, 516 (1979) (internal quotation marks and citation omitted).

II. The CFC erred when it departed from fundamental principles of fairness and denied Plaintiffs just compensation for the extensive losses they sustained during the years when the government flooded their land.

Contrary to the CFC's blithe dismissal, crops are not "consequential" to farmers. Indeed, the entire purpose of croplands is evident from the name: to grow crops. And when a parcel of crops is lost, so too is the entire enterprise on that parcel. It can hardly be said, then, that losses of multiple years' investment of seeds, fertilizer, water, and crop protection products—not to mention physical toil—is not compensable as mere "consequential damages" when the United States appropriates a benefit

and deprives farmers of the fruits of that labor. To hold otherwise would be to allow—and even to incentivize—the government to take private property slowly over time instead of carrying its burden to acknowledge the exercise of eminent domain and pay just compensation for the full extent of what is taken when it is due.

Farm Bureau is concerned that the CFC's decision in this case, if not reversed by this Court, would allow the government to destroy farmers' livelihoods without making them whole. The CFC misinterpreted and misapplied takings law, the upshot being that the United States is free to effectuate a land grab incrementally over time and potentially pay nothing—at least until it becomes plain that the taking has stabilized—thereby making a mockery of the phrase "just compensation" and undermining the foundational principle that such compensation "includes a recovery for all damages, past, present and prospective." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1359 (Fed. Cir. 2003) (internal quotation marks and citation omitted). The practical consequences of the decision below are vast. It is imperative that this Court reverse and instruct the CFC to determine the amount of compensation due for Plaintiffs' crop losses.

## ARGUMENT

### I. Compensation Cannot Be "Just" Unless It Makes the Property Owner Whole.

The Framers of our Constitution viewed the protection of property rights, and particularly rights in land, as "the first object of government." Federalist No. 10, at 78 (Madison) (C. Rossiter ed. 1961). For the Framers, private property was "the clear, compelling, even defining instance of the limits that private rights place on legitimate government." J. Nedelsky, *Private Property and the Limits of American Constitutionalism* 9 (1990); *see also* Michael W. McConnell, *Contract Rights and Property Rights: A Case Study in the Relationship between Individual Liberties and Constitutional Structure*, 76 Cal. L. Rev. 267, 270 (1988) ("protection of private property was a nearly unanimous intention among the founding generation"). The Framers intended for government to be "instituted no less for protection of the property, than of the persons, of individuals." Federalist No. 54, at 339 (Madison) (C. Rossiter ed. 1961).

These views are enshrined in the Takings Clause of the Fifth Amendment, which provides that the federal government may only take private property if (a) it is for a "public use" and (b) "just compensation"

is paid to the owner. U.S. Const. amend. V, XIV; *see also Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231-32 (2003) (underscoring the Takings Clause's two separate requirements). The Takings Clause, a bulwark against arbitrary rule that fosters respect for individuals and their property, ensures that the government cannot "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The cost the public should bear, *i.e.*, just compensation, "is measured by the property owner's loss rather than the government's gain." *Brown*, 538 U.S. at 236-37.

"The word 'just' in the Fifth Amendment evokes ideas of 'fairness' and 'equity[.]'" *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124 (1950). What constitutes "just compensation" is necessarily a fact-dependent endeavor. Indeed, the Supreme Court recently recognized that there are "few invariable rules" in takings cases. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). Regardless of the facts, however, just compensation means the "full and perfect equivalent in money of the property taken." *United States v. Miller*, 317 U.S. 369, 373 (1943); *see also id.* at 374 ("The owner is to be put in as good position

pecuniarily as he would have occupied if his property had not been taken.”). In the end, “the Constitution measures a taking of property not by what a [government] says, or by what it intends, but by what it does.” *Hughes v. State of Wash.*, 389 U.S. 290, 298 (1967) (Stewart, J., concurring).

Ultimately, when the direct result of the government’s actions is the destruction of property for its own, and thus the public’s, benefit, the affected property owners are entitled to just compensation for a taking.” *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 253 (2019).

In conclusion, while the calculation of just compensation requires the Court to evaluate the specific facts of the case, the “guiding principle of just compensation” that the owner “must be made whole” remains. *564.54 Acres of Land*, 441 U.S. at 516 (internal quotation marks and citation omitted).

## II. Just Compensation for a Taking of Cropland by a Single-Purpose Flood Must Include Actual Losses Incurred During the Stabilization of the Taking.

“A physical taking begins when the government’s action interferes with or substantially disturbs the owner’s use and enjoyment of the

property." *Nat'l Food & Beverage Co. v. United States*, 105 Fed. Cl. 679, 695 (2012) (internal quotation marks and citation omitted). A property owner is entitled to just compensation for all injuries and losses attributable to the taking, "past, present and prospective." *Ridge Line*, 346 F.3d at 1359 (internal quotation marks and citation omitted).

Of particular relevance here, where land is taken gradually through a continuous series of governmental actions that are "designed to serve a single purpose and [that] collectively caused repeated flooding" and loss of crops on the property, *Ark. Game & Fish*, 736 F.3d at 1370, there is no single date of taking for purposes of determining just compensation. Rather, the taking of the flowage easement is best viewed as a multi-year "period" of taking that triggers the government's "duty to provide compensation for the *period during which the taking was effective*." *Ark. Game & Fish*, 568 U.S. at 33 (emphasis added) (internal quotation marks and citation omitted). For these and other reasons articulated in Plaintiffs' brief, the holding from *Barnes* that "crop damages sustained prior to *the date* of taking … are the product of tortious invasion[ ]" does not stand in the way of recovery for crop losses here. *See, e.g.*, *Barnes v.*

*United States*, 538 F.2d 865, 874 (Ct. Cl. 1976) (emphasis added); Pls.' Br. at 69 (distinguishing *Barnes*).

The CFC's decision frustrates basic principles of just compensation by requiring private property owners to bear the financial burden of all damages directly attributable to the government's actions throughout the entirety of a continuous flooding project, while simultaneously limiting the government's liability to the diminution in fair market value of the flooded land determined *after* the precise contours of that project have been defined.

To be sure, although a taking of the flowage easement in this case may not have stabilized until December 31, 2014, the government undeniably actually invaded Plaintiffs' properties through the Missouri River Recovery Program—and appropriated those properties as its own—between 2007-2014. That the situation did not stabilize until 2014 for purposes of determining just compensation for the diminished value of the Plaintiffs' properties does not change the reality that the taking and injuries began years earlier.

As explained more fully below, a rule that mechanically forecloses recovery of crop losses sustained during the multi-year period leading up

to stabilization, without regard to the unique facts of any given case, is contrary to the constitutional command that the government provide just compensation so that the owner "be made whole." *564.54 Acres of Land*, 441 U.S. at 516. It also undermines this Court's longstanding command that "just compensation includes a recovery for all damages, past, present and prospective." *Ridge Line*, 346 F.3d at 1359 (internal quotation marks and citation omitted). Finally, it wrongly incentivizes the government to avoid ever commencing appropriate proceedings to condemn property and to instead take the property incrementally over a multi-year period, knowing it may never have to answer for any injuries or losses during the period the taking is stabilizing.

### A. Farmers Cannot Be Made Whole If the Value of Crop Losses Sustained During the Period of Taking Is Unrecoverable.

The CFC premised its conclusion that pre-stabilization damages were not compensable on a theory that they were mere "consequential" damages, incidental to the taking of the flowage easements over the parcels where the crops grew. Appx407-408. As Plaintiffs explain, the CFC's conclusion was wrong for several reasons. *See* Pls.' Br. at 75-78. In particular, the CFC's conclusion cannot be squared with the fact that

crops are for all intents and purposes inseparable from the parcel on which they grow. Literally, they are rooted in the earth. As such, every time the government flooded Plaintiffs' croplands and destroyed crops inextricably bound up with them, the government appropriated Plaintiffs' property for which just compensation must be paid.

A Ph.D.-level understanding of farm economics is unnecessary to reach this conclusion, but a brief overview of the inputs and outputs of a farm in a year may help illustrate why considerations of fairness and justice weigh in favor of reversal. To use one example, the Department of Agriculture estimates that every acre planted in corn in the United States required about $683 in production and overhead costs in 2020, on average. *See* U.S. Dep't of Agric., Econ. Research Serv., *Commodity Costs and Returns: Corn production costs and returns per planted acre, excluding Government payments* (Oct. 1, 2021), *available at* https://www.ers.usda.gov/webdocs/DataFiles/47913/CornCostReturn.xlsx?v=394.1. Those production and overhead costs include such inputs as seed, fertilizer, chemicals, fuel, repairs, water, labor, taxes, and the "opportunity cost" of the land. *Id.* (In fact, only $162 of those inputs is attributable to that "opportunity cost." *Id.*) Thus, while farmers *spend*

$683/acre to farm their land, the average total gross value of *production* of an acre of corn in the United States in 2020 was about $645—*i.e.*, less than the cost to produce.

This means that every bushel, every *stalk*, of corn from that acre is necessary to even approach breaking even. The revenue from the crop is what allows the farmer to recoup the investments in land, seed, labor, and other inputs. Depending on the year, any dip in revenue, even slight, may result in the farmer not being able to offset the cost of production, causing a loss for the farmer for that year. Even when growing conditions are perfect and weather is favorable, such losses can occur. Crop destruction directly caused by government-induced flooding only adds insult to injury. In short: lose the crops, lose the investment, lose the return, lose the business.

What is more, much of a farmer's revenue is often reinvested in the land itself year after year on soil building techniques—*e.g.*, application of fertilizer, application of gypsum to increase water absorption, planting of cover crops to add nitrogen to the soil—all in an effort to increase productivity in future years. Every year requires new seed, new fertilizer and crop protection products, new water, not to mention costs from labor

and ordinary farm-equipment upkeep. Every year is an entirely new investment in the land, and recovering a return on that investment requires all that the land can produce. After flooding, an even greater investment is required to ensure that the land remains fertile. Jason Clark, *Managing Soil and Soil Fertility After Flooding* (Aug. 26, 2020), *available at* https://extension.sdstate.edu/managing-soil-and-soil-fertility-after-flooding. On top of all of this, farmers often enter into contracts to sell their crops long before harvest. If their lands are taken, farmers may be forced to either pay money back to the purchaser or buy commodities from another party to avoid a breach.[4]

For these reasons, crop losses are readily distinguishable from business losses like "good-will" that have sometimes (but importantly, not always) been deemed unrecoverable, consequential damages. *E.g.*, *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945); *Kimball*

[4] If a production contract is in place, the farmers act as bailees because they have already transferred title to a buyer and are obligated to ensure delivery of the product at a future date. *See* N. Hamilton, *Farmer's Legal Guide to Production Contracts*, Univ. of Ark., The Nat'l Agric. Law Ctr., 3 (Jan. 1995) (explaining how agricultural production contracts are increasingly common), *available at* https://nationalaglawcenter.org/publication/hamilton-a-farmers-legal-guide-to-production-contracts-174-pp-farm-journal-inc-1995/.

*Laundry Co. v. United States*, 338 U.S. 1, 12-13 (1949); *cf.* Appx408 (citing inapposite business-loss precedent). Plaintiffs clearly lost more than intangible assets when the government unilaterally decided to flood their properties every year—they lost the production value of their land. While the fair-market value of a flowage easement (as of December 31, 2014) reflects *future* agricultural productivity of the properties in question, it does *nothing* to make Plaintiffs whole for the injuries and losses they sustained "for the period during which the taking was effective."[5] *Ark. Game & Fish*, 568 U.S. at 33.

Put simply, by destroying Plaintiffs' crops, the government appropriated the value of every parcel that experienced crop destruction between 2007-2014. The CFC's denial of compensation for *any* of those losses threatens the valuation of riparian farmland writ large. How are farmers supposed to plan, invest, or exercise any other rights of ownership with regard to that land, if they must try to account for not only weather, pests, and the ongoing pressures of urbanization, but also

[5] Nor are farmers' crop losses costless to society. The cumulative effects of several years' worth of uncompensated losses due to government-induced flooding has the potential to impact the provision of affordable food and other agricultural commodities.

government invasions? Accordingly, this Court should reverse the CFC and order the government to make Plaintiffs whole for past damages incurred.

### B. The Holding Below Creates Perverse Incentives for the Government.

In situations where the government chooses not to condemn farmland in the exercise of its power of eminent domain, but instead incrementally takes that land through a continuous process, farmers are faced with the undesirable choice between: (i) resorting to piecemeal or premature litigation each year to try to recover something for the destruction of their croplands; or (ii) waiting until the destruction of their croplands becomes sufficiently stabilized such that they can determine what lands were taken by the flowage easement and thereafter seek just compensation.

The former option likely is unavailable. Agriculture's land-rich, cash-poor nature means many (if not most) farmers lack the liquidity to engage in piecemeal and potentially time-consuming legal battles. And in more rural communities where farms and ranches are the leading economic driver, and are sustained on economies of scale that force a matching of high input prices with more land to generate more revenue,

the litigation opportunity and related costs of seeking just compensation would likely exceed the value of the crops lost.

If crop losses are unrecoverable under the latter option, as the CFC held, the government would never have any incentive to condemn flowage easements. Rather, the government could just gradually increase the frequency and volume of water releases over an extended period of time and take lands incrementally, knowing that the CFC's ruling shields it from having to compensate farmers for *any* losses, no matter how extensive, that occur during the years leading up to stabilization. And at the end of the process, the government would be responsible for at most the diminution in the market value of Plaintiffs' property, which cannot possibly compensate farmers for past injuries and losses.

To illustrate further the unjust consequences of the decision below, consider how this case would have gone if the government decided from the outset to condemn the land. A timely, affirmative acknowledgement of the effect of the Missouri River Recovery Program would have necessitated an evaluation of the extent of the flowage easements the government expected to take, paying for their fair-market value, and moving on. The farmers would have received compensation in 2007 and

could have made use of the funds immediately, through investment or otherwise. While the parties may have disputed the precise value of the land, at the end of the day the farmers would have been made whole in the eyes of the law. At the very least, the farmers would have had the benefit of (i) knowing what was likely to happen to their land; (ii) funds to compensate them for those events; and (iii) the ability to invest those funds in something other than growing crops, had they wanted to.

Here, by contrast, instead of the government carrying the burden of eminent domain—as it should, as the sovereign exercising the right—it took Plaintiffs' properties incrementally, over the course of several years and free of any obligation to compensate the farmers for the ensuing injuries and losses. Put simply, the government took a gamble hoping that no one would sue to recover for the damage done. It placed the burden on the farmers to exercise their rights and commence costly and lengthy litigation proceedings, despite knowing what was likely to happen during implementation of the Missouri River Recovery Program. In the meantime, the government enjoyed years of not having to pay anyone for the real damage its conduct was causing. And because Plaintiffs lacked knowledge about whether the government would

continue to flood their lands, Appx379-380, they continued to invest time, toil, and treasure into them—investments that could have been better made elsewhere, had they known. But now that the landowners are trying to recover, the CFC has given the government a free pass for all of those pre-stabilization years.

Affirming the decision below means the government is able to profit from the time value of money on the backs of landowners who are left decidedly less than whole. Affirming that decision also means that the government will have an incentive to continue in this vein in other projects where the full effect of a taking may take time to stabilize.

The CFC's decision effectively means that the government can affirmatively decide to flood farmers' lands—without notice, much less an eminent domain proceeding—and in all likelihood avoid liability until the government is found to have permanently taken an easement over those lands. And even then, the government will only be held responsible for the *future* effects of its actions.

## CONCLUSION

It is antithetical to the fundamental rights enshrined in the Constitution to allow the United States to decide to effect a taking of

private property gradually over time, wait to see if the owners sue to recover their just compensation instead of outright condemning the land, and then decline to make the property owners whole because the property destruction that occurred before the stabilization of the taking is merely "consequential" to the taking. The Court should correct the CFC's misinterpretation of the law and reverse.

*/s/David Y. Chung*
David Y. Chung
Elizabeth B. Dawson
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2587
dchung@crowell.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B), as modified by Circuit Rule 32(b), because this brief contains 4,086 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(b).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

*/s/David Y. Chung*
David Y. Chung

**CERTIFICATE OF SERVICE**

I certify that on December 23, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/David Y. Chung*
David Y. Chung