**21-1849**

# United Supreme Court of Appeals
# For the Federal Circuit

IDEKER FARMS, INC., ET AL.,

*Plaintiffs-Cross-Appellants,*

LYNN BINDER, ET AL.,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant-Appellee.*

*On Appeal from the United States Court of Federal Claims*
*Case No. 1:14-cv-00183 (Hon. Nancy B. Firestone)*

**BRIEF OF *AMICUS CURIAE* THE BUCKEYE INSTITUTE**

JAY R. CARSON
Counsel of Record
THE BUCKEYE INSTITUTE
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org

Counsel for *Amicus Curiae*

**FORM 9. Certificate of Interest** **Form 9 (p.1)**
July 2020

**UNITED STATES COURT OF APPEALSFOR THE FEDERAL CIRCUIT**

**CERTIFICATE OF INTEREST**

| | |
|---|---|
| **Case Number** | 21-1849 |
| **Short Case Caption** | Ideker Farms, Inc., et al. v. United States |
| **Filing Party/Entity** | The Buckeye Institute, Amicus Curiae |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/23/21 Signature: */s/ Jay R. Carson*

Name: Jay R. Carson

**FORM 9. Certificate of Interest** **Form 9 (p.2)**
July 2020

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| The Buckeye Institute | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None/Not Applicable Additional pages attached

| | | |
|---|---|---|
| N/A | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

None/Not Applicable Additional pages attached

| | | |
|---|---|---|
| N/A | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable Additional pages attached

| | | |
|---|---|---|
| N/A | | |
| | | |

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ........................................................................ i
TABLE OF AUTHORITIES ........................................................................ v
INTERESTS OF THE *AMICUS CURIAE*............................................................ 1
SUMMARY OF THE ARGUMENT .................................................................. 1
ARGUMENT.......................................................................................... 4
I. Magna Carta and Just Compensation in Colonial America. .......................... 4
II. The Framers and Succeeding Generations Held the Just Compensation Requirement to be Categorical and Fundamental. ............................................... 9
III. The Government's Proposed Causation Test is Unworkable and Antithetical to the Framers' Intent..........................................................................12
CONCLUSION .......................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Arkansas Game & Fish Com'n v. United States*, 568 U.S. 23 (2012) .............2, 3, 7
*Armstrong v. United States*, 364 U.S. 40 (1960)............................................2, 12
*Gardner v. Village of Newburgh*, 2 Johns Ch. 162, 1 N.Y. Ch. Ann 332, 1816 WL 1306 (1816) ...........................................................................11, 12
*Gibbons v. Ogden*, 22 U.S. 1 (1824) ..................................................................13
*Horne v. Dep't of Agric.,* 576 U.S. 350 (2015).................................................... 4
*John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972) .................13
*Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002) ......................................................................... 2
*United States v. Miller*, 317 U.S. 369 (1943).......................................................13
*United States v. Pewee Coal Co.,* 341 U.S. 114 (1951) ......................................... 2
*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980).................... 3

**Statutes**

FED. R. APP. P. 29(a) .......................................................................... 1
Flood Control Act of 1936 § 1, Pub. L. No. 74-738, 49 Stat. 1572 (1936) (codified as amended at 33 U.S.C. § 701a (2006) ..............................................14
U.S.C.A., Northwest Ordinance art. 2 (1787)......................................................10

**Other Authorities**

1 Blackstone's Commentaries, Editor's App. 305–306 (1803) ............................... 8
*A Brief History of Flooding and Flood Control Measures Along the Mississippi River Basin.*" Natural Disasters and Adaptation to Climate Change, 32 (2013), available at https://tinyurl.com/yckt86t6 ..............................................15
A Hint to the Legislature of the State of New York (1778), in *John Jay, The Making of a Revolutionary* 461–463 (R. Morris ed. 1975) ................................ 8
James W. Ely, Jr., *Property Rights in American History*, 4 (1997)......................... 9
Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis "Goes too Far*," 49 Am. U. L. REV. 181 ................................... 5
John F. Hart, *Takings and Compensation in Early America: The Colonial Highway Acts in Social Context*, 40 AM. J. LEGAL HIST. 253 (Jul. 1996).........................6, 7
Jan G. Laitos & Teresa Helms Abel, *The Role of Causation When Determining the Proper Defendant in a Takings Lawsuit*, 20 WM. & MARY BILL RTS. J. 1181 (2012) ..........................................................................................12
Joseph J. Lazzarotti, *Pub. Use Or Pub. Abuse*, 68 UMKC L. REV. 49 (1999).......10
Forrest McDonald, *Novus Ordo Seclorum: The Intellectual Origins of the Constitution* 154 (1985) ............................................................................. 9

William B. Stoebuck, *A General Theory of Eminent Domain*, 47 WASH. L. REV. 553 (1972) ....................................................................................4, 5, 6

*The Evolution of the 1936 Flood Control Act*, 4 (1988) available at https://tinyurl.com/25bkvnpt ..................................................................13, 14

William M. Treanor, Note, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale L.J. 684 (1985).....passim

Charles D. Wallace, *When (and Why) the Levee Breaks: A Suggested Causation Framework for Takings Claims that Arise from Government -Induced Flooding*, 61 WM & MARY L. REV. 603 (2019) ........................................................... 3

**Treatises**

James Madison, *Property* (1792), compiled in 1 *The Founders' Constitution*, Chap. 16, Doc. 23 (The University of Chicago Press, 1977), available at https://tinyurl.com/34cz994u ...................................................................10

**Constitutional Provisions**

U.S. CONST. amend. V................................................................................ 2

## INTERESTS OF THE *AMICUS CURIAE*

*Amicus curiae* The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy in the states.[1] The staff at The Buckeye Institute accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policy solutions, and marketing those policy solutions for implementation in Ohio and replication throughout the country. The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. section 501(c)(3). The Buckeye Institute's Legal Center files and joins amicus briefs that are consistent with its mission and goals.

The Buckeye Institute is dedicated to protecting individual liberties, and especially those liberties guaranteed by the Constitution of the United States, against government interference. The Buckeye Institute is a leading advocate of protecting private property.

## SUMMARY OF THE ARGUMENT

The Takings Clause's Just Compensation requirement is categorical and

[1] Pursuant to FED. R. APP. P. 29(a)(4)(E), The Buckeye Institute states that no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission. Further, pursuant to FED. R. APP. 29(a), all parties received timely notice of *amici's* intent to file this brief and have consented.

unconditional. Its simple and unadorned language provides, "Nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Those words carry the same meaning today that they carried when they were written with quill and ink and affirm the equitable premise that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Arkansas Game & Fish Com'n v. United States*, 568 U.S. 23, 31 (2012). Indeed, the Just Compensation provision of the Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

That original understanding of the Just Compensation Clause, rooted in Magna Carta and applied consistently to the present day, is that when the government takes an interest in property for some public purpose, its duty to compensate the former owner is "categorical." *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951)). In drafting the Fifth Amendment, Madison restated familiar and uncontroversial precepts of English law that had taken root in colonial statutes and common law. William M. Treanor, Note, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale L.J.

694 (1985). Indeed, colonial statutes, nascent State constitutions, and the Northwest Ordinance of 1787 all premised the sovereign's right to take property for the public good on just and contemporaneous compensation to the landowner.

Courts have long recognized the loss of land to flooding caused by the government as compensable taking. *Arkansas Game & Fish Comm'n,* 568 U.S. at 32. But commentators have debated the framework for determining causation in flood cases. *See*, e.g., Charles D. Wallace, *When (and Why) the Levee Breaks: A Suggested Causation Framework for Takings Claims that Arise from Government - Induced Flooding*, 61 WM & MARY L. REV. 603, 623 (2019). This case provides the Court with the opportunity to clarify that the Just Compensation requirement is in fact categorical, and that notwithstanding prior benefits that the government might have provided, a sovereign's proper authority to take private property exists *only* where there is payment of just compensation. *See, Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation . . . .").

The government's position that its obligation to compensate for its flooding of the land at issue must be measured against any and all past benefits that the government might have conferred cannot be squared with the Just Compensation Clause's purpose and history and the categorical requirement that the government provide compensation when it takes private property for a public benefit.

# ARGUMENT

## I. Magna Carta and Just Compensation in Colonial America.

The requirement that "just compensation" must accompany any taking of private property predates the United States Constitution and has pedigree stretching back nearly a millennium. The U.S. Supreme Court has observed that the roots of the Just Compensation Clause extend "back at least 800 years to Magna Carta, which specifically protected agricultural crops from uncompensated takings." *Horne v. Dep't of Agric.,* 576 U.S. 350, 358 (2015). Specifically, Clause 28 of Magna Carta forbade any "constable or other bailiff" from taking "corn or other provisions from any one without immediately tendering money therefor, unless he can have postponement thereof by permission of the seller." *Id.* (internal citations omitted). Chapter 31 of Magna Carta placed an outright prohibition on "the king or his officers taking timber" from land without the owner's consent. William B. Stoebuck, *A General Theory of Eminent Domain*, 47 WASH. L. REV. 553, 564 (1972). Lord Coke interpreted this limitation to imply that the while the king could take certain "inheritances" from land, he could not take the land itself. *Id.* Blackstone later asserted Magna Carta's protections of property meant that "only the legislature could condemn land." *Id.* As Professor Stoebuck explains, "eminent domain"—the physical taking of land—arose in Anglo-American jurisprudence as a function of Parliament," rather than as a prerogative of the Crown. *Id.* This distinction was

significant in English law; in America the distinction gradually blurred, and following ratification of the Constitution, disappeared entirely.

These principles of Magna Carta sailed with the early colonists to the New World and established themselves firmly in American soil. For example, in 1641, Massachusetts adopted a provision in its Body of Liberties, prohibiting "mans Cattel or goods of what kinde soever" from being "pressed or taken for any publique use or service, unlesse it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford." Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis "Goes Too Far*," 49 Am. U. L. REV. 181, at 209.

Consistent with Blackstone's distinction between the powers of the king and the powers of Parliament, most colonial legislatures did not recognize a blanket governmental obligation to compensate a property owner for the public taking of his property. Treanor, *supra* at 694. Rather, the duty to provide just compensation flowed from the specific statute authorizing the taking. Under these "purveyance statutes" legislatures often included payment as a matter of simple justice. Thus, "compensation became a feature [ ] through the American colonial period." Stoebuck, *supra* at 556. According to Stoebuck, "purveyance statutes" were "in themselves examples of the principle that government must pay for what it takes." *Id.* In other words, the colonial legislatures usually employed a "pay as you go"

policy, with each statute that authorized a taking including an offsetting appropriation to compensate the land owner.

Takings by colonial governments for roads provide an interesting parallel to the issues in the instant case. In the colonial period, governments often took unimproved wilderness to create highways that almost always benefitted the property and the landowner. *See*, Stoebuck, *supra* at 583 ("In a time when unimproved land was generally of little worth, a new road would give more value than it took."). Yet, despite significantly improving the value of the adjacent land, colonial legislatures still viewed compensation to landowners as a matter of fundamental fairness. For example, in 1639, the Massachusetts Bay colony amended its general highway act to provide that "'if any man suffer any extraordinary damage in his improved ground,' he would receive 'some reasonable satisfaction' from the town." John F. Hart, *Takings and Compensation in Early America: The Colonial Highway Acts in Social Context*, 40 AM. J. LEGAL HIST. 253, 258 (Jul. 1996).

As time passed, the legislative trend *toward* more liberal and universal compensation, even when the government action conferred a benefit to the property, took hold. For instance, the Massachusetts Bay colony amended its highway statute again in 1693 to require compensation not only when the government caused "extraordinary damage" but to guarantee "'reasonable satisfaction' to anyone 'thereby damaged' in his improved ground." *Id.* Similarly, the New York colonial

legislature evolved from a position of leaving the question of compensation to local governments, to adopting a 1721 highway act that required the government to pay "the true and full Value of the Land" if a highway was "laid through 'Improv'd or Inclosed Lands.'" *Id.* at 261. Connecticut's statute largely mirrored New York's. *Id.* at 290. And in 1700, Pennsylvania revised its highway statute to provide that "where it was necessary to lay a road through improved lands . . . the value thereof' would be paid to the owner." *Id.*

This compensation for highway takings was not, however, universal. Virginia and Maryland, for example did not provide compensation for land taken for highways, and New York frequently amended its statute to provide more protection for highways in certain counties and less in others. *Id.* at 259. Moreover, the duty to compensate and manner in which it was made varied on the geographic, social, and political idiosyncrasies of the colonies. *Id.* at 269-70.

Still, the principal that fundamental fairness and Anglo-American tradition required government compensation for a taking, even when that taking might benefit the landowner, was well established in the colonial period. That the colonial legislatures typically limited those takings to "Improv'd or Inclosed Lands" rather than unimproved wilderness also shows that colonial legislators—like the *Arkansas Game and Fish Commission* Court—understood and honored land-owners' "reasonable investment-backed decisions." *See Ark. Game & Fish Comm'n*, 568

U.S. at 38-39. And in ordering compensation for highway takings, colonial legislatures well understood that it was government action—in the form of royal grants, land purchases, treaties (albeit often dishonored) and the implied government protection that went with them—that made the land available for settlement in the first place.

But while pre-revolutionary colonists were largely content to trust their legislatures to provide compensation when fair, the experience of the Revolutionary War impressed on them the need for a broader and more consistent protection of property rights. *See* Treanor, *supra* at 700-701. The Revolutionary War brought with it the with seizures of property from both the British and the Continental Army. St. George Tucker, the author of the first published treatise on the U.S. Constitution and editor of the 1803 edition of Blackstone's Commentaries posited that the new nation's shift to the inclusion of compensation requirements in state constitutions, ] the Northwest Ordinance, and in the Takings Clause was due to "the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war, without any compensation whatever." 1 Blackstone's Commentaries, Editor's App. 305–06 (1803).

Similarly, during the war, many of the newly independent states enacted legislation allowing the confiscation of loyalist property. Some Founders, including

Madison, were concerned that this confiscation threatened the long-term safety of property rights in general. *See* James W. Ely, Jr., PROPERTY RIGHTS IN AMERICAN HISTORY, 4 (1997); *see also* Treanor, *supra* at 709 (noting Madison's opposition to the seizure of loyalist property). In short, Americans were "not as secure in their property rights between 1776 and 1787 as they had been during the Colonial period." Forrest McDonald, *Novus Ordo Seclorum: The Intellectual Origins of the Constitution* 154 (1985).

## II. The Framers and Succeeding Generations Held the Just Compensation Requirement to be Categorical and Fundamental.

In the aftermath of the Revolutionary War, Madison voiced his concerns over the recent erosion of property rights, writing to Jefferson that "[t]he necessity of . . . guarding the rights of property was for obvious reasons unattended to in the commencement of the Revolution" and citing the need for positive steps to secure those rights in the new country. Treanor, *supra* at 710.

While the colonial right to compensation for a taking of property often relied on a patchwork of purveyance statutes and general reliance on the common law, the Congress of the Confederation of the United States provided what was to be the first national statement on the matter when it enacted the Northwest Ordinance of 1787. In essence, the Northwest Ordinance provided the first national "pre-constitutional codification of the eminent domain power." Joseph J. Lazzarotti, *Pub. Use Or Pub.*

*Abuse*, 68 UMKC L. REV. 49, 54 (1999).[2] In language that prefigured the Fifth Amendment, the 1787 Northwest Ordinance provided that:

> No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land, and *should the public exigencies make it necessary, for the common preservation, to take any person's property*, or to demand his particular services, *full compensation shall be made for the same*.

An Ordinance for the government of the Territory of the United States northwest of the River Ohio, art. 2. U.S.C.A., Northwest Ordinance art. 2 (1787) (emphasis added).

Madison, in particular, saw broad protection for property—both real and intangible—as the proper end of government. James Madison, *Property* (1792), complied in 1 *The Founders' Constitution*, Chap. 16, Doc. 23 (The University of Chicago Press, 1977), available at https://tinyurl.com/34cz994u. And after the experiences of the Revolutionary War, he believed it necessary "to erect strong safeguards for rights in general and for property rights in particular." Treanor, *supra* at 694. His Just Compensation clause—although intended to have relatively narrow legal consequences—was just such a safeguard. And although Madison viewed the Fifth Amendment as a restatement of what was already unquestionably the law, he believed that the codification of these pre-existing guarantees into the Bill of Rights would serve the hortatory purpose of encouraging respect for private property:

[2] While the Northwest Ordinance provided the first "national" statement of the Just Compensation requirement, the Vermont Constitution of 1777 and the Massachusetts Constitution of 1780 included similar categorical requirements. Trainor, at 701.

> Paper barriers have a tendency to impress some degree of respect for them, to establish the public opinion in their favor, and rouse the attention of the whole community.

*Id.* at 710, citing Speech Proposing the Bill of Rights (June 8, 1789), in 12 J. MADISON, THE PAPERS OF JAMES MADISON 204-05 (C. Hobson & R. Rutland eds. 1979)

Following ratification, Madison's broader vision took hold in American jurisprudence. Professor Treanor explains that "[i]n addition to limiting the national government's freedom of action, the just compensation clause served an educative role: It inculcated the belief that an uncompensated taking was a violation of a fundamental right. . . . the Fifth Amendment was a national declaration of respect for property rights. Treanor, *supra* at 714. By the 1820's, the principle of just compensation had won general acceptance. *Id.*

In the landmark case of *Gardner v. Village of Newburgh*, 2 Johns Ch. 162, 1 N.Y. Ch. Ann 332, 1816 WL 1306 (1816), Chancellor Kent articulated the broad Madisonian view that had begun at Runnymede, crossed the ocean, survived a war, and firmly established its place as the fundamental law of the new nation:

> I may go further, and show that this inviolability of private property, even as it respects the acts and the wants of the state, *unless a just indemnity be afforded,* has excited so much interest, and been deemed of such importance, that it has frequently been made the subject of an express and fundamental article of right in the constitution of government. Such an article is to be seen in the bill of rights annexed to the constitutions of the states of *Pennsylvania, Delaware,* and *Ohio;* and it has been incorporated in some of the written constitutions adopted in *Europe,* (Constitutional charter of *Lewis* XVIII., and the ephemeral, but very elaborately drawn, constitution *de la Republique Française* of 1795.) But what is of higher authority, and is absolutely decisive

> of the sense of the people of this country, it is made a part of the constitution of the *United States*, "that private property shall not be taken for public use, without just compensation." I feel myself, therefore, not only authorized, but bound to conclude, that a provision for compensation is an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property.

*Id*. (emphasis in original).

## III. The Government's Proposed Causation Test is Unworkable and Antithetical to the Framers' Intent

Commentators have noted that while frequently litigated, "[t]he law surrounding [the Takings Clause's] causation requirement is unsettled and therefore uncertain." Jan G. Laitos & Teresa Helms Abel, *The Role of Causation When Determining the Proper Defendant in a Takings Lawsuit*, 20 WM. & MARY BILL RTS. J. 1181, 1209 (2012). The difficulty in determining causation is particularly acute in government flooding cases, where courts must take into account both natural phenomena as well as past and current government actions.

This case provides the Court with opportunity to alleviate any confusion by defaulting to the Taking Clause's original purpose—"to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

The Appellants essentially argues that what the government giveth, it may taketh away. Because the lands would not have been available for farming without

a prior government intervention, the landowners have nothing to complain about when the government takes back that land. As the Appellee's brief explains, this misreads both *United States v. Miller*, 317 U.S. 369 (1943) and *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972), which turn on whether when the initial governmental action occurred, subsequent government action was contemplated.

But more fundamentally, reverting to a time before any government intervention as the baseline for any flood relating taking is entirely unworkable. Since at least the landmark decision in *Gibbons v. Ogden*, 22 U.S. 1 (1824), the federal government had been involved in river management and by extension, flood control. Joseph L. Arnold, OFFICE OF HISTORY UNITED STATES ARMY CORPS OF ENGINEERS, *The Evolution of the 1936 Flood Control Act*, 4 (1988) available at https://tinyurl.com/25bkvnpt. Following large floods in the lower Mississippi Delta in 1849 and 1850, Congress passed the Swamp Land Acts, which

> transferred "swamp and overflow land" from federal hands to most state governments along the lower Mississippi River on condition that the states use revenue from the land sales to build levees and drainage channels. The acts required no federal funds, but they provided a means of putting millions of acres of land into agricultural use, ultimately exacerbating the flood problem.

*Id.*

The most sweeping federal intervention in river management and flood control came through the 1936 Flood Control Act. The Declaration of Policy that

accompanied the Act stated Congress's intent

> that the Federal Government should improve or participate in the improvement of navigable waters or their tributaries, including watersheds thereof, for flood-control purposes if the benefits to whomsoever they may accrue are in excess of the estimated costs, and if the lives and social security of people are otherwise adversely affected.

Flood Control Act of 1936 § 1, Pub. L. No. 74-738, 49 Stat. 1572 (1936) (codified as amended at 33 U.S.C. § 701a (2006).

Notably, this preamble anticipated that the investments that the government was making would accrue to the benefit of the public at large and posterity, and that those long term general public benefits would exceed the immediate cost to the taxpayers. Congress gave no indication that these benefits were merely on loan and that the government might claim them as a set-off against compensation for a future taking.

The Flood Control Act's reach and the changes it brought to the country were immense and widespread. The Army Corps of Engineers Office of History documented the Act's transformational effect on American geography and economy:

> The hundreds of reservoir, levee, and channelization projects that resulted from the 1936 act and subsequent amendments have literally changed the face of the nation. The projects have contributed to both the growth of towns and the protection of rural farmlands. Secondary purposes, such as recreation and water supply, have become more important to an increasingly urbanized nation. There are few areas of the United States that have not received the benefits of these flood control projects.

Arnold, *supra* at Preface.

It is beyond impractical to turn back the clock or calculate a retractive set-off for all the changes wrought by government flood control policy. The Missouri River, at issue here, was "once one of the wildest stretches of river in the American Midwest." Timothy Kusky, "*A Brief History of Flooding and Flood Control Measures Along the Mississippi River Basin.*" Natural Disasters and Adaptation to Climate Change, 32 (2013), available at https://tinyurl.com/yckt86t6. Historically, the Missouri River floodplain below Sioux City, Iowa, covered 1.9 million acres. *Id.* But "by the late 1970s, the Lower Missouri River had been totally channelised and its natural floodplain ecosystems almost completely converted to agricultural or other uses." *Id.*

Even if the court could articulate a test that practically turns back the clock, such a test would still offend the principles of the Just Compensation requirement. Such a requirement would force a current landowner to pay for all the past benefits of policies that impacted not only his land, but society at large, as well as the future benefits that society at large might realize from increased wildlife habitat and protection of endangered species. Requiring current landowners to both pay back the benefits that prior owners and the public at large received as a set-off against compensation owed for benefits that accrue to the public at large now is incompatible with the spirit and history of the Fifth Amendment and the jurisprudence interpreting it.

## CONCLUSION

For the all the foregoing reasons, the decision of the Court of Federal Claims as it relates to damage causation should be affirmed.

Respectfully submitted,

*/s/ Jay R. Carson*
Jay R. Carson
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
Email: j.carson@buckeyeinstite.org

*Attorney for Amicus*
*The Buckeye Institute*

## CERTIFICATE OF SERVICE

On December 23, 2021, the foregoing brief was electronically filed using the Court's CM/ECF System, which will serve via-email notice of such filing to all counsel registered as CM/ECF users, including any of the following:

*Counsel for Plaintiffs-Cross-Appellants and Plaintiffs*
Donald B. Verilli, Jr.
Elaine Goldenberg
Benjamin Joseph Horwich
Jonathan Meltzer
Dahlia Mignouna
Seth C. Wright

*Counsel for Defendant-Appellee*
Brian C. Toth
Todd Kim

December 23, 2021

*/s/ Jay R. Carson*
Jay R. Carson
The Buckeye Institute
*Counsel for the Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 3,745 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word2010 in 14-point Times New Roman font.

December 23, 2021

*/s/ Jay R. Carson*
Jay R. Carson
The Buckeye Institute
*Counsel for the Amicus Curiae*