**Nos. 2021-1849, 2021-1875**

# United States Court of Appeals for the Federal Circuit

IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, DBA ROBERT ADKINS & SONS PARTNERSHIP, GERALD SCHNEIDER, DBA BUFFALO HOLLOW FARMS, INC.,

*Plaintiffs – Cross-Appellants,*

LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, DBA MIDWEST GRAIN CO., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, INDIVIDUALLY AND, DBA DREWES FARMS, INC., PATRICK NEWLON, DBA NEWLON FARMS, INC., DAVID NEWLON, DBA D DOUBLE N FARMS, INC., JASON TAYLOR, BRAD TAYLOR, DBA H.B.J. FARMS, INC., LYLE HODDE, DBA HODDE & SONS LIMITED PARTNERSHIP, STEVE CUNNINGHAM, TRUSTEE OF THE DORIS J. CUNNINGHAM AND STEVEN K. CUNNINGHAM DECLARATION OF TRUST, GAIL CUNNINGHAM, DBA CUNNINGHAM FARMS, INC., CHARLES GARST, INDIVIDUALLY AND, DBA GARST FARMS, INC., CONNIE GARST, DBA GARST FARMS, INC., RON SCHNEIDER, MARY SCHNEIDER, ET AL.,

*Plaintiffs,*

*v.*

UNITED STATES,

*Defendant – Appellant.*

*On Appeal from the United States Court of Federal Claims*
*No. 1:14-cv-00183-NBF (Hon. Nancy B. Firestone)*

## BRIEF OF THE CATO INSTITUTE AND MOUNTAIN STATES LEGAL FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS – CROSS-APPELLANTS AND AFFIRMANCE

Joseph A. Bingham
MOUNTAIN STATES
LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
(303) 292-2021
jbingham@mslegal.org

Ilya Shapiro
Trevor Burrus
*Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

*Counsel for Amicus Curiae*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Ideker Farms, Inc. **v.** US

Case No. 21-1849

**CERTIFICATE OF INTEREST**

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ☐ (appellee) ☒ (amicus) ☐ (name of party)

Cato Institute

Certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held Companies that own 10 % or more of stock in the party |
|---|---|---|
| Cato Institute | Same | None |
| Mountain States Legal Foundation | Same | None |
| N/A | N/A | None |
| N/A | N/A | None |
| N/A | N/A | None |
| N/A | N/A | None |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are: N/A

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect of be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary.)

Milne et al. v. United States, No. 20cv2079 (Fed. Cl.)
Nolan v. United States, No. 21cv00122 (Fed. Cl.)

December 23, 2021
Date

*/s/ Trevor Burrus*
Signature of counsel

Trevor Burrus
Printed name of counsel

## TABLE OF CONTENTS


CERTIFICATE OF INTEREST .......... ii

TABLE OF AUTHORITIES .......... iv

QUESTION PRESENTED .......... 1

INTEREST OF *AMICI CURIAE* .......... 2

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 5

I. WHEN OWNERS' EXPECTATIONS ARE REASONABLE, PUBLIC FUNDING FOR PRIVATE BENEFITS SHOULD NOT BE CONSIDERED BACKWARD-LOOKING COMPENSATION FOR LATER TAKINGS .......... 6

A. The Government's Right to Undertake Public Projects Should Be Balanced against Owners' Reasonable Investment-Backed Expectations .......... 6

B. The Government Mistakenly Cites a Handful of Rulings on Investment-Backed Expectations that Undermine Its Compensation Argument .......... 9

C. Due to Many Supreme Court Decisions, the Balance Between Public and Private Rights Would Not Be Undermined by a Ruling for the Plaintiffs .......... 12

II. BACKWARD-LOOKING COMPENSATION IS NOT JUST UNFAIR, IT WOULD ALSO DISINCENTIVIZE PRIVATE INVESTMENT IN PROJECTS INVOLVING PUBLIC LABOR AND CAPITAL .......... 16

A. The Takings Clause Includes Concerns of "Fairness and Justice," Which Counsel Against Backward-Looking Compensation .......... 16

B. Adopting the Government's Position Would Cause Private Parties to Think Twice Before Investing in the Countless Projects in Which the State Is Involved .......... 20

CONCLUSION .......... 25

CERTIFICATE OF SERVICE .......... 26

ADDITIONAL CERTIFICATES .......... 27

## TABLE OF AUTHORITIES

### Cases

*Appolo Fuels, Inc. v. United States*, 381 F.3d 1338 (Fed. Cir. 2004) ........................7

*Arkansas Game & Wildlife Commission v. United States*. 568 U.S. 23 (2012) ........4

*Armstrong v. United States*, 364 U.S. 40 (1960) ....................................................18

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) .......................................................15

*First English Evangelical Lutheran Church v. Cty. of Los Angeles*,
482 U.S. 304 (1987)..............................................................................................14

*Hadacheck v. Sebastian*, 239 U.S. 394 (1915) .......................................................14

*Jackman v. Rosenbaum*, 260 U.S. 22 (1922) .........................................................17

*John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972) ............ 10, 11

*Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331 (Fed. Cir. 2018)......6

*Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994) .............20

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987)............................................15

Order Denying Motion to Amend Answer on the Grounds Requested, *Ideker Farms, Inc., et al. v. United States* (Fed. Cir. Jan. 9, 2020) (No. 14-183L)........10

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2002)................................................6, 18

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)............ 21, 22, 24

*Pennell v. San Jose*, 485 U.S. 1 (1988)...................................................................15

*Pennsylvania Coal v. Mahon*, 260 U.S. 393 (1922) .................................................5

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) .......................................14

*United States v. Sponenbarger*, 308 U.S. 256 (1939)...................................... 11, 12

*St. Bernard Parish v. United States*, 887 F.3d 1354 (2018) ...............................9, 10

*United States v. Caltex (Philippines), Inc.*, 344 U.S. 149 (1952).............................9

### Other Authorities

1 William Blackstone, Commentaries on the Laws of England (1765) ..................13

A. Dan Tarlock, *United States Flood Control Policy: The Incomplete Transition From the Illusion of Total Protection to Risk Management*, 23 Duke Envtl. L. & Pol'y F. 151 (2012) ...........................................................................................16

Daniel R. Mandelkar, *Investment-Backed Expectations: Is There a Taking?*, 31 Wash. U.J. Urb. & Contemp. L. 3 (1987) ............................................ 23, 25

Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165 (1967) .......13

Ilya Somin, "Does the Takings Clause Require Compensation for Coronavirus Shutdowns?," *Reason*, Mar. 20, 2020..................................................................13

Lynda J. Oswald, *Cornering the Quark: Investment-Backed Expectations and Economically Viable Uses in Takings Analysis*, 70 Wash. L. Rev 91 (1995).......8

Mark S. Davis & Christopher J. Dalbom, *Taken by Storm—Property Rights and Natural Disasters*, 29 Tul. Envtl. L.J. 287 (2017)..................................8, 14

R.S. Radford & J. David Breemer, *Great Expectations: Will* Palazzolo v. Rhode Island *Clarify the Murky Doctrine of Investment-Backed Expectations in Regulatory Takings Law?*, 9 N.Y.U. Envtl. L.J. 449 (2001)..............................23

Richard A. Epstein, *Simple Rules for a Complex World* (1995) ............................17

Richard H. Pildes, *Conceptions of Value in Legal Thought*, 90 Mich. L. Rev. 1520 (1992)......................................................................................6

Robert M. Washburn, *Reasonable Investment-Backed Expectations as a Factor in Defining Property Interest*, 49 Wash U.J. Urb. & Contemp. L. 63 (1996).....23

Sam Spiegelman & Gregory Sisk, Cedar Point*: Lockean Property and the Search for a Lost Liberalism*, 2020-2021 Cato Sup. Ct. Rev. 165 (2021) ..........15

William Michael Treanor, *The* Armstrong *Principle, the Narratives of Takings, and Compensation Statutes*, 38 Wm. & Mary L. Rev. 1151 (1997) ..................18

## QUESTION PRESENTED

Whether the federal government can avoid takings liability for the flooding of farmland along the Missouri River, the foreseeable result of the United States Army Corps of Engineers' mission shift from agricultural promotion to endangered species protection, on the theory that because it created the farmland out of floodlands through earlier projects, its later re-flooding of those areas to fulfill an unforeseen policy change is nothing more than a downward adjustment of plaintiffs' initial windfall.

## INTEREST OF *AMICI CURIAE*[1]

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*.

Mountain States Legal Foundation is a nonprofit, public-interest law firm dedicated to bringing before the courts issues vital to the defense and preservation of individual liberties, the right to own and use property, the free enterprise system, and limited and ethical government. Since its creation in 1977, MSLF attorneys have been active in litigation regarding the proper interpretation and application of statutory, regulatory, and constitutional provisions.

This case interests *amici* because it represents one of the federal government's more egregious attempts to obscure its culpability for a taking. The government argues that because the United States Army Corps of Engineers made millions of

[1] Pursuant to F.R.A.P. 29(a), all parties received timely notice of *amici*'s intent to file this brief, and have consented. No part of this brief is authored by any party's counsel; nobody but *amici* funded its preparation and submission.

acres along the Missouri River farmable, its subsequent flooding of a portion of those lands to protect endangered species rather than to promote agriculture is nothing more than a downward adjustment of the aggrieved owners' economic windfall. Stretching the timeline to stifle plaintiffs' investment-backed expectations and avoid takings liability sets a dangerous precedent, one that could place far more than farmland in the Missouri River Basin—the largest watershed in the country—beyond the Takings Clause's protection.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2004 the United States Army Corps of Engineers (the "Corps") folded to outside pressures (some of which it was legally obligated to follow) and refocused its Missouri River Basin mission on endangered species protection instead of its decades-old program of maintaining dams and various channeling mechanisms to clear vast acreage along the Missouri's riverbanks for non-harmful agricultural and other economic uses. Those policy changes subverted (and continue to subvert) the reasonable investment-backed expectations of hundreds of farmers and other economic actors who were induced to stake their livelihoods on the Corps's actions, initiated through the Flood Control Act of 1944's Pick-Sloan Missouri Basin Program and continued for decades thereafter.

While this case involves certain technical details and terms that may be foreign to some (if not most), the elements that establish the federal government's

takings liability are quite understandable and conform with the factors the Supreme Court outlined for flood-related takings in *Arkansas Game & Wildlife Commission v. United States*. 568 U.S. 23 (2012). Plaintiffs effectively counter the government's argument that its actions do not meet each of *Arkansas*'s five factors. *Amici* argue that the federal government's actions are a taking. The federal government is wrong that its help in creating plaintiffs' farmland provides backward-looking compensation for its later taking of a portion of those lands through artificial flooding. As the government argues in its opening brief:

> By improperly treating operational and physical changes to a flood control project as stand-alone federal actions, the [Court of Federal Claims] has turned the Fifth Amendment's guarantee of just compensation for the taking of *private* property into a guarantee of compensation for the removal of *public* benefits that are not and cannot be deemed part of any private property title.

U.S. Br. at 35 (emphasis added). But even if a court were to construe conditional benefits as equivalent to backward-looking compensation for subsequent deprivations (a stretch in itself), that would not be applicable to this case. Longstanding takings jurisprudence demands that the plaintiffs' investment-backed expectations of what the federal government would do with respect to their land must take precedence.

## ARGUMENT

The government's backward-looking compensation argument poses dangers not just to the immediate case but threaten property rights everywhere. While the government highlights the hazard in limiting its abilities to undertake public works, the risk that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished," as Justice Oliver Wendell Holmes put it, must be balanced with the countervailing risks of public overreach into the private realm. *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 413 (1922). The Takings Clause anticipates this tension and is structured accordingly, both extending and limiting the eminent domain power through its "just compensation" proviso.

Uncertainty over whether a public conferral of a private benefit now is sufficient compensation for a rug-pulling later would also render the entry investment costs far too high—likely prohibitively so. Tracing through the chain of purported "givings" and takings to calculate a fair and just compensation is impractical if not impossible. Unless private benefits accumulated through public labor and capital expenditures are made conditional from the first, for the government to change tack midway would create prohibitive opportunity costs in countless other public-to-private ventures. Even the most risk-friendly investors would keep their distance on the increased likelihood that what the government helped giveth, it could thereby taketh away.

## I. WHEN OWNERS' EXPECTATIONS ARE REASONABLE, PUBLIC FUNDING FOR PRIVATE BENEFITS SHOULD NOT BE CONSIDERED BACKWARD-LOOKING COMPENSATION FOR LATER TAKINGS

### A. The Government's Right to Undertake Public Projects Should Be Balanced against Owners' Reasonable Investment-Backed Expectations

The government essentially argues that if subsequent flooding indeed effects a taking under *Arkansas*, then its hand in creating plaintiffs' farmland is backward-looking compensation for later damages resulting from the 2004 mission shift. U.S. Br. at 44. This characterization of "compensation" has no modern or historical doctrinal support. Indeed, courts—and American society—have long recognized that the government cannot without proper notice subvert the reasonable expectations of those who benefit from public-to-private land grants. *See Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) ("The reasonable, investment-backed expectations analysis is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted."); *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2002) (O'Connor, J., concurring) ("[T]he regulatory regime in place at the time the claimant acquires the property at issue helps shape the reasonableness of those expectations."); Richard H. Pildes, *Conceptions of Value in Legal Thought*, 90 Mich. L. Rev. 1520, 1550 (1992) (citing debates during the Civil War over whether

slaveowners should be compensated for emancipation, writing that compensation decisions that account for "transition policy"—changes to the law—"reflect and create social understandings about which policy changes interfere with existing investments morally important enough to be considered 'property'"). In this case, that means the federal government would have had to announce the likelihood of a policy change that would result in re-flooding *before* the plaintiffs lost the opportunity to price that risk into the labor and capital investments that the government deliberately induced them to make.

Short of common-law exceptions or practical limitations to public action, owners' reasonable investment-backed expectations at the time of purchase should factor into what amount of compensation qualifies as just (and of course this does not mean that their claimed expectations will be dispositive). *See Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (holding that among the factors courts should consider in "the determination of a party's reasonable expectations" is "whether the plaintiff could have reasonably anticipated the possibility of such regulation in light of the regulatory environment at the time of purchase"). Further, that notice must be *bona fide*. The government cannot avoid takings liability in a particular circumstance by stamping a disclaimer that at some point it could flood or otherwise invade lands it has cleared or facilitated for private use. *See* Lynda J. Oswald, *Cornering the Quark: Investment-Backed Expectations*

*and Economically Viable Uses in Takings Analysis*, 70 Wash. L. Rev 91, 110 (1995) ("[G]overnment officials could engage in strategic declarations of intent to regulate in the future, thus reducing property values and, concomitantly, eventual costs of takings."). Future destructive policy changes are *always* a possibility, and the Takings Clause properly understood serves to ensure that investors can expect compensation if one occurs that thwarts reasonable investment-backed expectations.

On the flipside, there are obvious practical and fairness limitations to the scope of government's liability for flood-related takings. The state is not, for example, responsible for sea-level rise in littoral zones where people have not invested time and money based on official assurances that their coastal properties would be protected. There are some natural processes that government simply cannot control without too great expense. Mark S. Davis & Christopher J. Dalbom, *Taken by Storm—Property Rights and Natural Disasters*, 29 Tul. Envtl. L.J. 287, 298 (2017) ("[I]t is one thing to find the government liable for a taking when it intentionally floods land . . . but it is quite another to hold government liable for a taking when seas rise, land sinks, or when a levee is overtopped or fails."). For example, while the government does not *have* to destroy private property to keep it out of enemy hands in wartime, sometimes that is the most prudent course of action when the property could be co-opted by the enemy for use against the United States. And that doesn't mean the government owes those owners compensation. *See United*

*States v. Caltex (Philippines), Inc.*, 344 U.S. 149, 155 (1952) (finding no taking in the retreating Army's destruction of property, reasoning that "this property, due to the fortunes of war, had become a potential weapon of great significant to the invader" and so "[i]t was destroyed, not appropriated for later use").

The state should not have to compensate for damages that, in view of the human and economic costs involved, it could not have been reasonably expected to prevent. But government certainly must compensate for injures that are within its vision to foresee and its competency to prevent.

### B. The Government Mistakenly Cites a Handful of Rulings on Investment-Backed Expectations that Undermine Its Compensation Argument

The government here asked the Court of Federal Claims (CFC) to cast a net so wide it would capture *all* the actions it ever took regarding plaintiffs' properties, thus arguing that, on balance, the government's actions would be found to be net positive. The CFC, though, was having none of it. In its brief, the government liberally cited *St. Bernard Parish v. United States*, 887 F.3d 1354 (Fed. Cir. 2018), in which this Court rejected a taking-by-flooding when residents around New Orleans experienced catastrophic flooding from Hurricane Katrina that could have been prevented had the Corps "properly maintain[ed] or modifi[ed]" the levees surrounding the city. *Id.* at 1358. This Court held that "the government cannot be liable on a takings theory for inaction." *Id.* at 1357. "While the theory that the

government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim." *Id.* at 1360.

The CFC agreed that *St. Bernard Parish* does not control this case because here, *inter alia*, the Corps took affirmative steps that increased the threats to which plaintiffs' properties were exposed. Order Denying Motion to Amend Answer on the Grounds Requested at 15–16, *Ideker Farms, Inc., et al. v. United States* (Fed. Cir. Jan. 9, 2020) (No. 14-183L) ("*St. Bernard Parish* leaves open the exact circumstances of this case where the flooding at issue is caused by government *actions* that were plainly not contemplated at the time the original river flood control management systems were designed and constructed.") (emphasis added).

Instead of failing to take action in the face of foreseeable but unpredictable and uncontrollable floods (e.g., resulting from hurricanes), the Corps changed *policy* direction, knowing full well what the consequences would be for plaintiffs' properties. Thus does the Corps's actions conform more closely to a crucial exception—or, more accurately, an elaboration of the scope—of the causation prong in taking-by-flooding cases. As set forth in *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972), this "exception" provides that "a risk-reducing action that precedes a risk-increasing action would only be considered if the risk-increasing action . . . was contemplated at the time of the risk-reducing action." Order Denying Motion, *supra*, at 10 (citing *Hardwicke*, 467 F.3d at 490–91).

This case fits neatly within the *Hardwicke* exception, considering the ample evidence on the record that plaintiffs did not, nor could not, have contemplated the post-2004 change in direction—especially not when they or their predecessors settled and developed the land beginning in the 1950s. And crucially, unlike the plaintiff in *Hardwicke*, plaintiffs here could not have contemplated such a comprehensive Corps mission shift when they formed their investment-backed expectations. *Hardwicke* involved two dams, one adding value to plaintiff's land, the other reducing it. The first dam was "anticipated [to succeed] in controlling floods" when plaintiffs purchased hundreds of acres between 1961 and 1963 (adding value and raising the price of purchase). The second, however, "[o]n those dates . . . was completed and in plain sight . . . so that plaintiffs cannot base a taking claim on the hypothesis that they can garner the benefit conferred" by the one "without deduction for the detriment" of the other. *Hardwicke*, 467 F.2d at 491.

In addition to *St. Bernard Parish* and *Hardwicke*, the government incorrectly applies *United States v. Sponenbarger*, 308 U.S. 256 (1939), to support its claim that plaintiffs' reasonable investment-backed expectations did or should have included the potential for a Corps mission shift. U.S. Br. at 37–44. In *Sponenbarger*, the Supreme Court held that where the "relative benefits" were net positive, there was no taking: "[This Court] has never held that the Government takes an owner's land by a flood program that does little injury in comparison with far greater benefits

conferred." *Id.* at 266–67. While this might appear to support the government's argument, *Sponenbarger* does not.

*Sponenbarger* concerned the Flood Control Act of 1928, which "envisaged a vast program"—like the one in this case. But unlike here, the plaintiff in *Sponenbarger* should have priced in the *likelihood* that the government would implement changes periodically in order to further the Act's *original purpose* of flood control: "Recognizing the value of experience in flood control, Congress and the sponsors of the [1928] Act did not intend it to foreclose the possibility of changing the program's details as trial and error might demand." *Id.* at 268. This is far from the predicament in which plaintiffs find themselves. Here the Corps *has* departed from the original purpose of the 1944 Act, and, in contrast to *Sponenbarger*, it has not made mere adjustments necessary to sustain that purpose.

### C. Due to Many Supreme Court Decisions, the Balance Between Public and Private Rights Would Not Be Undermined by a Ruling for the Plaintiffs

The Takings Clause looks for a kind of equilibrium between the just use of the government's eminent domain power and owners' investment-backed expectations. As the late Professor Frank Michelman put it in his seminal *Property, Utility, and Fairness*: "It is supposed that men will not labor diligently or invest freely unless they know they can depend on rules which assure them that they will indeed be permitted to enjoy a substantial share of the product as the price of their

labor or the risk of their savings." Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165, 1212 (1967).

In light of the options available to courts, this approach—which requires a consideration of investment-backed expectations in the measurement of compensation owed—is preferable to other theories of takings, such as William Blackstone's absolutist definition of property, which makes little room for the state's exercise of its necessary taking powers. Blackstone opposed eminent domain in almost all cases. 1 Commentaries on the Laws of England 134–35 (1765) ("[T]he law of the land . . . postpone[s] even public necessity to the sacred and inviolable rights of private property.").

Courts should rightly fear a purist Blackstonean approach, which one could expect to require compensation for *all* public interferences with private property. It is, to put it mildly, unrealistic, especially in the modern world. *See, e.g.*, Ilya Somin, "Does the Takings Clause Require Compensation for Coronavirus Shutdowns?," *Reason*, Mar. 20, 2020, https://bit.ly/3p0kImi (concluding that the Takings Clause does not require compensation for most legitimate business shutdowns to reduce Covid-19 transmissions). Rest assured that this case and those like it will not move takings law anywhere close to Blackstone's Shangri-La, even as the government insists that the CFC "provides [p]laintiffs with a private property right to the public

benefits of government-provided flood protection and incorrectly transforms the government into an insurer against flooding." U.S. Br. at 23. For the government, *just* compensation means not having to pay for things that it could neither have foreseen nor afford to prevent—hurricane damage not attributable to a governmental action or omission, for example. *See* Davis & Dalbom, *supra*, at 298.

This well-established tradeoff between public and private prerogatives—along with all the permissions for government action articulated by the Supreme Court—should allay the not entirely unreasonable fear that a ruling for plaintiffs would endanger public action that confers private benefits. Beyond wartime destruction (*Caltex*), these Supreme Court permissions include, in chronological order of the most notable case(s) for each:

(1) Restricting nonconforming uses in zones created *after* those nonconforming uses began. *Hadacheck v. Sebastian*, 239 U.S. 394 (1915).

(2) Forcing certain businesses that have opened their doors to the public (e.g., shopping malls) to host speech with which its owners disagree. *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980).

(3) Normal delays in the granting of land-use permits. *First English Evangelical Lutheran Church v. Cty. of Los Angeles*, 482 U.S. 304 (1987).

(4) Imposing rent controls for the benefit of hardship tenants, provided landlords receive a reasonable return. *Pennell v. San Jose*, 485 U.S. 1 (1988).

(5) Allowing government agencies to impose conditions on land-use permits, provided what the developer must pay for bears an "essential nexus" to, and is "roughly proportional" in view of, the proposed use. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

And these cases only scratch the surface. All of them arguably fall under the state's police powers (or the federal government's enumerated powers)—especially those related to zoning. Still, the key takeaway is that courts will give government wide latitude in defining its own non-takings powers. But the government cannot use the courts' deferential approach to turn takings into public windfalls, at private expense, under the guise of public *rights*. That option is dangerous. *See* Sam Spiegelman & Gregory Sisk, Cedar Point*: Lockean Property and the Search for a Lost Liberalism*, 2020–2021 Cato Sup. Ct. Rev. 165, 166 (2021) ("In an era of ubiquitous governmental involvement in the private sector, any meaningful right to possess property would be eviscerated if all regulations of property were regarded as exceptions to the Takings Clause.").

## II. BACKWARD-LOOKING COMPENSATION IS NOT JUST UNFAIR, IT WOULD ALSO DISINCENTIVIZE PRIVATE INVESTMENT IN PROJECTS INVOLVING PUBLIC LABOR AND CAPITAL

### A. The Takings Clause Includes Concerns of "Fairness and Justice," Which Counsel Against Backward-Looking Compensation

Although the jurisprudence of the Takings Clause can be complex, the clause itself reflects an underlying concern for basic fairness and justice. If someone is to give up their property, it better be for the *public* benefit, not merely to enrich other private interests or government actors, and they better get *just* compensation. Figuring out what all that means in practice is of course the task of courts deciding takings claims. Yet allowing for a theory of backward-looking compensation when it is reasonable for the property owners to rely on a continuation of the government's policies—here because the purpose of the Pick-Sloan Act is clear—undermines the fairness and justice that are, fundamentally, at the core of the Takings Clause.

Under Pick-Sloan, the Corps engineered the Missouri River to make room for farmland that the federal government expected would benefit the broader American public. *See generally* A. Dan Tarlock, *United States Flood Control Policy: The Incomplete Transition from the Illusion of Total Protection to Risk Management*, 23 Duke Envtl. L. & Pol'y F. 151 (2012). The program was meant to bolster national economic prospects, not simply to reward the pioneering spirit of those who settled and farmed the cleared acreage. Characterizing the farming of former floodlands as

backward-looking compensation for the Corps's recent policy changes ignores this original purpose.

Though the CFC made quick work of the government's attempt to use *St. Bernard Parish*, *Hardwicke*, and *Sponenbarger* to its advantage, there is a critical lesson in the effort: Zoom out far enough, and the government could construe (or at least attempt to construe) most anything as a mere withdrawal of earlier windfalls. The danger to individual liberties this perspective poses is far greater to society writ-large than are those the government believes might follow if this Court rules in plaintiffs' favor.

In addition to the Supreme Court's safeguards for government action discussed in Part I.C, *supra*, another doctrine that protects systemic public interferences with the private realm is the "average reciprocity of advantage," which Justice Holmes first articulated in *Jackman v. Rosenbaum*, 260 U.S. 22, 30 (1922). Professor Richard Epstein reframed the concept as "in-kind compensation," where regulations that "sweep more broadly" in a sense pay for themselves, "insofar as all persons are benefited and burdened in equal proportions." Richard A. Epstein, *Simple Rules for a Complex World* 134 (1995). This concept justifies countless regulations that sit on the border between takings and police powers, zoning being perhaps the most ubiquitous.

An important limit on the average reciprocity of advantage is the ethos, reiterated in countless takings cases, that the Takings Clause is "designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The so-called "*Armstrong* principle" is a mainstay of takings jurisprudence. And unlike the "reciprocity of advantage," it hardly lurks in the shadows. It has taken center stage in several landmark rulings, and though somewhat vague it encapsulates that balance the clause is designed to strike between public and private rights. *See generally* William Michael Treanor, *The* Armstrong *Principle, the Narratives of Takings, and Compensation Statutes*, 38 Wm. & Mary L. Rev. 1151 (1997).

Those owners who "deserve" to have the values of their properties adjusted downward—to halt nuisances or to otherwise protect the public's health, safety, or morals—will bear them at no cost to the public fisc. But those owners who do not "deserve" to eat such losses, and are not compensated through implicit reciprocal advantages, are entitled to direct payment. It is fair and just to include within the latter's ambit those who staked their investment-backed expectations on the maintenance of an existing regime for which, at time of purchase, the government gave no indication of future alteration, even if it might strike some as a windfall. *See, e.g.*, *Palazzolo*, 533 U.S. at 636 (Scalia, J., concurring) (comparing potential for

a "sharp real estate developer" who realizes or "gambl[es]" that a regulation is unconstitutional to purchase property from a "naive landowner" before the offending law is invalidated to "the windfalls that occur every day at stock exchanges or auctions, where the knowledgeable (or the venturesome) profit at the expense of the ignorant (or the risk averse)").

Further, factoring in an owner's investment-backed expectations of the regulatory regime existing at the time of purchase will not so restrain public action that "government hardly could go on," as Justice Holmes put it. The Supreme Court has devised many workarounds and exceptions—discussed in Part I.C, *supra*—to ensure that this is not the case. Finding this line is in some cases a delicate pursuit—though not here. The plaintiffs did everything right, and much more is at risk if this Court favors the government's position.

The Takings Clause is designed to balance public and private interests, and not to favor one at the expense of the other. To maintain this balance, any interpretation of the clause must adhere to certain standards. For instance, *just* compensation requires that, even while the laws regulating their property may change with time, the point at which owners' costs are measured will not. In *Loveladies Harbor, Inc. v. United States*, this Court found that "interference with distinct investment-backed expectations . . . limit[s] takings recoveries to owners who could demonstrate that they bought their property in reliance on state of affairs

that did not include the challenged regulatory regime." 28 F.3d 1171, 1177 (Fed. Cir. 1994). The cases *Loveladies* uses for this proposition involved "regulatory regimes" that had not so changed as to legitimately frustrate claimant's expectations at purchase. This is not the case here. Throughout the litigation, plaintiffs have provided ample evidence that the post-2004 regulatory landscape creating the conditions that led to more flooding was an entirely different one than the one they or their predecessors encountered at purchase.

### B. Adopting the Government's Position Would Cause Private Parties to Think Twice Before Investing in the Countless Projects in Which the State Is Involved

Consider some of the many ways in which the public and private spheres are enmeshed—from taxation redistributing wealth on a regular basis to a complex of federal, state, and local laws favoring some interests to the detriment of others. Plaintiffs provide some examples of these entanglements (and entanglements of these entanglements). Pl. Br. at 40–43. In each of these cases, time and the complexities of life create an intricate maze of causes and effects—too intricate, in fact, to ever disentangle accurately. If this Court adopts the government's position, in subsequent cases officials will use this muddle to its advantage, overstating its contributions of labor and capital in an endless sea of public-to-private ventures, confident that courts will at worst revert to an exaggerated mean. Without

investment-backed expectations included in purchasers' cost bases, there will be far less on their side of the ledger to counterbalance the government's deductions.

And as anathema to the *Armstrong* principle as the government's proposed rule is, it is also downright reckless. Factoring investment-backed expectations into their baseline provides purchasers of any interest—regardless of the government's role in creating it—a degree of certainty, the loss of which is reflected in what rational buyers are willing to put down. If would-be investors are less certain that their investment would be fruitful, the less they will be willing to pay—if they can stomach paying anything at all.

In *Penn Central Transp. Co. v. New York City*, the Supreme Court held that a regulation can effect a taking if, using an ad hoc factual approach, a court finds that it has had an undue "economic impact" on the owner, in particular their investment-backed expectations, or the "character of the governmental action" makes it obviously a taking: "A 'taking' may more readily be found when the interference . . . can be characterized as a physical invasion . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. 104, 125 (1978). Notice that the "adjustment" language relates to the "character of the governmental action," and not to the investment-backed expectations prong. Justice William Brennan, writing for the majority in *Penn Central*, elaborated on this distinction:

> [T]his Court has . . . recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example. A second are the decisions in which this Court has dismissed "taking" challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant. . . .

438 U.S. at 124–25.

The upshot of the Court's distinction in *Penn Central* is that these sorts of "adjustments," including the taxing power and other regulations that fall within the state's police powers, are *involuntary*—in contrast to the drastic policy changes the Corps adopted after 2004. Investment-backed expectations, on the other hand, presume that one makes the choice to invest in the first place. Government could likely go on without these voluntary investments, though it would certainly have a harder go of it. The prices the reasonable person would be willing to pay would decline—to fatal levels for some public projects—were courts to give official versions of owners' investment-backed expectations the same deference as they tend to give the "adjustments" of value that the maintenance of routine government demands.

Despite surface-level appearances that "estoppel and vested rights doctrines protect a landowner from a change in land use regulations if he makes substantial expenditures on a development project in good faith reliance on a government act," these concepts have not translated well into takings law. Daniel R. Mandelkar, *Investment-Backed Expectations: Is There a Taking?*, 31 Wash. U.J. Urb. & Contemp. L. 3, 5 (1987). While Justice Brennan's reference to "distinct investment-backed expectations" "can be interpreted as well-defined or explicit" and "involv[ing] a financial venture with a view toward a specific future use"—in this case, agricultural and other commercial concerns along the Missouri—"[c]ourts have rarely relied on" that prong "as the sole factor in concluding that a taking without just compensation has occurred." Robert M. Washburn, *Reasonable Investment-Backed Expectations as a Factor in Defining Property Interest*, 49 Wash U.J. Urb. & Contemp. L. 63, 67 (1996). Indeed, in many cases courts seem not to lend claimants' investment-backed expectations much weight at all. *See* R.S. Radford & J. David Breemer, *Great Expectations: Will* Palazzolo v. Rhode Island *Clarify the Murky Doctrine of Investment-Backed Expectations in Regulatory Takings Law?*, 9 N.Y.U. Envtl. L.J. 449, 497 (2001) (noting that courts will often use "imputed expectations and constructive notice" of regulatory changes "to deny compensation for both partial and total regulatory takings").

The government's efforts to avoid payment here are but one example of the long odds aggrieved owners tend to face in regulatory-takings litigation. And for the reasons explained, these long odds carry costs—not just for the owners, but for the government, too. For example, if the Treasury Department reduced the interest rate on its notes fixed at auction, many holders would likely sell theirs in the secondary market at a loss. There is not much daylight between T-Note holders in this hypothetical and the plaintiffs in this case: Both see the reasonable expectancies on which they based their investment pulled out from under them. Besides the contextual distinctions—which should not bear on the severity of the deprivation—the same basic economic failure would result in both cases: The Treasury Department would raise fewer funds through T-Note issues, and the Pick-Sloan Program would have created far less economic activity in the Missouri Basin than hoped.

This comparison also highlights an important element here that is missing from cases wherein the governmental actions are closer to those Justice Brennan described as simply "adjusting the benefits and burdens of economic life." *Penn Central*, 438 U.S. at 125. Those cases involve uncertainties resembling those that investors face in securities markets. In those cases, "[i]nvestors should discount the risk of uncertainty about government regulation," lest "[t]he availability of compensation . . . distort the market and create inefficiencies." Mandelkar, *supra*, at

229. Without forcing investors to eat those uncertainty costs, "[t]he availability of compensation would only distort the market and create inefficiencies." *Id.* But not so in cases like this one, wherein "there is an abrupt and arbitrary change in a government regulation." *Id.* at 228.

In sum, the government's position ignores not just the *Armstrong* principle, but also the ultimate *economic* character of just compensation, too. Given the cascading effect of the government's argument could have on the economic potential of public-to-private ventures, it does so at its peril.

## CONCLUSION

For the above reasons, and those stated by plaintiffs, this Court should uphold the decision of the court below.

Respectfully submitted,

Joseph A. Bingham
MOUNTAIN STATES
LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
(303) 292-2021
jbingham@mslegal.org

Ilya Shapiro
Trevor Burrus
*Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

*Counsel for Amicus Curiae*

December 23, 2021

## CERTIFICATE OF SERVICE

On December 23, 2021, the foregoing brief was electronically filed using the Court's CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

*Counsel for Plaintiffs–Cross-Appellants and Plaintiffs*
Donald B. Verrilli, Jr.
Elaine Goldenberg
Benjamin Joseph Horwich
Jonathan Meltzer
Dahlia Mignouna
Seth C. Wright

*Counsel for Defendant–Appellee*
Brian C. Toth
Todd Kim

December 23, 2021

*/s/ Trevor Burrus*
Trevor Burrus
Cato Institute
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Federal Circuit Rule 32(a) in that the brief contains 5,408 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that the brief has been prepared in a proportionally spaced typeface using MS Word 2016 in a 14-point Times New Roman font.

December 23, 2021

*/s/ Trevor Burrus*
Trevor Burrus
Cato Institute
*Counsel for Amicus Curiae*