Nos. 2021-1849, -1875

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, dba Robert Adkins & Sons Partnership, GERALD SCHNEIDER, dba Buffalo Hollow Farms, Inc.,
*Plaintiffs–Cross-Appellants,*

LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, dba Midwest Grain Co., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, individually and, dba Drewes Farms, Inc., PATRICK NEWLON, dba Newlon Farms, Inc., DAVID NEWLON, dba D Double N Farms, Inc., JASON TAYLOR, BRAD TAYLOR, dba H.B.J. Farms, Inc., LYLE HODDE, dba Hodde & Sons Limited Partnership, STEVE CUNNINGHAM, Trustee of the Doris J. Cunningham and Steven K. Cunningham Declaration of Trust, GAIL CUNNINGHAM, dba Cunningham Farms, Inc., CHARLES GARST, individually and, dba Garst Farms, Inc., CONNIE GARST, dba Garst Farms, Inc., RON SCHNEIDER, MARY SCHNEIDER, et al.,
*Plaintiffs*,

v.

UNITED STATES,
*Defendant–Appellant.*

Appeal from the United States Court of Federal Claims
No. 1:14-cv-00183-NBF (Hon. Nancy B. Firestone)

# RESPONSE AND REPLY BRIEF FOR THE UNITED STATES

TODD KIM
*Assistant Attorney General*

BRIAN C. TOTH
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0639
brian.toth@usdoj.gov

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

I. The CFC's judgment should be reversed. .......... 3

A. The CFC applied an incorrect causation standard. .......... 3

B. The CFC erred by prohibiting the United States from presenting evidence that the relative benefits of the government action to Plaintiffs exceed its detriments. .......... 20

C. The CFC misapplied the pertinent factors for determining whether a taking occurred. .......... 25

1. Character of the land .......... 25

2. Reasonable, investment-backed expectations .......... 26

3. Severity .......... 30

D. The CFC erred by selecting an unsupported date of taking. .......... 32

II. Plaintiffs' arguments on cross-appeal should be rejected. .......... 41

A. The CFC correctly denied compensation for crop losses that occurred before the date of taking. .......... 42

B. The CFC correctly denied compensation for a taking by flooding during 2011. .......... 46

CONCLUSION .......... 51

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*767 Third Ave. Assocs. v. United States*,
48 F.3d 1575 (Fed. Cir. 1995) .......... 28

*Alford v. United States*,
961 F.3d 1380 (Fed. Cir. 2020) .......... 22, 23

*Almota Farmers Elevator & Warehouse Co. v. United States*,
409 U.S. 470 (1973) .......... 15

*Alves v. United States*,
133 F.3d 1454 (Fed. Cir. 1998) .......... 12

*Ark-Mo Farms, Inc. v. United States*,
530 F.2d 1384 (Ct. Cl. 1976) .......... 24

*Arkansas Game & Fish Commission v. United States*,
87 Fed. Cl. 594 (2009) .......... 44

*Arkansas Game and Fish Commission v. United States*,
568 U.S. 23 (2012) .......... 25, 32, 43

*Arkansas Game and Fish Commission v. United States*,
736 F.3d 1364 (Fed. Cir. 2013) .......... 31, 43

*Armstrong v. United States*,
364 U.S. 40 (1960) .......... 23

*Banks v. United States*,
314 F.3d 1304 (Fed. Cir. 2003) .......... 41

*Banks v. United States*,
741 F.3d 1268 (Fed. Cir. 2014) .......... 34, 37, 41

*Barnes v. United States*,
538 F.2d 865 (Ct. Cl. 1976) .......... 36

*Bartz v. United States*,
633 F.2d 571 (Ct. Cl. 1980) ....................23, 24

*Boling v. United States*,
220 F.3d 1365 (Fed. Cir. 2000) ....................34, 37

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .................... 39

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) .................... 50

*City of Van Buren v. United States*,
697 F.2d 1058 (Fed. Cir. 1983) .................... 23

*Conti v. United States*,
291 F.3d 1334 (Fed. Cir. 2002) .................... 12

*Cooper v. United States*,
827 F.2d 762 (Fed. Cir. 1987) .................... 44

*Cotton Land v. United States*,
75 F. Supp. 232 (Ct. Cl. 1948) .................... 34

*Danforth v. United States*,
308 U.S. 271 (1939)....................17, 18

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).................... 15

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).................... 15

*Gadsden Indus. Park, LLC v. United States*,
956 F.3d 1362 (Fed. Cir. 2020) .................... 46

*Goodrich v. United States*,
434 F.3d 1329 (Fed. Cir. 2006) .................... 37

*Hendler v. United States*,
175 F.3d 1374 (Fed. Cir. 1999) .......................................................... 22

*In re Operation of Missouri River System Litigation*,
421 F.3d 618 (8th Cir. 2005) ................................................................ 6

*John B. Hardwicke Co. v. United States*,
467 F.2d 488 (Ct. Cl. 1972) ................................................... 7, 8, 9, 10

*Johnson v. United States*,
479 F.2d 1383 (Ct. Cl. 1973) ............................................................. 16

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ............................................................................. 6

*Mildenberger v. United States*,
643 F.3d 938 (Fed. Cir. 2011) ............................................... 37, 40, 41

*Miller v. United States*,
317 U.S. 369 (1943) ............................................................................. 9

*Northwest Louisiana Fish & Game Preservation Commission v. United States*,
446 F.3d 1285 (Fed. Cir. 2006) .......................................................... 34

*Penn Central Transportation Co. v. New York City*,
438 U.S. 104 (1978) ..................................................................... 31, 32

*Portsmouth Harbor Land & Hotel Co. v. United States*,
260 U.S. 327 (1922) ........................................................................... 39

*Ridge Line, Inc. v. United States*,
346 F.3d 1346 (Fed. Cir. 2003) .......................................................... 45

*Rith Energy, Inc. v. United States*,
247 F.3d 1355 (Fed. Cir. 2001) ............................................................ 6

*St. Bernard Parish Government v. United States*,
887 F.3d 1354 (Fed. Cir. 2018) ......................................... 3, 7, 10, 11, 28

*Symbol Techs., Inc. v. Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991) ........................................................ 51

*United States v. Dow*,
357 U.S. 17 (1958) ............................................................................ 36

*United States v. General Motors*,
323 U.S. 373 (1945)........................................................................... 45

*United States v. L.A. Tucker Truck Lines*,
344 U.S. 33 (1952) ..........................................................................43-44

*United States v. Sponenbarger*,
308 U.S. 256 (1939).......................................................4, 9, 18, 19, 22

*United States v. Virginia Electric & Power Co.*
365 U.S. 624 (1961)........................................................................... 15

*United States ex rel. TVA v. Powelson*,
319 U.S. 266 (1943)........................................................................... 45

*Webster v. Fall*,
266 U.S. 507 (1925)........................................................................... 43

**Statutes and Court Rules**

Administrative Procedure Act
5 U.S.C. § 702................................................................................... 14

5 U.S.C. § 706(2)(A) ......................................................................... 15

28 U.S.C. § 2501 .................................................................................... 41

28 U.S.C. § 2509 .................................................................................... 15

33 U.S.C. § 579a .................................................................................... 14

33 U.S.C. § 579d-2 ................................................................................. 14

33 U.S.C. § 2282e.................................................................................... 14

Pub. L. 97-128, 95 Stat. 1681 (Dec. 29, 1981) .......... 14

Consolidated Appropriations Act, 2005
Pub. L. No. 108-447, 118 Stat. 2809 (2004) .......... 5

## Regulations

33 C.F.R. § 222.5(g)(2) .......... 14

40 C.F.R. § 1503.1–1503.4 .......... 14

40 C.F.R. § 1506.6 .......... 14

## Other Authorities

GAO Report B-206437 (Mar. 23, 1982), available at
https://www.gao.gov/assets/ced-82-55.pdf .......... 14

## INTRODUCTION

The government appeals from an unprecedented judgment of the United States Court of Federal Claims (CFC) holding the United States liable for a Fifth Amendment taking caused by the U.S. Army Corps of Engineers (Corps) undertaking physical and operational changes to the Missouri River Reservoir System (System) and related improvements (i.e., the Bank Stabilization and Navigation Project and federally authorized levees). That System—a massive, highly regulated program of reservoirs, navigational improvements, and levees along the Missouri River originally constructed more than half a century ago—has indisputably benefitted more than it has harmed adjacent landowners over the System's lifetime. The CFC attributed increased flooding on Plaintiffs' properties to the combined effect of changes in the System's operation and in its physical make-up, changes that were necessary to continue operating the System in compliance with the Endangered Species Act of 1973 (ESA).

Critically, the CFC erroneously failed to account for the extraordinary and undisputed improvements to Plaintiffs' properties resulting from the System, by (1) refusing to use a baseline for analyzing causation that compares the flooding Plaintiffs actually experienced to flooding that would have occurred without the System, and (2) precluding the government from presenting evidence that the relative benefits of the System outweigh asserted detriments from the Corps'

post-2004 changes to the System's operation and some physical components. The CFC's approach is contrary to established law. The ruling impermissibly incorporates into Plaintiffs' property title a guaranteed level of government-provided flood protection. Congress never so intended when authorizing the construction of the System, the management and operation of which was always understood to be subject to change based on compliance with contemporary law.

Nor can the CFC's approach reasonably be understood as a workable judicial construction of the Fifth Amendment, for it would require compensating landowners whenever compliance with congressional enactments merely reduces the benefits that taxpayers across the Nation have already long paid for, and Plaintiffs have long received. We are aware of no other gratuity provided by the United States that can become a guaranteed property interest subject to a taking by the United States merely due to the passage of time. Plaintiffs' response brief contends that reversal would result in "outrageous" scenarios where the government floods cities with impunity, but there are protections against such a result short of compensating the System's beneficiaries for every change in regulation that may result in a reduction of their profits.

For the reasons explained below and in the government's Opening Brief, the CFC's judgment should be reversed.

## ARGUMENT

### I. The CFC's judgment should be reversed.

#### A. The CFC applied an incorrect causation standard.

The United States' opening brief (pp. 27-36) showed that the CFC applied the wrong legal standard for proving causation in a takings case. This Court's decision in *St. Bernard Parish Government v. United States*, 887 F.3d 1354 (Fed. Cir. 2018), required that the CFC consider whether changes in flooding patterns that occurred on Plaintiffs' properties after the Corps made River and System changes in 2004 were worse than would have occurred but for the presence of the System and related improvements—a showing that Plaintiffs indisputably cannot meet. Instead of applying that precedent, the CFC seized on dicta from an old Court of Claims case to create a claimed "exception" to the *St. Bernard* causation standard, allowing Plaintiffs to prove causation by comparing the flooding that occurred after 2004 to flooding that purportedly would have occurred just before 2004.

The CFC's approach is both erroneous and unprecedented. Dicta in *St. Bernard* suggests that there might be situations where an historic federal flood-control project becomes part of the baseline against which the effects of a *new unrelated* project are determined, for purposes of deciding whether the new project causes a taking of private property. But until this case, no court has ever

applied that notion to hold that a taking occurred. And to create such an exception to the ordinary causation standard here—in the context of operational changes to an *existing* flood-control project—would dramatically expand federal takings liability beyond any reasonable application of the Fifth Amendment.

Specifically, the CFC's decision transforms the government into an insurer against flooding, improperly incorporating into Plaintiffs' real property title a *private* right to the *public* benefits of the historical level of government-provided flood protection. If allowed to stand, future takings claims may succeed on the theory that whenever the Corps (or any other agency) changes its operations or management of a flood-control project, any resulting changes in flood-patterns cause a taking of private property, even if the property otherwise would have been flooded worse absent the government project. There is no such guarantee in the Fifth Amendment. *See United States v. Sponenbarger*, 308 U.S. 256 (1939).

1. Initially, much of Plaintiffs' response brief depends on a skewed view of the record facts. Plaintiffs erroneously represent that the Corps' long-planned changes to its Master Manual in response to the first extended drought since the System became operational were a dramatic and surprising shift to prioritizing the System management for ESA-listed fish and wildlife species at the expense of flood control. *See*, *e.g.*, Response Brief 8-13, 21, 24-25. Although

the government is not challenging the CFC's fact-finding, some context for Plaintiffs' assertions is required.[1]

The government presented evidence at trial based on hydrological modeling that the Plaintiffs' properties would have flooded in the absence of the Corps' changes, and that precipitation, snowmelt and uncontrolled runoff were the fundamental cause of the flooding about which Plaintiffs complain. *See*, *e.g.*, Appx24671 (testimony by government's hydrologic engineering expert); *see also* Appx23669, Appx23763-23764, Appx23767-23771 (various testimony about runoff, upwardly trending flow volumes in the River's tributaries). Considerable parts of the CFC's first trial opinion discuss the parties' competing expert testimony. *See*, *e.g.*, Appx52-77, Appx85-133, Appx141-152. That the CFC, sitting as a fact-finder, was ultimately persuaded by Plaintiffs' experts does not diminish the complexity of the factual issues or call into question that, as the

[1] Plaintiffs exaggerate the meaning of one Corps employee's email mentioning a "paradigm shift" for funding the Corps' mitigation projects after the U.S. Fish and Wildlife Service released a biological opinion under the ESA in 2003. *E.g.*, Response Brief 8, 12, 20-21. Read in context, the single Corps employee's testimony and the email reveal merely that the off-hand use of that phrase primarily referred to a change in how such projects were funded and managed, not to the impacts of such projects on properties affected by the project. *See* Appx23556, Appx53501-53503; *see also* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 2939 (2004) (appropriating funds "for the benefit of federally listed species" to address effects of Corps projects).

CFC found, the Corps has attempted to minimize the impact of its River and System changes on flooding. Appx114.

Furthermore, Plaintiffs assert that the Corps in 2004 "fundamentally changed" its approach to managing the System, elevating fish and wildlife concerns and deemphasizing flood control, even intending to "revert" the River to its "natural state." Brief 10-11. As explained in the opening brief, however, the prioritization of management purposes under the 2004 Manual was challenged in other litigation, and the Manual was upheld as "in accordance with the [Flood Control Act of 1944]" precisely because it did not improperly elevate fish and wildlife interests over other interests such as maintaining downstream navigation. *In re Operation of Missouri River System Litigation*, 421 F.3d 618, 630 (8th Cir. 2005). Had the 2004 Manual deprioritized flood control in the manner that Plaintiffs assert, the Corps' "balancing" of interests could not have been in accordance with the 1944 Act, and a takings claim would not be cognizable. *See*, *e.g.*, *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001) (a plaintiff is "required to litigate its takings claim on the assumption that the administrative action was . . . lawful"); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (the "Takings Clause presupposes that the government has acted in pursuit of a valid public purpose").

2. The CFC's causation ruling rests on an erroneous legal standard. Plaintiffs contend that the "binding precedent" of *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972), dictates the result that the CFC reached on causation. Response Brief 31. That contention is based on a misreading of the applicable case law.

Fundamentally, the causation standard for determining whether the government has caused a taking-by-flooding is set forth in *St. Bernard*, which imposes the burden on Plaintiffs to prove "that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." 887 F.3d at 1362. The Court made clear that "the causation analysis must consider the impact of the entirety of government actions that address the relevant risk." *Id.* at 1364. *St. Bernard* states in a footnote that *Hardwicke* "suggested"—not that it *held*—that if the government takes an action to reduce flooding risk before taking a second action to increase flooding risk, "the risk-reducing action would only be considered in assessing causation if the risk-increasing action was 'contemplated' at the time of the risk-reducing action." *Id.* at 1367 n.14.

*St. Bernard* expressly declined to consider whether *Hardwicke*'s "suggest[ion]" was correct or where it might apply. *Id*. The CFC incorrectly took that dicta from *St. Bernard* as having "identified" an "exception" to the normal causation standard it applied in that case. Appx282. By contemplating that the

"correct[ness]" of *Hardwicke* might be at issue someday, the Court in *St. Bernard* showed that it did not believe there was a relevant holding in *Hardwicke*. Otherwise, future panels would be unable to consider whether *Hardwicke* was correct. As explained immediately below, *Hardwicke* did not apply such an "exception" even in that very case, and we are aware of no case other than this one in which the CFC has based a decision on this supposed exception.

Significantly, *St. Bernard* did not create an exception based on *Hardwicke* but merely speculated that *Hardwicke* might support an exception in some circumstances. And *Hardwicke* itself does not represent an "exception" to the rule stated in *St Bernard*. The plaintiffs in *Hardwicke* owned property in a natural flood plain of a river that flooded every few years. 467 F.2d at 488-89. Two dams were constructed—first, Falcon, and later, Anzalduas.[2] The plaintiffs alleged that a taking occurred when, in anticipation of flooding, the government closed the gates on Anzalduas Dam (which was *downstream* of the properties) and thereby diverted the river's waters onto their land. *Id.* at 490. But the plaintiffs were already receiving the benefits of Falcon Dam, constructed earlier and located *upstream* of their properties. *Id.* at 489. The later-constructed Anzalduas

[2] Plaintiffs' criticism of the opening brief's description of the *Hardwicke* dams is a distraction. Response Brief 44. The words "first" and "second" in the opening brief were simply distinguishing the dams, not placing them in temporal order.

Dam increased the incidence of flooding on plaintiffs' land (once every seven or eight years) from what it hypothetically would have been if only Falcon Dam existed (once every ten years). *See id*. But the expectation of flooding with *both* dams operating was still "far less" than if there were "no flood control program at all." *Id.* at 489-90. The Court of Claims considered whether the government "should have to pay compensation" for a taking due to the Anzalduas Dam, and held that it did not. *Id.* at 490-91 (discussing *Sponenbarger*, 308 U.S. at 266-67, discussed below (pp. 18-20), and *Miller v. United States*, 317 U.S. 369 (1943)).

Plaintiffs contend that *Hardwicke* "did not ask whether the property was subject to less flooding after both dams were in operation than the property would have experienced if neither dam had ever been constructed." Response Brief 33. Plaintiffs are incorrect. As the Court of Claims explained in *Hardwicke*: "In the natural state of affairs this land was subject to flooding on an average of once every two years." 467 F.2d at 489. The first dam (Falcon) "reduced the anticipated incidence of flooding . . . to once every ten years," and the second (Anzalduas) dam was estimated to have "increased the incidence . . . to once every seven or eight years." *Id*. Based on those findings, *Hardwicke* concluded that although "the incidence and severity of flooding was increased from what it would have been if only Falcon Dam was in operation[,] the expectation of flooding was *still far less than it would have been if there had been no flood control*

*program at all.*" *Id.* at 489-90 (emphasis added). Ultimately, *Hardwicke* denied the takings claim based on reasoning derived from the relative benefits doctrine in *Sponenbarger* and on *Miller*, concluding that "on the whole, the value of the Hardwicke property has been greatly enhanced by the operation of the Rio Grande water control program, of which both Falcon and Anzalduas Dams are parts." *Id.* at 491; *see also infra* (pp. 18-20 (further discussing *Sponenbarger*)).

As Plaintiffs point out, *see* Response Brief 33-34, *Hardwicke* discussed various facts, such as that the government had "contemplated" both dams when it originally developed plans for the area, 467 F.2d at 489, and that it should have been evident that the second dam would be operated at some point, *see id.* at 490-91. But *Hardwicke* does not identify those factors as necessary to how it considered the multiple government actions, and it never suggests that its takings analysis would have turned out differently if the facts had been different.

Plaintiffs' whole causation argument relies on a counterfactual inference that "had the facts been otherwise" in *Hardwicke*—that is, if there were hypothetically less of a connection between the two dams—then *Hardwicke* "would have" reached a different conclusion and held that there was a taking. Response Brief 33. Plaintiffs try to bolster that inference by pointing to the footnote in *St. Bernard* where Court says *Hardwicke* "suggests" by implication such a possibility. 887 F.3d at 1367 n.14. But as discussed, that *St. Bernard*

footnote goes on to question whether this inference would even be sound, including whether the compensation analysis in *Miller* ought to apply in the causation context. As the Opening Brief explains (pp. 29-30), *Hardwicke* applied *Miller* by examining the differences in property value of plaintiffs' land under different scenarios (without either dam, with only the first-constructed dam, and with both dams) to conclude that the property value had been "greatly enhanced" on the whole by both dams. Nothing in *Miller*, however, indicates that causation must be analyzed piecemeal by disregarding the government actions that benefitted the landowner.

Plaintiffs maintain that it would not be "just" to "reflexively" credit the government for "every past value-enhancing action" that it takes regarding a property. Response Brief 37. But such an effort to balance benefits and burdens is not properly part of the causation analysis required by *St. Bernard* and other cases; those issues arise more properly in the relative benefits analysis. *See infra* (pp. 20-25). Moreover, Plaintiffs' criticism attacks a straw-man argument. *St. Bernard* already limits the causation analysis to those "government actions that address the relevant risk." 887 F.3d at 1364. Here, the Corps' longstanding efforts to manage the System, paid for by the Nation's taxpayers as a whole, have provided decades of protections for Plaintiffs and their farming businesses. Appx11-12; *see also* Opening Brief 4-7 (discussing Corps projects that benefitted

Plaintiffs). The Fifth Amendment's Just Compensation Clause is not a baseline through which Plaintiffs receive the value of those benefits in perpetuity. Nor is it unjust to modify or decrease the flood control that the benefits provide to Plaintiffs in order to pursue other public goals, like the goals of the ESA or simply the reduction of operational or maintenance costs that the federal government has determined it should no longer bear. For it is well established that gratuities provided by Congress are not compensable property interests. *See*, *e.g.*, *Conti v. United States*, 291 F.3d 1334, 1338 (Fed. Cir. 2002) (fishing license); *Alves v. United States*, 133 F.3d 1454, 1457 (Fed. Cir. 1998) (grazing permit). Plaintiffs may be disappointed by such a public policy choice, but that choice does not cause a taking of Plaintiffs' property.

3. Plaintiffs try to bolster the CFC's reliance on a *Hardwicke* "exception" to the ordinary causation standard by conflating causation with the consideration of a landowner's "reasonable expectations." Response Brief 40. But neither the CFC nor any other court has held that investment-backed expectations are relevant to the causation inquiry. For purposes of causation, the relevant question is whether (or to what extent) preexisting federal projects that serve to protect private property adhere to a private owner's title, such that a modification or change to the project that reduces the protection to the private

property can be deemed a taking. It is not apparent what (if any) role investment-backed expectations might play in that inquiry.

In any event, Plaintiffs are mistaken in arguing that the government is advocating for a rule that would disrupt the reasonable expectations of private property owners. Where landowners rely for flood protection on extensive government projects—especially those that the government must operate and maintain—it is not reasonable for them to expect that that the government will never change its operation or maintenance of such structures in the face of changing conditions. Factoring Plaintiffs' expectations into the baseline therefore must account for the understanding that the Corps' management of the System has always been subject to changes in law and policy, *see* Opening Brief 5, 48-49. Any expectations Plaintiffs conceivably had of an *undiminished* level of government-provided flood protection are simply not "reasonable."

Nor are Plaintiffs correct that a ruling for the government will leave private owners without any recourse in the event that federal officials decide, for example, to remove entire flood-control projects or other beneficial programs on which owners rely. Response Brief 40-42. First and foremost, the Corps has not abandoned the System or its associated works. The very point of the 2004 changes was to *continue* operating those projects in compliance with existing law.

Because the construction and operation of Corps projects is originally directed by Congress, *see* Opening Brief 4-6, legislative approval would be required for any dismantlement, *see*, *e.g.*, 33 U.S.C. § 579a, § 579d-2 (deauthorization of unconstructed projects); 33 U.S.C. § 2282e (post-authorization change reports for existing projects); Pub. L. 97-128, 95 Stat. 1681, 1681-85 (Dec. 29, 1981) (deauthorizing multiple projects, including instructions for disposing of lands and undertaking certain measures to prevent flood damage); GAO Report B-206437 (Mar. 23, 1982), available at https://www.gao.gov/assets/ced-82-55.pdf (describing public and legislative process required for deauthorizing Corps projects). Such legislation would enable Congress to consider effects on landowners adjacent to the projects.

Furthermore, substantial changes to flood-control projects could not come about without public notice and opportunity for comment. *See*, *e.g.*, 33 C.F.R. § 222.5(g)(2) (public involvement requirements for Corps water control manuals); 40 C.F.R. § 1506.6 (National Environmental Policy Act regulations); *see also id.* §§ 1503.1–1503.4 (comment procedures on environmental impact statements). And such final decisions are also normally subject to judicial review under the Administrative Procedure Act., 5 U.S.C. § 702 *et seq*., including for whether the agency takes into account any "serious reliance interests"

engendered by its earlier policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see*, *e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

A decision to remove a flood-control project without congressional authority and thereby somehow submerge a municipality—with or without providing compensation to affected landowners—would surely be regarded as "not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). Here, although other parties challenged the 2004 Manual for whether it improperly elevated ESA-listed species over other dominant uses of the System, *see supra* (p. 6), Plaintiffs here did not bring such a claim. Regardless, as a last resort in one of Plaintiffs' extreme hypothetical situations, landowners could obtain a private bill referring the matter to the CFC for an award of compensation. *See* 28 U.S.C. § 2509 (congressional reference cases).[3]

4. Plaintiffs identify no case in which an appellate court has applied the *Hardwicke* dicta to hold that a taking occurred. Plaintiffs offer strained

---

[3] Plaintiffs cite *United States v. Virginia Electric & Power Co.* as refusing to adopt a rule that would "destroy the entire property interest in fast lands without compensation." 365 U.S. 624, 631 (1961), cited in Response Brief 43. As explained elsewhere, however, Plaintiffs' farms remained profitable. Opening Brief 50, 53; *see infra* (pp. 29-30). Likewise, Plaintiffs' citation to *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973), cited in Response Brief 43, is inapt. *Almota* concerned whether in condemning a leasehold, a court must value improvements made by the lessee measured over their useful life. 409 U.S. at 473. No such valuation question is presented here.

readings of three cases—*Johnson*, *Danforth*, and *Sponenbarger*—as support for their inaccurate inference about the *Hardwicke* dicta. But none of those cases supports their position.

Plaintiffs cite *Johnson v. United States*, 479 F.2d 1383 (Ct. Cl. 1973), as applying *Hardwicke*, but *Johnson* actually supports the government. Response Brief 34. In *Johnson*, the owners of land adjacent to a highway alleged a Fifth Amendment taking based on the denial of highway access after the government fenced part of a highway that crossed the owners' property. *See* 479 F.2d at 1388-89. The court denied the claim because the fencing did not impair the owners' reasonable access or substantially diminish the land's value. *See id.* at 1393. In reaching that conclusion, *Johnson* analogized the situation to a baseline of no government action (i.e., a new expressway "where no previous road existed"), rather than partial action (i.e., an existing highway without fencing). *Id.* at 1392.

*Johnson* did find a "sufficient nexus" between the road and the fencing, such that the plaintiffs could not claim the benefits of the former without deducting detriments from the latter. *Id.* at 1392. But that does not distinguish *Johnson* from this case. Here, also, the CFC agreed that the Corps' construction of the System and its operational and management changes were sufficiently "related" to be considered part of one government action. *See* Appx278 n.5,

Appx281. Thus, any "sufficient nexus" under *Hardwicke* was met, and *Johnson* does not provide the basis for applying a *Hardwicke* exception here.

Plaintiffs' reliance on *Danforth v. United States*, 308 U.S. 271 (1939), is similarly misplaced. Response Brief 38-39. *Danforth* involved property within a floodway between an existing levee beside the Mississippi River and a later-constructed "set-back levee" located five miles inland. 308 U.S. at 277-78. Pursuant to the Flood Control Act of 1928, the government sought to condemn a flowage easement between the two levees to build a "fuse-plug" that would lower the riverside levee and thereby relieve water built-up in the floodway; but the fuse-plug work was never done. *Id.* Then, when a large flood came, the Corps artificially crevassed the riverside levee at the location of the planned (but unbuilt) fuse plug. *Id.* at 279. The landowners asserted that a taking occurred when Congress passed the 1928 Act or when the Corps built the set-back levee. The Court held otherwise, reasoning that any increase in the depth or duration of flooding within the floodway was merely an "incidental consequence" of building the set-back levee. *Id.* at 286-87 (internal quotation marks omitted).

*Danforth* does not support Plaintiffs' position. Like the flooding that resulted in *Danforth* despite the riverside levees, here Plaintiffs' land remains in a flood zone even with the construction of the System. *See*, *e.g.*, Appx331 (referencing historic flooding (citing Corps employee testimony, Appx30369,

Appx30389)); Appx30679-30681, Appx30691-30692 (testimony by U.S. Department of Agriculture, Risk Management Agency employee about "high risk" flood hazard classification for Plaintiffs' properties before and after 2004). Any purported changes in flooding patterns after 2004 were likewise merely an "incidental consequence" of operating the System and adjusting its physical components. Plaintiffs quote a passage from *Danforth* to suggest that new work leaving the land less protected from destructive floods could have effected a taking. Response Brief 38-39. To the extent (if any) that *Danforth* can be read in such a way, the cited statement was *dicta*, because the new work (i.e., lowering of the riverbank levee through the construction of a "fuse-plug") was not completed. *See* 308 U.S. at 286.

Plaintiffs also misconstrue *Sponenbarger* as supporting the use of a causation baseline that takes government-provided flood control as a given. *See* Response Brief 39-40. *Sponenbarger* concluded that the government's then-incompletely implemented 1928 flood-control plan—which may have included risk-reducing (e.g., bank protection, channel stabilization, river regulation) and risk-increasing (fuse-plug levee and floodway) measures, *see* 308 U.S. at 261-62—did not cause a taking of private property because the same floods would occur had the government undertaken "no work of any kind," *see id.* at 265. To be sure, *Sponenbarger* also discussed the government's long-standing efforts to

reduce flood risk along the Mississippi River and how those efforts were insufficient to avoid severe flood damage, most notably in 1927. *Id.* at 261. The 1928 plan thus built upon existing levees to construct a "comprehensive" flood-control plan. *Id.* at 261-62. The overall effect of that project—including the pre-existing levees, plus additional work that could under certain circumstances cause even *more* damage than the 1927 flood—did not cause additional flooding of the claimant's land above what would occur if the government "had not acted." *Id.* at 266.

Plaintiffs point out that the United States in *Sponenbarger* argued for a comparison of post-1928 work to pre-1928 conditions without going further back to argue that the benefits of earlier, 1883 levees should also be taken into account. Response Brief 40. But the United States certainly did not concede that the *only* relevant baseline was the one that included the older levee structure. *See* U.S. Brief at 10-11, *Sponenbarger*, No. 72 (Sep. 30, 1939) ("The construction of cut-offs . . . together with strengthening the levees elsewhere on the Mississippi, have resulted in greater protection and security to respondent's land than it has ever before had."). The facts in that case did not require addressing that question. That is so because it was understood that the older levees did not adequately protect the respondent from severe flooding: the respondent's land "has never been entirely free from overflow notwithstanding the construction of

strong levees," and even with the levees, the improvements on her land "are at all times of the flood stage of the river subject to extreme hazards." *Id.* at 4. Thus, the government argued that the landowner's property was better off under the 1928 plan, even though the plan's floodways might subject the land to even greater flooding than in 1927, when the older levees offered no protection. Under that argument, the post-1928 plan did not increase flooding hazard *regardless* of what baseline was used.

### B. The CFC erred by prohibiting the United States from presenting evidence that the relative benefits of the government action to Plaintiffs exceed its detriments.

The CFC relied on the same mistaken notion from *Hardwicke* to deny the government from presenting any evidence at the Phase II trial to demonstrate that the relative benefits conferred on Plaintiffs' properties by the construction and longstanding operation of the System and its associated works far outstripped any detriments to the properties' values. Opening Brief 37-44; *see also* Appx284-306 (CFC order); Appx14778-14779 (government's proffer of what evidence it would present). Plaintiffs conceded that they could not prove that the System's overall benefits are outweighed by the more recent asserted detriments to their property. *See*, *e.g.*, Appx14792 (acknowledgment by Plaintiffs' trial counsel that the "benefits are so great" such that there would be no factual basis for Plaintiffs' claims). And although the CFC allowed a limited exception for

measures taken after 2014, Appx289, it is the benefits of the System, Navigation Project, and federal levees—all constructed decades ago—that are uniquely dispositive of Plaintiffs' claims, *see*, *e.g.*, Opening Brief 4-7.[4]

Plaintiffs mischaracterize the government as seeking to present evidence "about the benefits conferred by all government action that was ever—at any time in history—directed at the risk of flooding" on the property. Response Brief 50-51. But this case concerns changes to an existing federal project—physical additions and operational changes to a series of flood-control structures that the Corps has always operated as an integrated whole. This is *not* a case, for instance, where the government filled submerged lands for private development and then decades later sought to flood some of those lands for an unrelated purpose. Here, the government is simply arguing that the relative benefits analysis must incorporate the benefits provided by the very structures that the Corps chose to modify (physically and through operations changes).

---

[4] As a procedural matter, the CFC incorrectly cited law-of-the-case doctrine and looked to its erroneous ruling on the causation baseline to deny the government an opportunity to present a relative benefits defense. Opening Brief 37-38. Plaintiffs acknowledge that the CFC's use of the term "law of the case" was "imprecise," and that the court's reference to the doctrine did not affect its decision. Response Brief 53-54. Law-of-the-case doctrine is therefore not an independent ground on which the CFC's relative benefits ruling may be affirmed.

By contrast, Plaintiffs propose a "more focused analysis" that would allow an inquiry into relative benefits while looking only to a single "flood control program" or "single government decision," or sometimes only a "single dam, not a flood control plan as a whole." Response Brief 51-52. But that artificially narrow focus is unsupported by the decisions of this Court and the Supreme Court. *See*, *e.g.*, *Sponenbarger*, 308 U.S. at 266-67 (noting "far reaching benefits" to respondent's land from "the program measured in its entirety," considering the "benefits when measured in the whole"); *Hendler v. United States*, 175 F.3d 1374, 1382 (Fed. Cir. 1999) (noting that land owners need be restored only to the position they were in "absent *any* government action") (emphasis added).

Indeed, just two years ago in *Alford v. United States*, this Court emphasized that breadth of the relative benefits doctrine, summarizing cases discussing the doctrine as examining the "overall benefits of the government action" with respect to a property. 961 F.3d 1380, 1384 (Fed. Cir. 2020). *Alford* declined to endorse the "narrower view" of the doctrine that the parties presented in that case (i.e., of examining benefits to the plaintiffs' properties from a single government decision to raise a reservoir level), instead merely "assuming that this narrow focus was correct" to reject the takings claim there at issue. *Id*.

Plaintiffs are incorrect to imply that the government's conception of the relative benefits doctrine is unbounded by any limiting principle. *See* Response

Brief 40-43 (discussing causation), 50-51. For one, the inquiry "must be focused on the particular property owned by the plaintiffs and claimed to have been damaged." *Alford*, 961 F.3d at 1384 n.1. Also, general benefits inuring to the public-at-large rather than to a specific plaintiff's property are properly not taken into account. *Id.* at 1386 (finding the "general benefits of having a federal government," such as security against a foreign invasion, not relevant); *accord City of Van Buren v. United States*, 697 F.2d 1058, 1062 (Fed. Cir. 1983). Those principles, unchallenged here, meaningfully limit the doctrine's application.

Nor may Plaintiffs avail themselves of the Supreme Court's general statement that the Takings Clause "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960), *quoted in* Response Brief 50. It does not follow from that statement of general principle that when the United States chooses to build flood-control projects, the benefitting landowners thereby acquire a private property interest in flood protection that can be asserted against the government, if and when such projects are operated in a manner, consistent with other public interests, that does not provide the landowners maximum protection against flooding.

Prior precedent confirms the breadth of the relative benefits analysis. In *Bartz v. United States*, 633 F.2d 571 (Ct. Cl. 1980), the government modified dam

operations allegedly to prioritize other interests (recreation, real estate) over the dam's original flood-control purpose. *Id*. at 573-74. In analyzing relative benefits, *Bartz* was not limited to only those benefits accruing since the modification, but rather it considered all prior flood-control benefits accruing since the dam had been placed into operation. *Id*. at 575-76. Thus, any harms from the modifications were "heavily countervailed by the benefits to the [claimant's] farmland as a whole." *Id*. at 577-78.

Similarly, in *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384 (Ct. Cl. 1976), the court addressed flooding allegedly caused by the government's construction of a dam downstream of the plaintiff's property. *Id.* at 1385. The downstream dam was part of a multi-purpose federal system authorized decades earlier, which included other flood-control structures upstream of the property. *Id.* at 1385. After first observing that "[n]o proof was made that" the downstream dam "cause[d] . . . the floods complained of," the Court of Claims next explained that, because the system as a whole had "decreased [the] peaks, duration and frequency of floods at the [plaintiff's] farm," the case was "at most" one of "little injury in comparison with far greater benefits conferred." *Id.* at 1386 (quoting *Sponenbarger*).

Fundamentally, the relative benefits analysis looks at a different suite of factors from the causation analysis. Causation under *St. Bernard* requires a court

to determine whether the flooding that occurred would have happened in a hypothetical scenario where no government action has been taken to control flooding. By contrast, a relative benefits analysis requires a court to weigh how the accumulation of flood-control benefits a landowner received from prior government action compares to whatever flooding detriments government action now imposes on the claimant. Even if there were some rationale under *Hardwicke*'s dicta for limiting the consideration of a particular government action in the context of analyzing causation (which there is not, *see supra*, (pp. 3-20)), no case supports extending that approach to the analysis of relative benefits.

### C. The CFC misapplied the pertinent factors for determining whether a taking occurred.

The government's opening brief (pp. 44-53) identified errors the CFC made when misapplying three of the factors for determining liability under *Arkansas Game and Fish Commission v. United States*—(1) character of the land, (2) reasonable, investment-backed interests, and (3) severity of the interference with Plaintiffs' property rights. 568 U.S. 23, 39 (2012). We discuss Plaintiffs' responses to each of those arguments in turn.

#### 1. Character of the land

In assessing the character of the land, the CFC relied on its erroneous rulings that incorporate a right to an established level of government-provided flood control into the Plaintiffs' real property titles. *See* Opening Brief 45-46.

Relying on the baseline it used to assess causation and relative benefits, the CFC disregarded expert testimony by the government's environmental historian about flooding that occurred before the System was built. *Id.* It also discounted undisputed facts about the land's location in a flood zone and other past floods that occurred in river reaches where Plaintiffs' properties are located, even after the System's construction. *Id.* In response, Plaintiffs assert that the CFC's character-of-the-land analysis rises or falls along with our arguments about the erroneous baseline that the CFC used elsewhere. Response Brief 55.

We agree that the CFC's error infected all of those issues. But even assuming that the System should be considered in the baseline for determining causation or relative benefits, the Corps' actions did not fundamentally alter the character of the land. Plaintiffs' properties lie in a flood plain and undisputedly have continued to flood since the System was developed. *See*, *e.g.*, Appx331 (referencing Appx30369, Appx30389)); Appx30679-30681, Appx30691-30692.

**2. Reasonable, investment-backed expectations**

The government's opening brief (pp. 46-50) demonstrated that the CFC erred in several respects when analyzing the Plaintiffs' reasonable, investment-backed expectations. The court erred by concluding that it was objectively reasonable for Plaintiffs to rely on the notion that the River's flooding patterns would remain unchanged from the operation and features of the System. *See*

Appx367-371. Four points illustrate the CFC's error: (1) Plaintiffs' land still flooded after the System was built and before operational changes began in 2004, (2) the Manuals stated that operations were subject to change, (3) Congress in 1986 directed that measures be taken to protect fish and wildlife, and (4) the ESA's enactment in 1973 established obligations for any agency operating a practice to alter operations to protect a species that might be listed. Opening Brief 47-50. Also, the CFC erred in ruling that government action had disrupted Plaintiffs' expectations for use of their land because Plaintiffs' land remains productive, and their farming business remains profitable. Opening Brief 49-50.

In response, Plaintiffs incorrectly focus on their alleged subjective expectation that the government would ensure against future flooding. They argue that the government's construction of the System and associated works "induced" landowners to cultivate property that accreted because of that construction, and that the government therefore bears responsibility when it undertook changes to the System in response to a 2004 court order about ESA compliance. Response Brief 48-49 (emphasis omitted), 56. But the Corps' Manual has always cautioned that the System's operations will change based on changes in law, policy, and in response to floods and droughts. *See* Opening Brief 5 (citing Manual provisions). Plaintiffs should have recognized long ago that the System was built to serve multiple, congressionally authorized purposes, not

flood control alone. *See* Opening Brief 4. Nor have Plaintiffs ever had a property right to any particular level of federal flood-control protection on their property. *See supra* (pp. 11-12). Moreover, Plaintiffs should have understood that policy changes were possible as a result of validly enacted laws (like the ESA), even as those laws are interpreted by court decisions.

Plaintiffs contend that the inquiry into reasonable, investment-backed expectations is factual and that the CFC's factual findings are unchallenged. Response Brief 48-49, 56-57. But although the question of whether Plaintiffs actually *hold* expectations is factual, determining whether the expectations are objectively reasonable is a question of law. *See*, *e.g.*, *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995) (holding that the government could obtain judgment as a matter of law on the issue). The CFC's misapplication of the pertinent factors from *Arkansas* to conclude that a taking occurred is a legal error, even if it has "factual underpinnings." *St. Bernard*, 887 F.3d at 1359 (cleaned up); *see also* Opening Brief 44. Facts that the CFC acknowledged, bearing on the ultimate legal conclusion that a taking occurred, are relevant to that inquiry. For example, the CFC acknowledged as "true" that the Corps must comply with federal laws like the ESA and that the Corps is free to change the Manual. Appx369. But in concluding that Plaintiffs' expectations were reasonable, the CFC cherry-picked certain claimed personal, subjective

expectations of the Plaintiffs as dispositive without according proper weight to the expectations necessitated by the legal scheme in which Plaintiffs own their properties, and under which the Corps has discretion to change its Manual, and must comply with the changing law. *See* Appx8 (acknowledging that the Manual contains "the Corps' interpretation of its statutory responsibilities" (citing Appx50726-50727)).

Even assuming that the CFC's statement that it was "unexpected" for the Corps to prioritize species protection after a court decision in 2004 was factually correct, *see* Appx369, that statement reflects a misapprehension about the Corps' responsibility to follow the rule of law, including statutory interpretations by federal court decisions to which the agency is a party.

Furthermore, the proper focus of the reasonable investment-backed expectations inquiry is on the extent to which government action may have disrupted Plaintiffs' reasonable economic expectations for their property. Opening Brief 46. Plaintiffs have long been aware that their properties are subject to flooding even after construction of the System, *see* Opening Brief 48, yet they do not dispute that despite any flooding, they are still productively farming their land today or leasing it to be productively farmed by others, such that their businesses remain profitable. Opening Brief 50; *see* Response Brief 55-57; *see also*, *e.g.*, Appx30074-30075 (Plaintiff's testimony that lessee of his

farmland in 2017 did not demand extra money for subjecting the lease to Plaintiff's superior right to grant the United States a flowage easement). As a result, the CFC erred in holding that Plaintiffs' expectations were disrupted.

### 3. Severity

As the opening brief explained (pp. 50-51), the CFC did not allow evidence of severity in the Phase II trial, but nevertheless issued substantive findings about severity on an incomplete evidentiary record. Opening Brief 50-51. Plaintiffs' Response Brief fails to address the fact that the CFC improperly prevented the United States from putting on trial evidence as to this severity determination.

Moreover, as further discussed in the opening brief, the CFC purportedly addressed the severity of the Corps' interference with Plaintiffs' property interests by pointing to Plaintiffs' testimony about the extent of flooding that occurred on their properties and its effect on crop yields. But the CFC's reliance on that evidence about the extent of flooding was misplaced because the CFC in fact found that the Corps was *not* responsible for *all* the flooding. *See* Appx314-315. Even though the CFC agreed that it must focus its inquiry on additional flooding caused by the Corps' action, *id.*, it never made a determination of the agency's supposed responsibility for any particular portion of that flooding.

Plaintiffs respond that there was no need to determine how much of the increased flooding on their property was fairly attributable to the Corps because the CFC concluded that flooding was "far more frequent and damaging" after 2004, and that such a finding satisfies *Arkansas Game and Fish Commission v. United States*, 736 F.3d 1364 (Fed. Cir. 2013). Response Brief 59-60. In *Arkansas*, however, the CFC found that a new flooding pattern caused a "wholesale change" in the property's ability to support land uses of the sort historically maintained—timber harvest and a wildlife and hunting preserve. 736 F.3d at 1374. *Arkansas* was not a case where the flooding "was within a range that the property owner could have reasonably expected to experience in the natural course of things." *Id.* at 1375. Here, however, there has not been a "wholesale change" in the land's highest and best use as agriculture across most of the properties, as Plaintiffs' expert appraisers testified. *See*, *e.g.*, Appx30096 (Leo Smith's testimony about Adkins property); Appx30106; Appx30124 (Timothy Keller's testimony). And because of the CFC's errors in selecting the baseline for its analysis, there was no meaningful comparison to flooding that would have otherwise occurred "in the natural course of things," that is, in the absence of the System and its associated works.

The severity of the taking here is limited by the CFC's findings of a 12% loss of crop value and a 28% loss of property value, some of which is attributable

to the portion of flooding the Corps did *not* cause. Appx372, Appx395-396. Plaintiffs do not dispute that in an ordinary analysis of severity under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 130-31 (1978), these impacts would not be sufficient to constitute a taking. Response Brief 58-59; *see* Opening Brief 53 (collecting cases). Instead, Plaintiffs contend that a rule about diminished value "has no place" in analyzing physical takings by flooding. Response Brief 59. But that contention cannot be squared with the Supreme Court's reliance on *Penn Central*, a regulatory takings case, in directing that courts must consider severity of the interference in *Arkansas*, a flooding case. 568 U.S. at 39. That this Court on remand in *Arkansas* did not consider the severity of interference in terms of economic diminution does not mean that such a factor is always irrelevant. Where, as here, the character of the property has not changed—it is in a flood plain in which there was flooding before the System was developed, and flooding has continued after the System was developed, *see*, *e.g.*, *supra* (pp. 17-18, 26)—the economic effect of the Corps' operations on the property should weigh significantly against the finding of a taking.

**D. The CFC erred by selecting an unsupported date of taking.**

As discussed by the opening brief (pp. 54-63), the CFC erred when it held that Plaintiffs' takings claims did not accrue until December 31, 2014, nearly ten months *after* Plaintiffs filed their complaint. But that date was merely the date

stipulated by the parties prior to trial as the "cutoff" for what years of flooding claims would be litigated in the first phase of the case. Opening Brief 56-57. It was established for litigation convenience. It could not represent an accrual date for the takings claims, as it corresponds to no physical, real-world event related to flooding on Plaintiffs' properties. Opening Brief 56-58. To the contrary, the record compels a conclusion that Plaintiffs' claims accrued no later than 2007, a date that would require dismissal because it is more than six years before the filing of Plaintiffs' operative complaint. Opening Brief 54-56.

Furthermore, the CFC's resort to the "stabilization" doctrine was error because the identified flooding manifested its claimed effects immediately, not gradually. Opening Brief 58-59. That error is evident even on the face of the CFC's ruling, which was that the taking somehow began—and that damages were recoverable—seven years *before* Plaintiffs' claims accrued. But if the claim had not accrued until 2014, that conclusion would compel the CFC to deny Plaintiffs the cost of repairing a levee on one property in 2010 when such damages would correctly be characterized as tortious and not recoverable under the Tucker Act. Opening Brief 61-62.

In response, Plaintiffs argue that their claims were timely filed because the CFC correctly applied the stabilization doctrine and selected December 31, 2014

as the date of taking, and the record did not compel a conclusion to adopt an earlier date. Response Brief 60-69. The Court should reject those arguments.

Plaintiffs are wrong that the stabilization doctrine applies. That doctrine is ordinarily reserved for property damage that results from gradual physical processes occurring over many years or even decades. *See*, *e.g.*, *Banks v. United States*, 741 F.3d 1268, 1272-73 (Fed. Cir. 2014) (erosion for more than 50 years); *Boling v. United States*, 220 F.3d 1365, 1368 (Fed. Cir. 2000) (same for over 40 years); *Northwest Louisiana Fish & Game Preservation Commission v. United States*, 446 F.3d 1285, 1287-88 (Fed. Cir. 2006) (aquatic weeds growing uncontrolled for years); *Cotton Land v. United States*, 75 F. Supp. 232, 232-33 (Ct. Cl. 1948) (sedimentation caused by dam leading to upstream flooding years later). But the Corps' releases from Gavins Point dam, the most downstream dam in the System, take days, not years, to affect River elevations at Plaintiffs' properties downstream. Opening Brief 58-59; *see* Appx25 n.15, Appx23658-23659.

Plaintiffs do not dispute this point, but instead counter that the River Changes (i.e., work related to chutes, revetments, dikes), together with the reservoir releases, resulted in a gradual change in water levels. Response Brief 63. However, with one minor exception from 2011, Plaintiffs did not seek to attribute the flooding on their property to any particular Corps projects, or even to the River Changes collectively, apart from the System Changes. *See* Appx150

n.73 (stating that "the court has not examined any individual Corps project" other than one chute that the Plaintiffs contended caused a levee breach in 2011), Appx118 n.59 (noting that Plaintiffs contend that River Changes "in combination with the System releases" were causing water levels to rise).

Nor do the CFC's causation findings permit such a fine-grained distinction between flooding caused by the River Changes apart from the System Changes. The CFC concluded that the River and System Changes "together" caused additional rises in downstream water-surface elevation, Appx93, which Plaintiffs' experts described as having occurred since 2004 and as appearing "particularly stark" during high flows, Appx92 (citing Appx23128, Appx23132); *see also* Appx90 (discussing testimony by Plaintiffs' expert of a "dramatic increase" in flood frequency and floodwater levels since 2004, citing Appx23118-23119). None of those findings support a conclusion that the changes in water-surface elevation were gradual. Rather, the CFC's conclusions illustrate that such changes were significantly manifested early on. *See*, *e.g.*, Appx352-353 (finding a "new pattern of increased flooding" on Plaintiffs' properties "beginning in 2007" that was "far more frequent and damaging").

As the opening brief establishes (pp. 56-57), the CFC's selected date of December 31, 2014 was chosen as an arbitrarily selected limit for the Phase I litigation, rather than on a date that corresponds to any naturally occurring event

related to flooding on Plaintiffs' properties. That fact alone demonstrates the CFC's error, for it results in a valuation date occurring years after the flowage easement on which the taking is premised began, directly contrary to long-established principles governing the date of taking. *See United States v. Dow*, 357 U.S. 17, 22 (1958) ("[I]f the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking."); *accord Barnes v. United States*, 538 F.2d 865, 873 (Ct. Cl. 1976) ("[T]he date of taking is the date the Government enters into possession of the interest seized.").

Plaintiffs contend that the December 31, 2014 date is supported by "large-scale" projects that continued until 2014, citing their expert hydrologist's testimony at trial. Response Brief 64. But Plaintiffs never linked their takings claims to any particular projects, and as already discussed, Plaintiffs and their experts testified that dramatic effects to the River's flooding patterns occurred years earlier due to the *cumulative* effects of the System and River changes. Opening Brief 55-56 (citing testimony). In fact, Plaintiffs' hydrologist testified (1) that the Corps' actions had *already* upset the River's "equilibrium" by 2007, (2) that the changes were by then clearly apparent, and (3) that nobody could know when a new equilibrium might be reached. *See*, *e.g.*, Appx107, Appx23226, Appx23214, Appx23243. That the Corps had not completed every

aspect of its System changes at that time does not mean that the effects of the Corps' activities were not observable long before December 31, 2014. Nor do Plaintiffs point to any material change in the effect of the Corps' activities during the pertinent time period that supports the CFC's ruling that their claims "stabilized" after that date.

Plaintiffs do not seriously quarrel with the fact that they began to see changes to flood patterns before 2014. Opening Brief 55-56 (citing testimony, e.g., from Roger Ideker that "beyond any doubt" the River has changed since 2004–2006); *see* Response Brief 68. Rather, they contend that not all of the events that *fixed liability* occurred until that date, and claim that they were unaware earlier of the extent of the flooding or that the Corps' actions were the flooding's cause. Response Brief 65-69. Those arguments should be rejected.

First, it is well settled that physical erosion or flooding need not be "complete" for a takings claim to accrue. *See*, *e.g.*, *Banks*, 741 F.3d at 1281; *Boling*, 220 F.3d at 1370-71 (stabilization doctrine does not require that "the process has ceased" or that "the entire extent of the damage is determined"). Rather, "[t]he obligation to sue arises once the permanent nature of the Government action is evident, regardless of whether damages are complete and fully calculable." *Mildenberger v. United States*, 643 F.3d 938, 946 (Fed. Cir. 2011) (citing *Goodrich v. United States*, 434 F.3d 1329, 1336 (Fed. Cir. 2006)).

Here, the nature of the damage was evident to Plaintiffs no later than 2007. And Plaintiffs' own testimony shows their awareness of claimed changes in the River as early as 2007. Opening Brief 55-56; *see also* Appx4023 (trial counsel's statement that "the river reached its tipping point, from which it has yet to recover, in 2007"); Appx4398 ("[O]ur Plaintiffs say the river's changed since 2006"). Also, Plaintiffs' contention that they should receive compensation for crop losses going back to 2007, *see* Response Brief 79-79, reveals their belief that they experienced significant damage due to the Corps' actions much earlier. So, too, does their consultation with attorneys about their claims in 2011, and with an expert hydrologist in spring 2013. Opening Brief 61.

Even more to the point, Plaintiffs' economist testified at the Phase II trial that the real estate market (both farmers and "outside buyers") had reacted to the increased flooding by 2011, and that prices for bottomland farms along the River reflected the effects of the Corps' changes no later than that year. *See* Appx30270-30271. And, of course, Plaintiffs actually filed their lengthy, detailed complaint on March 5, 2014—over nine months *before* the date by which the CFC ruled that their claims stabilized, and by which they now claim they were unaware of the flooding's full extent. *See* Appx1000-1071.

Next, Plaintiffs contend that fixing 2007 as the date of taking is inconsistent with the government's arguments in other cases that a single flood

in those cases was insufficiently substantial for treating a landowner's claim about a property invasion as a taking rather than a trespass. Response Brief 66. Not so. To be sure, isolated invasions are properly assessed as individual torts, and a "single act [of trespass] may not be enough" to establish a taking. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2078 (2021) (quoting *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329-30 (1922) (emphasis added)). Here, however, Plaintiffs asserted—and the CFC ruled—that the Corps' actions resulted in multiple floodings, not an isolated, single event. Their amended complaint even alleged that the "atypical flooding" they attributed to the Corps' actions had been occurring "[s]ince 2006." Appx1329; *see also* Appx1242, Appx1266 (alleging taking by flooding in 2006 for other properties); Appx15885, Appx15909, Appx15972 (second amended complaint). Under Plaintiffs' own theory of their case, a reasonable person in 2007 would have known that the 2007 flooding was not going to be isolated.

Plaintiffs' reliance on two Corps modeling studies that consider the "roughness" of the River is also misplaced. Opening Brief 64-65. As the CFC observed, the studies use "two different modeling methods." Appx379; *see also* Appx23119 (Dr. Christensen's testimony about the difference in models); Appx53490-53491 (discussing model differences). Because the models are different, comparing the roughness values does not necessarily demonstrate

even that the River's roughness actually changes, let alone that any change in roughness over time is due to the Corps' changes in the River. Plaintiffs also attempt to rely on draft and final versions of a *single* study to demonstrate that there was "no meaningful change in roughness" between 2015 and 2018. Response Brief 65. But that assertion is unsound. Both the draft and final version of that study used the same data set, which was based on water-surface elevation data from 2011–2012. *See* Appx53513, Appx53520; *compare* Appx53495 *with* Appx53500 (showing identical values). Obviously, a single data set cannot represent a change in value over time.

Plaintiffs rely on cases about "justifiable uncertainty" to argue that the Corps' denial that its actions resulted in a taking supports the CFC's choice of a late date of taking. Response Brief 65-66, 67-68 (citing *Banks v. United States*, 314 F.3d 1304, 1310 (Fed. Cir. 2003) (*Banks II*)). Plaintiffs' reliance on those cases is wholly misplaced. In such cases, the Corps' "promises to mitigate damages" will delay a takings claim's accrual if a claimant proves that "the predictability and permanence of the extent of the damage to the claimant's land was made justifiably uncertain by the Corps' mitigation efforts." *Mildenberger*, 643 F.3d at 947 (cleaned up).

In *Banks*, for example, the Corps acknowledged that a federal project contributed to downstream erosion but undertook a mitigation program. This

Court held that the Corps' efforts to mitigate the impacts delayed when the plaintiffs should have known that erosion damage was "permanent" and the subject of a takings claim. 741 F.3d at 1282; *accord Banks II*, 314 F.3d at 1310 (noting that "justifiable uncertainty" about the taking's permanence was caused by the Corps' "actual mitigation efforts"). Here, as Plaintiffs agree, the Corps consistently denied that it was increasing flooding on Plaintiffs' land. Response Brief 65. The Corps never agreed that it was causing a taking, nor did it state that the taking would be delayed or mitigated. *See Mildenberger*, 643 F.3d at 947 (rejecting "justifiable uncertainty" theory where the Corps never committed to mitigating the taking).

In sum, the CFC's selected date of taking as December 31, 2014, is erroneous. The record shows that Plaintiffs' claims accrued no later than 2007, and that Plaintiffs' claims were therefore time-barred by the CFC's six-year statute of limitations, 28 U.S.C. § 2501.[5]

## II. Plaintiffs' arguments on cross-appeal should be rejected.

Although the CFC's judgment was overwhelmingly favorable to them, Plaintiffs nevertheless bring a cross-appeal challenging two aspects of that

[5] Even a later date before December 31, 2014 would have significant consequences both for Plaintiffs' damages model before the CFC and for later-filed claims in other cases. *See*, *e.g.*, Opening Brief 63.

judgment: (1) the denial of compensation for crop losses that Plaintiffs experienced before the date of taking, *see* Response Brief 70-79, and (2) the finding that Plaintiffs failed to prove that flooding on their properties in 2011 was caused by the Corps' River and System changes, as opposed to uncontrolled and unusually high runoff from rainfall and late-season snowmelt, *see* Response Brief 79-89. Both of Plaintiffs' cross-appeal arguments should be rejected.

### A. The CFC correctly denied compensation for crop losses that occurred before the date of taking.

Plaintiff contends that the CFC incorrectly denied them compensation for crop losses that occurred from 2007 to 2014, before the date that the CFC determined the taking stabilized under *United States v. Dickinson*, 331 U.S. 745 (1947). Response Brief 70-79. The CFC, however, correctly denied Plaintiffs' request. Appx407-409.

The CFC's conclusion is compelled by the Court of Claims' precedential decision in *Barnes*. There, a Fifth Amendment taking occurred from the flooding of cropland located between two of the dams on the Mainstem System. 538 F.2d at 872-73. After holding that flooding on plaintiffs' cropland resulted in the permanent taking of a flowage easement due to a gradual process initiated by the government's construction and operation of the two dams, the Court of Claims applied *Dickinson* to determine that the date of taking was the final day of flooding in 1973, four years after the first year of sustained flooding in 1969.

*Id.* at 873. The Court then rejected the plaintiffs' contention that they could recover their crop damages from 1969 through 1973, holding them at best "the product of tortious invasions—mere trespasses." *Id.* at 874. Thus, under *Barnes*, compensation for takings of farmland includes "any increment in value attributable to . . . immature crops" present as of the valuation date, and mature crops present on that date are separately compensable. *Id.* Crops destroyed before the date of taking, however, result from trespasses for which the Tucker Act has not waived the government's sovereign immunity. *Id*.

Plaintiffs argue that this Court "discarded" *Barnes* when it decided *Arkansas* on remand from the Supreme Court. Response Brief 69. But *Arkansas* does no such thing. It neither mentions *Barnes*, nor does it confront whether damages occurring while a taking of cropland by flooding stabilizes are compensable as part of the taking. *See*, *e.g.*, *Arkansas*, 736 F.3d at 1369-70. Nor could Plaintiffs reasonably maintain that the Supreme Court's ruling in *Arkansas* so undermined *Barnes* that the panel on remand could ignore it as law of the Circuit. That is so because the Supreme Court viewed *Arkansas* as a "modest" ruling that "augurs no deluge of takings liability," and that "simply and only" made clear that temporary, government-induced flooding is not automatically exempt from takings analysis. *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 37-38 (2012); *see also United States v. L.A. Tucker Truck Lines*, 344

U.S. 33, 37-38 (1952) (prior decision is not binding precedent on point neither raised by counsel nor discussed in the opinion of the court in that case); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

To be sure, the trial court in *Arkansas* held that the claim at issue there did not stabilize until after the temporary taking was already completed. *Arkansas Game & Fish Commission v. United States*, 87 Fed. Cl. 594, 646 (2009). But neither this Court nor the Supreme Court considered that issue on appeal. Also, unlike the present case, *Arkansas* involved the flooding of timberland, where the destruction of standing trees occurred only gradually. *Cf. Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir. 1987), cited in Response Brief 62-63 (noting that flood water "operates differently, and at different times, to cause a taking of land by inundation, or a taking of timber by suffocation"). In such cases, the CFC has rationally allowed a claimant "not . . . to measure compensation based upon the taking of a flowage easement, but rather upon the timber destroyed and damaged by the flowage easement." *Arkansas*, 87 Fed. Cl. at 617.

Here, by contrast, Plaintiffs have already employed a method to estimate the diminution in the real property value attributable to the government's action. *See* Appx393-397 (describing appraisal methodology of Plaintiffs' agricultural

economist, Dr. Bruce Babcock). Unlike longer-term damage to standing timber, Plaintiffs' crop losses were ascertainable enough to be measured annually. *See*, *e.g.*, Appx30163-30168 (Dr. Bateman's testimony about his methodology for comparing annual crop yields). If anything, that further underscores the CFC's error in selecting a later date of taking. *See supra* (pp. 32-41). But to permit recovery of crop losses on top of the real property valuation would essentially award Plaintiffs lost profits, which are not compensable. *See* Appx30185-30186 (testimony Plaintiffs' agricultural economist, Dr. Merrill Bateman, agreeing that his crop-yield model estimates lost profits from Plaintiffs' farming business); *see also United States v. General Motors*, 323 U.S. 373, 380 (1945) (Fifth Amendment compensation does not include "losses to [a] business"); *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 281 (1943) ("not all losses" are compensable).

Plaintiffs rely on a quotation from *Ridge Line v. United States* that just compensation includes "all damages, past, present and prospective." 346 F.3d 1346, 1359 (Fed. Cir. 2003) (quoted in Response Brief 71, 74). But that statement appears in the context of a ruling that the CFC could award compensation by examining either the proportionate cost of building storm-water control facilities or the cost of comparable easements the government had acquired in years outside the taking. *See id. Ridge Line* does not stand for the proposition that Plaintiffs may recover tortious damages that occur before the date of taking.

Finally, Plaintiffs assert that their failure to apportion crop losses attributable to flooding due to the government's action is not a basis for affirmance. Response Brief 78-79. Plaintiffs ignore, however, that the CFC rejected their "argument that the government caused *all* the flooding on their properties for the years where the court found causation" as "incorrect," and it found that Plaintiffs' reliance on their Phase I experts for such an argument was "not supported," Appx313-314 (emphasis in original). Plaintiffs do not challenge that finding. Rather, they contend that the CFC should have apportioned crop losses based on the *government's* evidence. Response Brief 79. But it is Plaintiffs' burden to demonstrate their actual loss with reasonable certainty. *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (cleaned up). The CFC is not obligated to fashion its own award when Plaintiffs have not met that burden. *See id.* at 1372-73 (CFC did not err by awarding no damages for a taking despite submitted evidence)

### B. The CFC correctly denied compensation for a taking by flooding during 2011.

Plaintiffs cross-appeal from the CFC's ruling that, even under the erroneous causation standard that the court applied, Plaintiffs failed to prove that the flooding of their properties in 2011 was attributable to the Corps' post-2004 actions, as opposed to its discretionary decisions about how to manage the System when faced with record-breaking runoff from precipitation and

snowmelt. Response Brief 79-89; *see* Appx80-85, Appx157-158, Appx175-176, Appx222-223, Appx246 (Phase I opinion); Appx264-265, Appx277-279 (reconsideration denial). Plaintiffs' arguments should be rejected.

In 2011, runoff and rainfall in the upper reaches of the Missouri River basin were "unprecedented in magnitude and duration," the result of record snowfall in the northern Rocky Mountains and a late but rapid snowmelt that coincided with heavy, late-spring rains. Appx31 (Phase I opinion); *see also* Appx23733 (testimony of Corps employee Jody Farhat). All of the runoff from the previous year had been released from the system by the end of January, and the Corps did not release any water during that year for ESA purposes. Appx32 (citing Appx23735).

Plaintiffs attribute the flooding they experienced in 2011 to the "same package of changes" they contend was responsible for flooding in other years. Response Brief 79. They posit that a so-called "switch to advisory guidance" for releasing water from the System somehow ties into their theory that ESA releases caused increased flooding on their properties in other years, regardless of any "decisions made [by the Corps] during any single wet year." Response Brief 79-83. That argument is incoherent, and it also lacks merit.

At the outset, Plaintiffs incorrectly assert that the entirety of the Corps' actions relate to protecting endangered species, and that ESA litigation alone

prompted the Corps' River and System Changes. Response Brief 85. As already discussed (Opening Brief 8-9, 49), the revisions to the Manual arose in response to public concerns about the System's management during the first extended drought experienced under the older 1979 Manual. By tying their 2011 claims to the Corps' "act[ions] to prioritize fish and wildlife," Response Brief 86, Plaintiffs ignore that the Corps made no decisions to store or release water for fish-and-wildlife purposes in 2011. *See* Appx32, Appx23735.

Instead, Plaintiffs base their 2011 flooding claims solely on an update in the 2004 Manual—replacement of a graph on "Plate 44" in the 1979 Manual with a new "Plate VI-1," which Plaintiffs contend effected a change from "mandatory-minimum releases" to releases that are merely "advisory." Response Brief 81 (internal quotation marks omitted). But Plaintiffs' own expert testified that the reason for the updated graph was the accumulation of sediment in the reservoirs, not ESA concerns. Appx23076. In any event, Plaintiffs' characterization of the Manual change is inaccurate.

First, the cited graphs do not represent how much water the Corps "releases" from the System. Instead, they depict various scenarios for the System's "service level," which approximates the water-volume necessary to achieve different downstream flow targets (e.g., for navigation) when there is average flow in the River's tributaries. Appx50125 (2004 Manual); *see also*

Appx23683, Appx23687 (Farhat testimony that "the service level is not the release from the dam"). Releases are used to achieve certain flows at different locations downstream to meet the desired service levels in high-runoff years. Appx23690. But actual releases depend upon on-the-ground conditions like the forecasted flow of the River's tributaries downstream, and the exercise of professional judgment. *Id.*, Appx23674-23675, Appx23916, Appx25269-25270.

Next, the Corps' releases at issue here are not "mandatory" under the current or prior Manual versions. *See* Appx22227, Appx23690. Regardless of whether the Manual legally binds the Corps, the Manual's provisions confer flexibility and discretion on the employees carrying them out. *See id.*, Appx23814, Appx23867, Appx23916, Appx25269-25270. That flexibility existed under the 1979 Manual as well as the 2004 version. Appx23674-23675, Appx23916-23917; *see also* Appx25270, Appx25287 (practice regarding exercise of discretion did not change), Appx25314.

Additionally, the pertinent graphs are very similar:



*Compare* Appx41252 *with* Appx50398; *see* Appx22228 (describing them as "nearly identical"). The only difference is that the newer version was adjusted slightly to account for the reduced storage capacity due to accumulated sediment. *See* Appx23685, Appx23917, Appx25269; *accord* Appx23076 (testimony by Dr. Christensen, Plaintiffs' hydrologist).

Plaintiffs rely heavily on the testimony of their expert hydrologist, Dr. Christensen, and assert that the CFC "clearly erred" by misinterpreting his model to determine whether the Corps' operation of the System in 2011 caused more flooding than would have occurred if the 1979 Manual had been in effect. Response Brief 82-84, 87-88. Specifically, Plaintiffs contend that the CFC rejected Dr. Christensen's model by wrongly believing that it depends on an assumption that upper Basin runoff in 2011 and 1997 were virtually the same. Response Brief 87.

Plaintiffs' contention, however, misses the mark. When a trial court sits as a fact-finder, it has "wide discretion" whether to credit or disbelieve an expert witness's testimony. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012). Here, Dr. Christensen's testimony embraced the importance of the events from 1997 to his modeling. He testified that there "were significant parallels with 1997 on which [his] but-for model is based," Appx23090, and that "[a] comparison to the 1997 flood operations is important in modeling how the

Corps would have managed 2011 releases under its pre-2004 policies and practices," Appx23094. He even gave a point-by-point comparison of the two years. Appx23102-23103. And Plaintiffs agree that he compared 2011 to 1997 to attempt to show that high runoff need not cause flooding. Response Brief 88.

As the CFC pointed out, 1997 and 2011 were significantly different flooding events because 2011 saw far more runoff, and it came later in the spring. Appx82-83. It was therefore reasonable for the CFC to reject Dr. Christensen's testimony that the record flooding in 2011 could be attributed to the Corps' post-2004 actions, rather than to the record runoff and the Corps' efforts to preserve the mainstem System. *See*, *e.g.*, *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1576 (Fed. Cir. 1991) (trial court is free to accept or reject expert testimony).

## CONCLUSION

For all of the foregoing reasons and those in the opening brief, the CFC's judgment should be reversed respecting the issues in the government's appeal. On the issues in Plaintiffs' cross-appeal, the CFC's judgment should be affirmed.

Respectfully submitted,

*/s/ Brian C. Toth*
TODD KIM
*Assistant Attorney General*
BRIAN C. TOTH
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice

March 2022
90-1-23-14155

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the word limit of Federal Circuit Rule 28.1(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b):

☒ this document contains 11,732 words, or

☐ this brief uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☐ this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font, or

☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

/s/ Brian C. Toth

Attorney for Defendant-Appellant the United States

Dated: March 25, 2022