Nos. 2021-1849, -1875

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, dba Robert Adkins & Sons Partnership, GERALD SCHNEIDER, dba Buffalo Hollow Farms, Inc.,

*Plaintiffs–Cross-Appellants*

LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, dba Midwest Grain Co., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, individually and, dba Drewes Farms, Inc., PATRICK NEWLON, dba Newlon Farms, Inc., DAVID NEWLON, dba D Double N Farms, Inc., JASON TAYLOR, BRAD TAYLOR, dba H.B.J. Farms, Inc., LYLE HODDE, dba Hodde & Sons Limited Partnership, STEVE CUNNINGHAM, Trustee of the Doris J. Cunningham and Steven K. Cunningham Declaration of Trust, GAIL CUNNINGHAM, dba Cunningham Farms, Inc., CHARLES GARST, individually and, dba Garst Farms, Inc., CONNIE GARST, dba Garst Farms, Inc., RON SCHNEIDER, MARY SCHNEIDER, et al.,

*Plaintiffs*

v.

UNITED STATES,

*Defendant–Appellant.*

Appeals from the United States Court of Federal Claims in No. 1:14-cv-00183-NBF, Senior Judge Nancy B. Firestone

# REPLY BRIEF FOR PLAINTIFFS–CROSS-APPELLANTS

SETH C. WRIGHT
**POLSINELLI, PC**
900 W 48th Place
Suite 900
Kansas City, MO 64112

BENJAMIN J. HORWICH
TERESA A. REED DIPPO
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street
27th Floor
San Francisco, CA 94105

DONALD B. VERRILLI, JR.
ELAINE GOLDENBERG
DAHLIA MIGNOUNA
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Plaintiffs–Cross-Appellants*

## Certificate of Interest

Counsel for Plaintiffs–Cross-Appellants certifies the following:

1. The full name of every party represented by me is:

Ideker Farms, Inc.

Robert Adkins, Jr.

Robert Adkins, Sr.

Estate of Betty Adkins

Estate of Robert Adkins, Sr.

Ken Adkins, dba Robert Adkins & Sons Partnership

Buffalo Hollow Farms, Inc.

Gerald Schneider, dba Buffalo Hollow Farms, Inc.

2. The names of the real party in interest represented by me is:

Not applicable

3. All parent corporations and any publicly held companies that own 10% or more of stock in the party represented by me are:

Not applicable

4. The names of all law firms and the partners or associates that appeared for the party now represented by me before the Court of Federal Claims or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Ronald Dan Boulware

Edwin H. Smith

Benjamin D. Brown

David Schultz

Laura Alexander

R. Todd Ehlert

Sharon Kennedy

Joshua Emberton

Polsinelli PC

Cohen, Milstein Sellers & Toll PLLC

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

*Milne et al. v. United States*, No. 20cv2079 (Fed. Cl.)

*Nolan v. United States*, No. 21cv00122 (Fed. Cl.).

6. Organizational Victims and Bankruptcy Cases:

Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) are not applicable because this is not a criminal or bankruptcy case. *See* Fed. Cir. R. 47.4(a)(6).

Dated: May 12, 2022

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli Jr.

# Table of Contents

**Page**


Certificate of Interest .......... i

Introduction .......... 1

Argument .......... 4

I. Plaintiffs Are Entitled To Compensation For The Period From 2007 To 2014 In Which The Taking Was Stabilizing .......... 4

A. The Statement In *Barnes* That Crop Losses During Stabilization Are Unrecoverable Torts Does Not Survive *Arkansas Game & Fish Commission* .......... 5

B. Crop Losses Are A Proper Measure Of Damages Caused By The Government's Taking Of A Flowage Easement During The Stabilization Period .......... 18

II. The CFC's Rejection Of Plaintiffs' 2011 Flooding Claims Should Be Vacated .......... 23

A. The Severity Of Flooding In 2011 Was Produced By The Same Single-Purpose Package Of Changes That Caused Flooding In Other Years .......... 24

1. The CFC's Reasoning With Respect To 2011 Flooding Was Unsound .......... 25

2. The Government's Alternative Account Of 2011 Flooding Contradicts The CFC's Factual Findings, Which Are Not Clearly Erroneous .......... 26

B. The Government's Remaining Arguments Regarding 2011 Flooding Fail To Justify The CFC's Decision .......... 32

Conclusion .......... 37

Certificate of Compliance .......... 38

Certificate of Service .......... 39

# Table of Authorities

**Page(s)**

**CASES**

*Ark. Game & Fish Comm'n v. United States*:
637 F.3d 1366 (Fed. Cir. 2011) .......... 9
568 U.S. 23 (2012) .......... *passim*
736 F.3d 1364 (Fed. Cir. 2013) .......... *passim*

*Barnes v. United States*, 538 F.2d 865 (Ct. Cl. 1976) .......... 2, 5, 6, 7

*De Leon v. Holder*, 761 F.3d 336 (4th Cir. 2014) .......... 22

*Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) .......... 6

*First Federal Lincoln Bank v. United States*,
518 F.3d 1308 (Fed. Cir. 2008) .......... 19

*John B. Hardwicke Co. v. United States*,
467 F.2d 488 (Ct. Cl. 1972) .......... 32

*In re Operation of Mo. River Sys. Litig.*:
305 F. Supp. 2d 1096 (D. Minn. 2004) .......... 28, 30
421 F.3d 618 (8th Cir. 2005) .......... 28

*Ridge Line v. United States*, 346 F.3d 1346 (Fed. Cir. 2003) .......... 1, 5, 11

*United States v. Dickinson*, 331 U.S. 745 (1947) .......... 14, 15, 16

*United States v. Riley*, 363 F.2d 955 (2d Cir. 1966) .......... 22

## Introduction

The Court of Federal Claims ("CFC") got many things right in this case, correctly ruling that the case sits in the heartland of takings law: the government permanently took a flowage easement over plaintiffs' properties and therefore must compensate plaintiffs for that easement. But the CFC erred by refusing to award compensation for the period while the taking was stabilizing and by rejecting entirely plaintiffs' claims as to the extremely severe flooding that occurred in 2011. In seeking to defend those rulings, the government relies on a Court of Claims decision that is no longer good law, makes factual assertions that contradict well-grounded CFC findings, and outright fails to defend key aspects of the CFC's reasoning. The CFC's judgment must be vacated on the two issues that are the subject of plaintiffs' cross-appeal.

First, the CFC's refusal to award compensation during the stabilization period—measured, reasonably enough, as the crops destroyed in the floods caused by the government—cannot be reconciled with the fundamental principle that "just compensation includes a recovery for all damages, past, present and prospective." *Ridge Line v. United States*, 346 F.3d 1346, 1359 (Fed. Cir. 2003) (citation omitted).

Plaintiffs here suffered not only a permanent diminution in property values as of 2014, but also damages during the stabilization period leading up to 2014.

The government relies on *Barnes v. United States*, 538 F.2d 865 (Ct. Cl. 1976), which states that crop damages arising from flooding occurring before a taking has stabilized are not compensable under the Constitution because such flooding amounts to a tort rather than a taking. But *Barnes* is no longer good law; the Supreme Court and this Court have conclusively rejected its key premises, holding that single-purpose recurring flooding constitutes one taking that occurs over several years rather than a series of separate, tort-like trespasses. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) ("*AGFC II*"), *remanded*, 736 F.3d 1364 (Fed. Cir. 2013) ("*AGFC III*"). And there is no logic or fairness in awarding compensation only for property's *prospective* reduced value as of the date a taking stabilized, as the CFC did here, but failing to award compensation for damages that occurred *while* the taking was stabilizing. Moreover, in *AGFC* itself this Court approved compensation for the effects of a *temporary* flowage easement measured by timber destruction; it is at least as compelling that part of

the effect of the *permanent* flowage easement here would be measured by crop destruction.

Second, the CFC's rejection of plaintiffs' claims for the destructive 2011 flooding rests on flawed reasoning. Contrary to the CFC's mistaken conclusion, the increased severity of 2011 flooding was directly and foreseeably caused by the same package of government changes that caused flooding in other years. Put in the language of *AGFC*, the increased severity of flooding in 2011 resulted from the same single purpose—reverting the Missouri River Basin to its original state to protect fish and wildlife. And those floods imposed the same kinds of burdens on the plaintiffs' property as the floods in other years. The 2011 flooding therefore should have been considered to be part of the flowage easement that the government took. The government's main response is not to defend the CFC's reasoning but rather to conjure a world in which the Corps never changed its management of the River and plaintiffs waived key arguments. But the government's preferred version of the facts contradicts the CFC's well-founded findings, and plaintiffs repeatedly advanced in the CFC the same arguments about 2011 flooding that they have pressed here.

In the end, the government's cross-appeal arguments are all-too-familiar demands for special per se rules and special deference to the government that would bar aspects of takings liability in flooding cases. The Supreme Court in *AGFC II* made clear that such special pleading has no place in flooding cases (or elsewhere in takings law). That makes these cross-appeal issues unusually simple in this Court, even if they will require a remand to resolve important details: the government can take private property for public purposes like protecting the environment, but when it does so, it must justly compensate the private parties who have borne the economic brunt of those public choices. That is as true in flooding cases as in all takings cases—and plaintiffs here are entitled to no less.

## Argument

### I. Plaintiffs Are Entitled To Compensation For The Period From 2007 To 2014 In Which The Taking Was Stabilizing

As the CFC found, the government repeatedly flooded plaintiffs' lands from 2007 to 2014, continued to do so after 2014, and will continue to do so—all to pursue the public purpose of reverting the Missouri River to its natural state, at the expense of plaintiffs' use of their land to farm their crops. The CFC thus correctly recognized that

the government must compensate plaintiffs for the flowage easement it has permanently taken. *See* Ideker.Br.70-72. But the CFC awarded compensation only for the land's *prospective* reduced agricultural productivity as of the date the taking stabilized in 2014; the CFC refused to compensate plaintiffs for damages of exactly the same kind that occurred *while* the taking was stabilizing. That was a legal error, because "just compensation includes a recovery for all damages, past, present and prospective." *Ridge Line*, 346 F.3d at 1359 (citation omitted).

### A. The Statement In *Barnes* That Crop Losses During Stabilization Are Unrecoverable Torts Does Not Survive *Arkansas Game & Fish Commission*

**1.** The government's principal response is that *Barnes*, *supra*, categorically bars awards for crop losses during stabilization of a flooding taking. Specifically, the government relies on the Court of Claims' statement that flooding that occurred during the stabilization period in that case was a series of "tortious invasions—mere trespasses." U.S.Resp.Br.42-43 (quoting *Barnes*, 538 F.2d at 874). On that view, crops destroyed before a taking stabilizes are the result of

individual, tortious, trespassing floods for which the government retains sovereign immunity. U.S.Resp.Br.43.

But *Barnes*'s crop-loss rule is no longer good law. In *AGFC II*, the Supreme Court repudiated *Barnes*'s key premise by holding that temporary recurring flooding—even recurring over only a few years—is a taking rather than a mere trespass (provided that the flooding is sufficiently severe and the circumstances otherwise warrant recognizing a taking). *See* 568 U.S. at 26, 39. This Court cannot follow a Court of Claims decision that is "inconsistent" with subsequent Supreme Court authority. *See Doe v. United States*, 372 F.3d 1347, 1354 (Fed. Cir. 2004) ("Court of Claims decisions are … binding upon us unless undermined by intervening Supreme Court or en banc authority."); *id.* at 1354-57 (Court of Claims cases "inconsistent" with subsequent Supreme Court authority were not binding).

*Barnes*'s reasoning is flatly inconsistent with *AGFC II*. *Barnes* wrongly conceived of flooding prior to stabilization as a series of individual torts, but that construct rests on the Court of Claims' misunderstanding that only *permanent* ("inevitably recurring") flooding could constitute a taking. *See Barnes*, 538 F.2d at 870 ("Government-

induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort. In such cases recovery is not authorized in this court."). From the general proposition that temporary flooding was necessarily a series of individual torts, *Barnes* concluded that, in particular, crop losses before the taking became permanent were not compensable. *Id.* at 873 (establishing the date of the taking as the year when the "permanent nature" of the flooding became clear); *id.* at 874 ("[N]ot until the date of taking did these several tortious invasions ripen to the extent necessary to confer on the defendant a flowage easement. For damages sustained prior to that moment, we have no statutory jurisdiction.").

The Supreme Court's holding in *AGFC II* (and this Court's remand opinion in *AGFC III*) annihilated *Barnes*'s key premise. *AGFC II* holds that "a taking may occur, within the meaning of the Takings Clause, when government-induced flood invasions, although repetitive, are temporary." 568 U.S. at 26. Moreover, both *AGFC II* and this Court's decision in *AGFC III* establish that recurring, single-purpose flooding over many years constitutes a single taking. *See id.* at 39 ("[W]hile a single act may not be enough, a continuance of them in

sufficient number and for a sufficient time may prove [a taking]. Every successive trespass adds to the force of the evidence.") (citation omitted, brackets in original); *AGFC III*, 736 F.3d at 1370 (explaining that "[t]he government cannot obtain an exemption from takings liability on the ground that the series of interim deviations were adopted on a year-by-year basis, rather than as part of a single multi-year plan, when the deviations were designed to serve a single purpose and collectively caused repeated flooding" and harm to the plaintiff's "property"). Any assessment of compensation must likewise treat the taking as a unit—something the CFC correctly did for most purposes, but not for awarding stabilization-period compensation. *See*, *e.g.*, Appx384 ("The atypical flooding caused by the MRRP began in 2007, as part of a series of floods caused by the Corps' actions under the MRRP that is continuing today. Under [*AGFC III*] the court treats this series of intermittent floods collectively in determining the period and nature of the taking and in evaluating just compensation.") Absent from the government's brief here is any attempt to defend *Barnes*'s reasoning or result, because it is impossible to do so after *AGFC II* and *AGFC III*.

Tellingly, this Court had embraced *Barnes*'s misguided view in its since-overruled decision in *Arkansas Game & Fish Commission v. United States*, 637 F.3d 1366 (Fed. Cir. 2011) ("*AGFC I*"). That decision had "distinguish[ed] between a tort and a taking" and cited *Barnes* as a case "from our predecessor court" that "held that inherently temporary conditions cannot result in the taking of a flowage easement." *Id.* at 1374-75. Indeed, the Court had recounted the facts and holding of *Barnes* in some detail, explaining that in *Barnes* "[t]he releases caused intermittent flooding from 1969-1973 and again beginning in 1975. Noting that 'the flooding [was] of a type which will be inevitably recurring,' the [*Barnes*] court determined that a taking had occurred but held that it did not occur until 'the permanent character of intermittent flooding could fairly be perceived' in 1973." *Id.* at 1378 (citations omitted). The *AGFC I* Court thus understood *Barnes* to draw a permanence-based line for compensation: "Consequently, [*Barnes*] did not allow the plaintiffs to recover for crop damage sustained from 1969-1973 because it was not obvious that the releases and the flooding would be permanent until 1973." *Id.* The concurrence in denial of rehearing en banc in *AGFC I* likewise recognized that *Barnes* rested on

the ground that flooding before stabilization was temporary and therefore not a taking. 648 F.3d 1377, 1379 (Dyk, J., concurring in denial of reh'g en banc).

Overruling that reasoning, the Supreme Court held in *AGFC II* "that recurrent floodings, even if of finite duration, are not categorically exempt from Takings Clause liability." *AGFC II*, 568 U.S. at 27. On remand, this Court confirmed that a series of floods due to "deviations [that] were directed to a single purpose" would not be a mere series of torts, but could instead constitute flooding that "is properly viewed as having lasted for seven years." *AGFC III*, 736 F.3d at 1370.

The government is correct that this Court's decision on remand in *AGFC III* does not "mention[] *Barnes*." U.S.Resp.Br.43. But that is precisely the point. The key premise of *Barnes*'s crop loss analysis—that flooding before permanent stabilization is necessarily a tort, not a taking—had been quite relevant to the Court's decision in *AGFC I*, but was obviously rejected by the Supreme Court in *AGFC II*. *AGFC II* and *AGFC III* interred *Barnes*'s mode of analysis, and this Court should decline the government's invitation to revive it.

**2.** This Court's decision in *Ridge Line* underscores that *Barnes* offered an anomalous (and now clearly defunct) view of just compensation for flooding cases. Both *Ridge Line* and the decisions in *AGFC* reflect the rule that the government must pay just compensation for all damages caused by its taking, regardless of timing. Ideker.Br.73-74. *Ridge Line* is clear: "[J]ust compensation includes a recovery for all damages, past, present and prospective." 346 F.3d at 1359 (citation omitted).

Applying that maxim in *Ridge Line* itself, this Court stated that "the damages analysis is not to be limited to 1993, the time of the alleged taking." 346 F.3d at 1359. That view of just compensation is directly contrary to *Barnes*, which had adopted a special rule for flooding and crops that insisted on measuring compensation only at and after "the time of the alleged taking" (*i.e.*, once the taking stabilized), refusing to award compensation for the period leading up to stabilization. *Ridge Line* is thus consistent with *AGFC II & III*, while *Barnes* is part of the anomalous strain of case law casting temporary flooding as per se inactionable—an error that the Supreme Court unanimously corrected in *AGFC II*.

**3.** The government's refusal—even now—to acknowledge *Barnes*'s incompatibility with the principles in *Ridge Line* and *AGFC II* is pure recalcitrance. Once again, the government urges a special per se rule (here, against the award of crop losses during stabilization) in a field of law where per se rules and special-purpose categories are sharply disfavored. As the Supreme Court has emphasized in this very context, "[i]n view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in [the Takings Clause] area .... [M]ost takings claims turn on situation-specific factual inquiries." *AGFC II*, 568 U.S. at 31-32. Having failed to establish a purpose-built per se rule against takings liability for temporary flooding in *AGFC*, the government should not be allowed here to reduce its liability under a purpose-built per se rule that rests on the exact same premise.

Indeed, the claim here to measure compensation by crop losses is scarcely different from what *AGFC II* and *AGFC III* already approved in measuring compensation by timber lost to temporary flooding in that case. Imagine that the government had only *temporarily* adopted the MRRP from 2004 to 2014, and then decided to reverse course and re-

prioritize flood control once again, as it had done consistently for many decades before 2004. In that interim period, the government would have destroyed plaintiffs' crops in a multi-year flood, just as it did here. That case would be a temporary takings case on all fours with *AGFC*, in which the government changed the operation of a flood-control project for several years before deciding to return to the prior operation, in the meantime destroying valuable plants growing on the land (there, trees), the value of which was the principal basis for computing compensation for the taking. *See AGFC III*, 736 F.3d at 1367-69.

In that hypothetical temporary-MRRP case, no permanent taking would occur because property values would presumably rebound to reflect the return to the government's longstanding and long-advertised policy of prioritizing flood control. Ideker.Br.6-7. And in that hypothetical, crop losses would be the natural measure of the damages for the (temporary) flowage easement taken from 2007 to 2014. But under the rule in *Barnes*, no such compensation would be permissible. That result would be obviously inconsistent with *AGFC II* and *AGFC III*. It cannot be the law that, in this case where the taking is *permanent*, those same crops, destroyed in the same period through the

same physical process, become legally irrelevant to the measure of just compensation.

**4.** *Barnes*'s rule that no compensation is due for losses during the stabilization period also works at cross-purposes with the stabilization doctrine itself. That doctrine applies where, as here, the government elects to "bring about a taking by a continuing process of physical events." Ideker.Br.60-63 (quoting *United States v. Dickinson*, 331 U.S. 745, 749 (1947)). In that situation, the takings claim does not accrue until the situation has stabilized, so that a property owner "is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Dickinson*, 331 U.S. at 749.

Plaintiffs' claim for crop losses respects the stabilization doctrine. That doctrine provides that a takings claim does not accrue until "the consequences of inundation have so manifested themselves that a final account may be struck." *Dickinson*, 331 U.S. at 749. Here, it would be objectively unreasonable to require plaintiffs to have sued on a theory that a single flood in 2007 had been caused (contrary to the government's own contemporaneous representations) by the

government's actions. Ideker.Br.65-66. Moreover, the government made over two thousand structural changes that modified the River's flow, and thus the extent of flooding, starting in 2004 and continuing for a decade. Ideker.Br.62-65. Under those circumstances, no "final account" could "be struck" in 2007. *Dickinson*, 331 U.S. at 749. Rather, the natural and intended operation of the stabilization doctrine is to avoid "piecemeal or … premature litigation," wait until later, and then look back to strike "a final account," including compensation during the period of stabilization.[1] *Id.* Plaintiffs here ask for nothing more.

The equities are simple in the stabilization context: the government may not use the stabilization period to avoid paying compensation for damages suffered while the taking was stabilizing. After all, the government itself created the physical process that took time to stabilize, and yet chose not to condemn the necessary flowage

[1] Because the stabilization doctrine recognizes that compensable damages can be suffered during the stabilization period, there is no force to the government's argument (U.S.Resp.Br.45) that the ability to measure crop losses annually during the stabilization period is a reason to believe that the CFC misapplied the stabilization doctrine by selecting 2014 as the accrual date. The government conflates two distinct concepts: the physical process of a taking (which may take time to stabilize), and the manner of measuring damages from that process and the ultimate taking. The ability to measure components of the latter says little or nothing about the timing of the former.

easements up front—thus necessitating this litigation. *See Dickinson*, 331 U.S. at 747-48 (explaining that where the government could have condemned land and flowage easements at the outset but "chose not to do so," thereby putting "on the owner the onus of determining" when the taking had stabilized, the stabilization doctrine applies and the owner need not rush to bring suit prematurely); *id.* at 748 ("The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die.").

The government's unsettling response is that it would be unworkable to provide compensation here. Instead, the government suggests, plaintiffs should simply be grateful for the "gratuity" provided by the government when it originally reengineered the Missouri River, decades ago, to encourage agricultural development. U.S.Resp.Br.2. That characterization fundamentally misunderstands the nature of plaintiffs' property interest and their investment in the land and crops. At most, the government created an opportunity. It was plaintiffs—encouraged by the government, and through decades of hard work and expenditures of untold millions of dollars—who cleared the land, turned

it into farmland, and then made the capital investments necessary to make that land productive for farming crops. *See* Ideker.Br.6-7.

Plaintiffs' efforts manifest "the property owner's distinct investment-backed expectations" that establish a compensable taking. *AGFC II*, 568 U.S. at 36. Over the course of the stabilization period here, the government took and exercised an easement over plaintiffs' land that was incompatible with plaintiffs' use of it to grow crops—the defining feature of their farmland. *See* Farm.Bureau.Amicus.Br.13-17 (explaining that crops are "inextricably bound up" with croplands and that, based on the economics of farming, "by destroying Plaintiffs' crops, the government appropriated the value of every parcel that experienced crop destruction between 2007-2014"). As one amicus explains, allowing the government to avoid paying compensation for that period would only encourage the government "to effectuate a land grab incrementally over time and potentially pay nothing[,] at least until it becomes plain that the taking has stabilized"—and that approach would "undermin[e] the foundational principle" from *Ridge Line* that just compensation includes recovery for *all* damages. Farm.Bureau.Amicus.Br.6, 12-20.

### B. Crop Losses Are A Proper Measure Of Damages Caused By The Government's Taking Of A Flowage Easement During The Stabilization Period

The CFC correctly awarded plaintiffs damages for the taking of their property as of 2014, which reflects the diminished *future* productive value of the cropland in 2014 moving forward. But that award does not compensate plaintiffs for the government's taking of the productive value of their land during stabilization. The government's arguments against using crop losses to measure damages incurred during that period lack merit. And in any event, the question before this Court is simply whether *any* compensation is due (after the CFC awarded *nothing*); a remand to establish the amount of compensation due is unavoidable.

**1.** The government first argues that plaintiffs have already received the full measure of the diminution in their property value caused by government flooding through the change in real market value as of 2014. U.S.Resp.Br.44. That is wrong. As the CFC correctly ruled, the government's taking constituted one multi-year flood that began in 2007 and stabilized in 2014. Appx383-384. Even though the consequences (or indeed the causes) of the flooding were not clear until

2014, *see* Ideker.Br.60-69, the government thus took a flowage easement in plaintiffs' croplands *starting* in 2007. Plaintiffs' entitlement to the diminution in property value as of 2014 is only a partial measure of the damage caused by the government's action. That diminution value measures only how the government's flowage easement reduces the prospective value of the plaintiffs' properties as of 2014, because market value reflects what someone will pay to own a property based on its value going forward, not harms that property suffered in the past. *Cf. First Fed. Lincoln Bank v. United States*, 518 F.3d 1308, 1317 (Fed. Cir. 2008) ("[T]he market value of … lost property reflects the then-prevailing market expectation as to the future income potential of the property ….").

In contrast, crop losses for the period from 2007 to 2014 *do* measure the harm suffered by the property during the period of stabilization. Ideker.Br.72-73. The government advances no alternative measure, so its position amounts to yet another argument that plaintiffs should receive *no compensation at all* for the period of time during which the government was in fact taking a flowage easement over their property. Whatever quarrel the government might

have with the details of the calculation of compensation—a subject on which the CFC heard ample evidence from the parties—the correct answer cannot be an award of zero compensation for that period.

**2.** The government also criticizes the use of crop-loss damages by characterizing such damages as a measure of lost profits. *See* U.S.Resp.Br.45. That is not a view adopted by the CFC, which correctly did not ascribe legal significance to the fact that plaintiffs' expert once, in a line of questioning, agreed with the *government's* casual phrasing of the expert's model as "in a nutshell" capturing "lost profits." Appx30185-30186, *cited in* U.S.Resp.Br.45.

The relevant question is not how an attorney cross-examined a witness but rather the legal justification for compensation. Here, crop losses do not measure some attenuated negative impact that is a mere side effect of government-caused flooding. The destruction of crops on farmland is substantial harm to the defining feature of the land itself. Ideker.Br.76. The Supreme Court and this Court indicated as much in *AGFC*, giving no weight to the government's similar argument that the value of destroyed timber growing on the plaintiff's forestland measured only consequential damages. Ideker.Br.76-77. As amici put

it here, "the entire purpose of croplands is … to grow crops," Farm.Bureau.Amicus.Br.5-6, and "by destroying Plaintiffs' crops, the government appropriated the value of every parcel that experienced crop destruction between 2007-2014," Farm.Bureau.Amicus.Br.16.

In a similar vein, the government insinuates that plaintiffs are entitled to less compensation, or maybe none at all, because some of their businesses remain profitable. U.S.Resp.Br.15 n.3, 27, 29. That notion (for which the government offers no legal support) is a naked attempt to distract from the CFC's finding that the government's flooding caused catastrophic damage to plaintiffs' farms, including months-long flooding that destroyed crops and farm structures. Ideker.Br.14-16. Nothing in the whole of takings jurisprudence supports the government's suggestion that it can take a significant property interest and yet owe no compensation at all because it has not outright bankrupted the property's owner.

**3.** The proper disposition of the stabilization-period compensation issue is straightforward. If the government owes *some* compensation for damages during the stabilization period, then this Court should remand for entry of appropriate compensation by the CFC.

Given that such a remand is necessary, there is no force to the government's argument (U.S.Resp.Br.46) that a lack of apportionment of the crop losses attributable to government-caused flooding is an independent basis for affirmance. Both sides offered expert testimony that would support an actual damages award. Plaintiffs took the position that (2011 aside) the flooding during the stabilization period was caused entirely by the government's conduct, and there was thus no need to apportion crop losses between those attributable to government action and those attributable to other factors. And even the government's expert concluded that the flooding during the stabilization period resulted in *some* crop losses—a point the government does not dispute, *see* U.S.Resp.Br.46. Although plaintiffs contend that the government's expert grossly underestimated those losses, the government is plainly wrong to claim that such evidence is off limits to show that damages are more than zero. "As Judge Friendly noted long ago, a party may satisfy his burden of proof by pointing to evidence supplied by his adversary." *De Leon v. Holder*, 761 F.3d 336, 342 (4th Cir. 2014) (citing *United States v. Riley*, 363 F.2d 955, 958 (2d Cir. 1966), and "[n]umerous other cases").

On remand, the CFC can decide whether to accept additional evidence from the bellwether plaintiffs or to decide the compensation issue as to those plaintiffs on the existing record. In either event, non-bellwether plaintiffs, whose damages have not yet been adjudicated and whose claims are not on appeal here, must be permitted to introduce (and the CFC must consider) their evidence of crop losses and the portion of those crop losses attributable to government actions. Ideker.Br.79.

## II. The CFC's Rejection Of Plaintiffs' 2011 Flooding Claims Should Be Vacated

The CFC correctly ruled that the package of government actions taken to revert the Missouri River to its natural state resulted in the taking of a flowage easement over plaintiffs' properties during flood years from 2007 to 2014. Appx372. But the CFC erroneously rejected plaintiffs' claims for 2011 flooding. The CFC's primary basis for that rejection was the conclusion that 2011 flooding was not caused by conduct taken for the same "single purpose" as flooding in other years. Appx80. When closely scrutinized, however, the CFC's reasoning does not rest on the *purpose* of the government's actions (which were all aimed at environmental restoration, even if they were many and

varied). Rather, the CFC relied on the fact that 2011 flooding was caused most directly by *mechanisms* other than immediate releases of water from reservoirs to support downstream habitat for threatened and endangered species ("T&E releases").

In attempting to defend that mismatched reasoning, the government presents an entirely new version of facts—a parallel universe in which the MRRP did not actually affect the System's operation—that clearly contradicts the CFC's factual findings. The government also repeats the CFC's error of conflating a "single purpose" with a single physical mechanism. Finally, the government quibbles with nomenclature in the CFC's decision and plaintiffs' principal brief. But none of that justifies the CFC's categorical rejection of the 2011 flooding claims.

### A. The Severity Of Flooding In 2011 Was Produced By The Same Single-Purpose Package Of Changes That Caused Flooding In Other Years

The CFC erred in rejecting plaintiffs' claims with respect to 2011 flooding, which manifested the same "single purpose" as flooding in other years.

### 1. The CFC's Reasoning With Respect To 2011 Flooding Was Unsound

As the CFC recited, *AGFC III* asks whether multiple flooding events were caused by conduct directed to a single governmental purpose. Appx37-38. If they were, then the events are part of the same single flood that constitutes an exercise of one flowage easement. *See AGFC III*, 736 F.3d at 1370 ("The government cannot obtain an exemption from takings liability … when the deviations were designed to serve a single purpose and collectively caused repeated flooding and timber loss."). Accordingly, the relevant inquiry is whether 2011 flooding was caused by government actions aimed at the "single purpose" underlying flooding in other years, not whether the flooding in each year occurred by an identical physical mechanism.

The severity of 2011 flooding was caused by features of the same package of changes that caused flooding in other flood years—changes all implemented for the single purpose of reverting the Missouri River to its natural state in order to comply with the Corps' obligations under the Endangered Species Act ("ESA"). Those changes, under the umbrella of the MRRP, consisted of both River and System Changes. Appx21-22.

The CFC's own factual findings discuss several System Changes, Appx24-25; Appx60 n.32, one of which bore particular responsibility for the severity of 2011 flooding: a 2004 change under which the Corps released less water early in any given year than the Corps would have previously released at that point of the year (applying the 1979 Manual). With that change, when a year as wet as 2011 arrived, the Corps had to make significantly larger releases later in the year, causing severe flooding on plaintiffs' lands. Ideker.Br.80-84. Flooding in other years was caused by other MRRP changes—such as T&E releases to alter breeding and nesting patterns. Yet those differences in physical mechanism are beside the point when the flooding all served the same single governmental purpose.

#### 2. The Government's Alternative Account Of 2011 Flooding Contradicts The CFC's Factual Findings, Which Are Not Clearly Erroneous

The government's brief barely grapples with the CFC's erroneous conflation of physical mechanisms with governmental purpose, focusing instead on factual assertions and mischaracterizations that the government says support the CFC's ultimate rejection of the 2011 flooding claims. According to the government's one-sided narrative,

(a) the MRRP did not actually change river management, and (b) plaintiffs' case was based exclusively on the System Change of T&E releases (thus having minimal connection to 2011 flooding). Both points must be rejected because they contradict the CFC's well-supported factual findings.

**a.** The government asserts that the MRRP made no significant change in the Corps' management of the Missouri River. U.S.Resp.Br.4-6, 47-50. The government would treat the MRRP as a mere continuation of the Corps' efforts since the 1940s to limit flooding. U.S.Resp.Br.4-6 (rehashing evidence that the government concedes the CFC rejected, and pointing to the revised Manual's compliance with the 1944 Flood Control Act as evidence that nothing changed); U.S.Resp.Br.47-48 (citing the government's own skewed presentation of the factual context that led to the MRRP and suggesting that the MRRP was not driven in large part by an effort to protect fish and wildlife). Those are extraordinary assertions given that the government itself resisted and delayed for *years* to avoid the massive changes ultimately wrought by the MRRP, which a court *forced* the government to make in order to protect fish and wildlife. *See In re Operation of Mo. River Sys.*

*Litig.*, 421 F.3d 618, 625-27 (8th Cir. 2005); *In re Operation of Mo. River Sys. Litig.*, 305 F. Supp. 2d 1096 (D. Minn. 2004).

The CFC has already rejected the government's revisionist history. The CFC found that the MRRP was a sea change in the Corps' management of the Missouri River, designed to protect fish and wildlife and deprioritize flood control. *See* Appx21-28. The CFC further found that the Corps' actions represented "a significant change in the focus of the work the Corps was doing in managing the River—from flood control to River restoration work" (that is, work to restore the River to a non-controlled state). Appx23; *see* Appx23-24 (describing how the Corps "embarked on an 'unprecedented' [shallow-water habitat] construction program in 2004").

The government does not challenge those findings as clearly erroneous—indeed, the government disclaims *any* challenge to the CFC's factual findings in that regard. U.S.Resp.Br.4. The government therefore cannot now assert that the System and River Changes the government made under the MRRP were somehow insignificant. And given how radical the MRRP changes were, it is particularly outrageous for the government to suggest (U.S.Resp.Br.13, 26-30) that plaintiffs

were foolish and naïve to rely on the government's decades-long representations about prioritizing flood control when plaintiffs invested millions of dollars and decades of their lives in developing their farmlands.

**b.** The government also mischaracterizes plaintiffs' takings arguments in the CFC as limited to T&E releases. To the contrary, plaintiffs' consistent theory is and has been that the "single purpose" for flooding in all flood years was the plan to revert the Missouri River to its natural state, which was made to protect endangered species and includes the wide array of System and River Changes. The CFC consistently recognized the breadth of plaintiffs' claims and arguments and of the MRRP itself. *E.g.*, Appx21-22 ("This litigation arises from the changes the Corps has made .... Together, these changes are referred to as 'System and River Changes.' … The System and River Changes that have been made to comply with the ESA are numerous …."); *see* Ideker.Br.10-12 (describing System Changes and River Changes). The only aberration was the CFC's treatment of plaintiffs' 2011 flooding claims.

The court order that forced the Corps' 2004 shift proves that operational changes to protect endangered species were not limited to T&E releases alone (which were simply one type of System Change, Appx24-25). The Corps was ordered to issue a new Master Manual—a "detailed plan" that "specifically explains how the Corps must conduct its operation of the Missouri River"—that complied with the ESA. *Operation of Mo. River*, 305 F. Supp. 2d at 1097; *see* Appx20-23. Central to the revised Manual was a new "adaptive management process," which elevated "ecosystem resilience" at the expense of other policy objectives. Appx22-23.

The CFC agreed that plaintiffs could make their case by tracing flooding back to any or all of the System Changes and River Changes that manifested the Corps' "single purpose" of satisfying its ESA obligations. Appx81. And the CFC recognized that System Changes included both an overall deprioritization of flood control and the elimination of mandatory-minimum releases, Appx10, Appx24, Appx60 n.32, both of which were responsible for the severity of 2011 flooding, Ideker.Br.81-82. Yet the CFC doubled back on its own reasoning when

it decided that 2011 flooding could not be a taking because it did not involve T&E releases.

The government tries to salvage the CFC's flawed reasoning by blaming plaintiffs for supposedly pinning their case entirely on T&E releases. But the array of changes that the Corps made in 2004 to prioritize environmental concerns is far broader, and so were plaintiffs' arguments.[2] Indeed, the CFC's own decision confirms the breadth of plaintiffs' claims. The CFC would hardly have taken such pains to detail all of the System and River Changes, Appx21-28, if all but one were irrelevant to the plaintiffs' position.

**c.** For all of those reasons, the government's key assertion—that "the Corps made no decisions to store or release water for fish-and-wildlife purposes in 2011," U.S.Resp.Br.48—is entirely irrelevant. The

[2] *E.g.*, Appx11064-11065; Appx11065 (Pls. Phase I Post-Trial Brief) ("Plaintiffs allege that the retransformation of the River required [the Corps] to … mak[e] changes in its operation of the System ('System Changes') and its operation and maintenance of the BSNP ('BSNP Changes') … and that the combined and cumulative effects over time of those changes predictably resulted in the MRRP flooding."); Appx13149-13151, Appx13156-13157 (Pls. Motion for Reconsideration) ("[B]oth the storing-more-water and T&E mechanisms of causation as to System Changes serve the 'single purpose' on which Plaintiffs actually relied for establishing the causal connection between the Corps' System Changes as to storage and releases and the flooding in question …." (emphasis omitted)).

nature of T&E releases in 2011 does not matter because, under the circumstances in 2011, the Corps took *other* actions pursuant to the MRRP that caused the severity of the 2011 flooding. Those other actions in 2011 were very much "for fish-and-wildlife purposes," *id.*, because *all* of the System Changes were made to protect endangered species. Most importantly, some of the System Changes—including deprioritizing flood control and eliminating mandatory early releases—directly dictated the government's choices about when and how to release water in 2011.

### B. The Government's Remaining Arguments Regarding 2011 Flooding Fail To Justify The CFC's Decision

The government makes three additional arguments, none of which can sustain the CFC's decision.[3]

**1.** First, the government takes issue with plaintiffs' nomenclature in describing certain graphs, arguing that the graphs do not show "releases" (the word plaintiffs have used) but rather show "service

[3] Notably, the government fails to distinctly address—let alone defend—many of the CFC's observations about 2011 flooding. Plaintiffs previously explained how the CFC erred in (1) conceptualizing claims as tort-based challenges to specific 2011 actions; (2) suggesting that *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972), might bar the claims; and (3) relying on what the Corps did or did not know in 2011. Ideker.Br.86-89.

levels." U.S.Resp.Br.48-49. Yet the government's own explanation directly links service levels to releases, noting that release amounts will achieve particular flows to meet desired service levels. *See* U.S.Resp.Br.48-49. Plaintiffs' point—which is supported by expert testimony—is that when keeping constant the "on-the-ground conditions like the forecasted flow," and taking into account how the Corps "exercise[d]" its "professional judgment," U.S.Resp.Br.49, there was a significant difference in the service levels, and thus in the releases, under the 1979 Manual versus the revised Manual. Specifically, the revised Manual led to more water being kept in the System reservoirs early on in the year, leaving less (or no) buffer for additional water inflows. That meant that in a year like 2011 with high water inflows, more water had to be released later in the year to avoid overloading the system than would have had to be released under the 1979 Manual, and thus there was more government-caused flooding. Ideker.Br.82-84, 87-88. Quibbles about "releases" and "service levels" do not undermine that basic point.

**2.** The government likewise argues about nomenclature rather than substance when it contends that because flexibility existed under

both the 1979 and revised versions of the Master Manual, the releases under the 1979 Manual were not "mandatory." U.S.Resp.Br.49. That obscures the important point: the Corps unquestionably had far more flexibility under the revised Manual to protect fish and wildlife at the expense of flood control, for two reasons. First, flood control was no longer the top priority as it had been under the 1979 Manual, which made fish and wildlife the *last* priority. Appx23-24. Second, the revised Manual, through the "adaptive management" approach, gave the Corps a newfound ability to prioritize "ecosystem resilience" and thus protect endangered species. Appx22-23, Appx60 n.32. The shorthand reference to "mandatory" releases captures the 1979 Manual's contrasting approach, which constrained the Corps' discretion and placed firm parameters on the timing and circumstances of flood-control releases. Ideker.Br.8. Confirming the contrast between the two protocols, plaintiffs' expert took into account how the Corps historically exercised its limited discretion under the 1979 Manual, Appx23103, and found a significant difference between the releases that would have occurred in 2011 under the 1979 Manual versus the releases that did actually occur that year under the Revised Manual.

In all events, such highly technical arguments were not the basis for the CFC's decision below, and this Court is poorly positioned to adjudicate them in the first instance.

**3.** Finally, where the government does address the CFC's opinion, it fails to defend the CFC's analysis. Plaintiffs argued that it was clear error for the CFC to reject Dr. Christensen's model of 2011 based on the (demonstrably false) belief that his conclusions depended on assuming that conditions in 2011 and 1997 were virtually identical. Ideker.Br.87-88. The government clearly understands and accurately restates plaintiffs' argument: Dr. Christensen used 1997 to illustrate the differences (before and after the MRRP) in how the Corps operated the System in a wet year. U.S.Resp.Br.50.

Tellingly, however, the government does not argue that the CFC was correct to think that Dr. Christensen's model depended on conditions being the same in 1997 and 2011. Instead, the government feebly argues that the CFC's clear error was not completely unreasonable, stating that a trial court has "wide discretion" as to whether to credit expert testimony and that the CFC's decision was

"reasonable" because 1997 was generally "importan[t]" to Dr. Christensen's model. U.S.Resp.Br.50-51.

Plaintiffs have not disputed that 1997 was an important illustrative *example* in Dr. Christensen's model. But his model simply did not depend on assuming that 1997 was virtually identical to 2011, which was the ground on which the CFC rejected the model. Ideker.Br.87. Thus, the government all but concedes that the CFC was clearly mistaken—and that should be the end of the matter.[4]

[4] If this Court nonetheless agrees with the CFC's decision on 2011 flooding, it should make clear that non-bellwether plaintiffs (whose claims are not on appeal) can still demonstrate that the River Changes contributed to additional flooding in 2011 on their properties, even if the System Changes did not. Ideker.Br.89 n.5. The government does not contend otherwise.

## Conclusion

The judgment of the CFC should be vacated in part, insofar as it denied compensation for the period while the taking was stabilizing and denied compensation for 2011 flooding, and the case remanded for further proceedings on those issues.

Respectfully submitted.

Dated: May 12, 2022

/s/ *Donald B. Verrilli, Jr.*
DONALD B. VERRILLI, JR.
ELAINE GOLDENBERG
DAHLIA MIGNOUNA
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

BENJAMIN J. HORWICH
TERESA REED DIPPO
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street
27th Floor
San Francisco, CA 94105

SETH C. WRIGHT
**POLSINELLI, PC**
900 W 48th Place
Suite 900
Kansas City, MO 64112

*Counsel for*
*Plaintiffs–Cross-Appellants*

**Certificate of Compliance**

1. This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(3)(A), because it contains 7,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface in 14-point font.

Dated: May 12, 2022

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

**Certificate of Service**

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on May 12, 2022.

I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.