# United States Court of Appeals for the Federal Circuit

---

**IDEKER FARMS, INC., ROBERT ADKINS, JR., ROBERT ADKINS, SR., ESTATE OF BETTY ADKINS, ESTATE OF ROBERT ADKINS, SR., KEN ADKINS, DBA ROBERT ADKINS & SONS PARTNERSHIP, GERALD SCHNEIDER, DBA BUFFALO HOLLOW FARMS, INC.,**
*Plaintiffs-Cross-Appellants*

**LYNN BINDER, ELAINE BINDER, TODD BINDER, APRIL BINDER, TYLER BINDER, VALERIE BINDER, RICHARD BINDER, DUSTIN BINDER, DARWIN BINDER, DBA MIDWEST GRAIN CO., EDDIE DREWES, ROBERT W. DREWES REVOCABLE TRUST, RITA K. DREWES REVOCABLE TRUST, DAVID DREWES, INDIVIDUALLY AND, DBA DREWES FARMS, INC., PATRICK NEWLON, DBA NEWLON FARMS, INC., DAVID NEWLON, DBA D DOUBLE N FARMS, INC., JASON TAYLOR, BRAD TAYLOR, DBA H.B.J. FARMS, INC., LYLE HODDE, DBA HODDE & SONS LIMITED PARTNERSHIP, STEVE CUNNINGHAM, TRUSTEE OF THE DORIS J. CUNNINGHAM AND STEVEN K. CUNNINGHAM DECLARATION OF TRUST, GAIL CUNNINGHAM, DBA CUNNINGHAM FARMS, INC., CHARLES GARST, INDIVIDUALLY AND, DBA GARST FARMS, INC., CONNIE GARST, DBA GARST FARMS, INC., RON SCHNEIDER, MARY SCHNEIDER, ET AL.,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2021-1849, 2021-1875

---

Appeals from the United States Court of Federal Claims in No. 1:14-cv-00183-AOB, Judge Armando O. Bonilla.

---

Decided: June 16, 2023

---

DONALD B. VERRILLI, JR., Munger, Tolles & Olson LLP, Washington, DC, argued for plaintiffs-cross-appellants. Also represented by ELAINE GOLDENBERG, DAHLIA MIGNOUNA; BENJAMIN JOSEPH HORWICH, San Francisco, CA; SETH C. WRIGHT, Polsinelli, PC, Kansas City, MO.

BRIAN C. TOTH, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by TODD KIM.

DAVID CHUNG, Crowell & Moring LLP, for amicus curiae American Farm Bureau Federation. Also represented by ELIZABETH DAWSON.

TREVOR CALDWELL BURRUS, Cato Institute, for amici curiae Cato Institute, Mountain States Legal Foundation. Also represented by JOSEPH BINGHAM, Mountain States Legal Foundation, Lakewood, CO; ILYA SHAPIRO, Manhattan Institute, New York, NY.

JEREMY CHARLES MARWELL, Vinson & Elkins LLP, Washington, DC, for amicus curiae Chamber of Commerce

of the United States of America.

JAY R. CARSON, Wegman Hessler, Cleveland, OH, for amicus curiae Buckeye Institute.

---

Before MOORE, *Chief Judge*, PROST and TARANTO, *Circuit Judges*.

MOORE, *Chief Judge*.

Plaintiffs brought this action against the United States under the Fifth Amendment seeking compensation for the Army Corps of Engineers' (Corps) alleged taking of their farmlands and personal property by permanent, recurring flooding. The Court of Federal Claims determined there was a taking and entered judgment awarding compensation for the diminished value of the land but rejected damages claims for lost crops. The Government appeals the trial court's determination that a taking occurred. Plaintiffs cross-appeal the denial of compensation for lost crops. For the reasons discussed below, we affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

## BACKGROUND

### A. The Missouri River

The Missouri River (River) spans over 2,300 miles. It begins in southwestern Montana and winds through North Dakota, South Dakota, Iowa, Nebraska, Kansas, and Missouri before emptying into the Mississippi River. The River's basin encompasses approximately one sixth of the land mass of the continental United States. Until the middle of the twentieth century, the River was multi-channeled and predominantly "wide and shallow," ranging from 1,000 feet to almost six miles wide. J.A. 51,703.

In its natural state, the River experienced annual flooding that constantly morphed its path and the

topography of its floodplain. The annual flooding pattern consisted of April flooding caused by snowmelt on the plains and local rainfall and June flooding caused by melting snowpack in the Rocky Mountains and rainfall at lower elevations. J.A. 50,742. During these floods, the River would extend across large portions of the floodplain up to seventeen miles, connecting the primary channel to secondary channels. J.A. 50,741–42; J.A. 50,899. The flooding caused erosion and deposited sediment as the flood waters receded. J.A. 50,742. In a flood's wake was an altered floodplain, riverbank, and laterally relocated river channels. J.A. 50,742; J.A. 50,900. In this way, the flooding cycles kept the River in a state of "dynamic equilibrium with its floodplain" in which the River "migrated back and forth" across its floodplain. J.A. 50,742; J.A. 50,886. In sum, the River "was uncontrolled" and, as a result, rendered large portions of the floodplain unproductive for development, including agricultural use. J.A. 50,885; J.A. 51,052; J.A. 52,926.

In the 1940s, Congress passed several bills to improve navigation and reduce flooding. The Flood Control Act (FCA) of 1944 authorized the construction of a series of dams to create a reservoir storage system designed to contain excess water and reduce flooding. Pub. L. No. 78-534, 58 Stat. 887 (codified at 33 U.S.C § 701 *et seq.*); *see South Dakota v. Ubbelohde*, 330 F.3d 1014, 1019 (8th Cir. 2003) (summarizing history of FCA); *see also ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 499–505, 512–14 (1988) (same). The dams, which make up the Missouri River Mainstem Reservoir System (Mainstem System), were completed in 1967. The FCA required the Corps to operate the Mainstem System to promote a series of objectives, primarily navigation and flood control, and secondarily fish and wildlife conservation, among other things. *See* 58 Stat. 887–91; 33 U.S.C. § 701–1 (Declaration of Policy of FCA); *see ETSI*, 484 U.S. at 512; *Ubbelohde*, 330 F.3d at 1019–20. In 1945, Congress established the Bank Stabilization and

Navigation Project (BSNP). Under the BSNP, the Corps altered the River's water flow (including location, volume, and rate) by constructing a "self-scouring" navigation channel and building dikes, levees, and revetments. J.A. 51,707. These modifications eliminated secondary channels, narrowed the River's channel to as little as one third its natural width, reduced flooding, and stabilized the riverbanks. As a result, the River was no longer dynamic with respect to the floodplain. J.A. 51,707–08; J.A. 51,724. The Corps completed the BSNP in 1980.

Consistent with the FCA, the Corps manages the Mainstem System while accounting for the effects of BSNP structures according to operations outlined in its 1979 Master Manual, which it used from 1979 until 2004. The 1979 Master Manual prioritized flood control first and recreation and wildlife last. *See Ubbelohde*, 330 F.3d at 1028.

The Mainstem System and BSNP accomplished their intended effect: what was previously economically unproductive floodplain became stable for development. J.A. 53,478 (Government 30(b)(6) witness stating goal was to encourage development). Farmers and developers invested in and improved the land free from annual flooding. J.A. 52,862 (Government report). By March 2005, 95 percent of the River floodplain was developed for agricultural, urban, and industrial uses. J.A. 52,862.

The Mainstem System and BSNP, however, also had significant environmental side effects. *See Ideker Farms, Inc. v. United States*, 136 Fed. Cl. 654, 664–66 (2018) (*Phase I*). In particular, the self-scouring navigation channel altered downstream sediment deposits, while riverbank stabilization and floodplain reduction eliminated fish and bird habitats and interrupted wildlife breeding cycles. *Id.* at 664–65. Realizing the environmental impact of the Mainstem System and BSNP, in 1986, Congress authorized the Corps to purchase land adjacent to the River to recreate lost habitats. *Id.* at 665.

The Corps' land reclamation was not its only mitigating action. The Fish and Wildlife Service (FWS) placed several bird species and one fish species affected by the Mainstem System and BSNP on the endangered species list pursuant to the Endangered Species Act (ESA). *Id.* at 666 (citing 16 U.S.C. § 1531 *et seq*.). The ESA requires any agency, including the Corps, to consult with FWS and conduct a biological assessment regarding the impact of its activities on the survival or recovery of an endangered species. 16 U.S.C. § 1536(a), (c). In response to the agency's assessment, FWS provides a biological opinion (BiOp) of the agency's impact on the endangered or threatened species and provides "reasonable and prudent alternatives" for the agency to take if it determines the agency's intended action would violate the ESA. 16 U.S.C. § 1536(b)(3)(A). Unless the agency gets an exemption or is allowed to "take" a limited number of endangered species, the agency must follow the BiOp or provide a reasonable alternative to satisfy its obligations under the ESA. 16 U.S.C. §§ 1536(a)(2), 1539; *Phase I*, 136 Fed. Cl. at 666.

In the 1990s, the Corps and FWS began discussions concerning proposed changes to the River designed to mitigate the environmental impact of the Mainstem System and BSNP. J.A. 52,103–27. As part of those discussions, FWS issued several BiOps, some of which called for restoring the natural spring and summer river cycles and wildlife habitats. *Phase I*, 136 Fed. Cl. at 666; *see In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 626 (8th Cir. 2005). The Corps did not make those changes because it determined FWS' proposed actions would exacerbate flood risks to land adjacent to the River, contrary to the Mainstem System and BSNP's primary objective. *Phase I*, 136 Fed. Cl. at 666–67; *see Mo. River Sys. Litig.*, 421 F.3d at 626. In 2002, the Corps faced several lawsuits—which were consolidated for multi-district litigation—from private parties and states objecting to the Corps' River management for

differing reasons, including its failure to implement the changes in the 2000 BiOp. *See In re Operation of the Mo. River Sys. Litig.*, 363 F. Supp. 2d 1145, 1156–62 (D. Minn. 2004), *aff'd in part*, 421 F.3d 618. As a result of those lawsuits, the district court ordered the Corps to revise its 1979 Master Manual, which resulted in the 2004 Master Manual. *In re Operation of Mo. River Sys. Litig.*, 305 F. Supp. 2d 1096, 1099 (D. Minn. 2004).

The 2004 Master Manual brought many changes to the Mainstem System and BSNP (2004 Changes). The BSNP changes (River Changes) were intended to "restor[e] the Missouri River to a more natural state." *Phase I*, 136 Fed. Cl. at 669. The Corps referred to this as the Missouri River Recovery Program (MRRP). *Id.* The MRRP created more shallow water habitats through modifications to the channel and dikes and reopened chutes that the Corps previously closed. *Id.* The Corps also made changes to the Mainstem System management (System Changes). Unlike the 1979 Master Manual that prioritized flood control over wildlife, the 2004 Master Manual eliminated prioritization. J.A. 50,117.

### B. Procedural Background

This case arises out of the impacts of the 2004 Changes. Plaintiffs are approximately 372 individuals and entities who own and operate farms adjacent to the River in six states. While the period from 2000–2006 was largely a drought, periodic flooding returned in 2007, 2008, 2010, 2011, 2013, and 2014. *Phase I*, 136 Fed. Cl. at 670. Plaintiffs filed suit in 2014 in the Court of Federal Claims, alleging the 2004 Changes caused frequent and severe flooding on Plaintiffs' farms between 2007 and 2014 that amounted to permanent, physical takings under the Fifth Amendment.

The trial court split Plaintiffs' action into two phases. In Phase I, the trial court selected 44 bellwether Plaintiffs to be the subject of its decision whether the 2004 Changes

caused the flooding, whether the flooding was the foreseeable or predictable result of the 2004 Changes, and whether the flooding was severe enough to be a taking. *Id.* at 659, 672–73, 675, 678–79. The bellwether Plaintiffs presented evidence about their respective properties and the flooding events that occurred on their lands between 2007 and 2014. *Id.* Expert witnesses and government officials also testified about the effects of the 2004 Changes. *Id.* The trial court found that 28 of the 44 bellwether Plaintiffs established at least causation and foreseeability or causation, foreseeability, and adequate severity for some years of flooding between 2007 and 2014.[1] *Id.* at 761–62. It dismissed the remaining 16 Plaintiffs. *Id.* at 763. It also found the 2004 Changes did not cause flooding in 2011 for any Plaintiff. *Id.* at 691–93.

The Government moved for reconsideration of the Phase I opinion's causation analysis in light of our intervening decision in *St. Bernard Parish Government v. United States*, 887 F.3d 1354, 1364 (Fed. Cir. 2018). *See Ideker Farms, Inc. v. United States*, 142 Fed. Cl. 222 (2019) (*Reconsideration Decision*). The trial court denied the motion, determining the exception to the causation standard identified by *St. Bernard Parish* was applicable to this case. *Id.* at 232.

The trial court then proceeded to Phase II, where it tried damages and the Government's defenses. To assess these issues, the court selected the properties of three representative Plaintiffs out of those who prevailed in Phase I: the Adkins property, the Ideker Farms property, and the Buffalo Hollow Farms property. *Ideker Farms, Inc. v. United States*, 151 Fed. Cl. 560, 567 (2020) (*Phase II*).

---

[1] The trial court found that some bellwether Plaintiffs had not yet established severity. *Id.* at 761–62. The trial court reserved the remaining severity determinations for Phase II. *Id.*

Based on the trial court's finding that the parties agreed it was appropriate to apply the *Arkansas Game & Fish II* factors, it applied those factors to this case. *Id.* at 584, 593 n.23 (citing *Arkansas Game & Fish Comm'n v. United States,* 568 U.S. 23 (2012) (*Arkansas Game & Fish II*)). The factors, which apply to temporary, intermittent flooding, are severity, duration, intent or foreseeability, character of the land, and the owner's reasonable, investment-backed expectations. *Arkansas Game & Fish II*, 568 U.S. at 31–39. Applying those factors, the trial court determined the flooding was a taking of a permanent flowage easement, *Phase II*, 151 Fed. Cl. at 584–93, that began in 2007 and stabilized on December 31, 2014. *Id.* at 593–98. The trial court collectively awarded the three representative Plaintiffs approximately $7,000,000 for property value diminution, $1,000,000 for repairing a levee, and prejudgment interest.[2] *Id.* at 606, 608–10. The court ruled, however, that Plaintiffs were not entitled to compensation for crops destroyed during the stabilization period because they were consequential damages. *Id.* at 606–08.

The Government appeals, and Plaintiffs cross-appeal, rulings from both trial phases. Specifically, the Government argues the Court of Federal Claims erroneously determined the accrual date for Plaintiffs' taking claims, which resulted in the trial court's improper exercise of jurisdiction after the statute of limitations on Plaintiffs' claims had run. Appellant's Opening Br. at 1–2. It also argues the trial court erred in its application of the *Arkansas Game & Fish II* factors, the legal standard for causation, and the availability of a relative benefits defense. *Id.* at 2. Plaintiffs cross-appeal, arguing the trial court erred in denying compensation for lost crops and finding the 2004 Changes did not cause the 2011 flooding. Resp. Br. and

---

[2] The trial court stayed the remaining Plaintiffs' cases until this appeal is resolved.

Cross-Appeal Br. at 1. We have jurisdiction under 28 U.S.C § 1295(a)(3).

## DISCUSSION

### I. GOVERNMENT'S APPEAL

#### A. Jurisdiction

As a threshold issue, the Government argues the Court of Federal Claims lacked jurisdiction over Plaintiffs' claims. *See* 28 U.S.C. § 2501. First, the Government challenges the Court of Federal Claims' use of the stabilization doctrine in this case because the effects of the flooding manifested immediately. Second, the Government contends the trial court clearly erred in finding that the claims accrued in December 2014 rather than 2007. And because Plaintiffs filed this action in 2014, more than six years after the alleged 2007 accrual date, their claims are time-barred. Plaintiffs respond that the trial court properly applied the stabilization doctrine because the recurring flooding establishing the taking was a gradual process. They also argue the trial court's fact findings that the claims did not stabilize until 2014 were not clearly erroneous and that the trial court had jurisdiction. We agree with Plaintiffs that the Court of Federal Claims had jurisdiction over this case.

A plaintiff must bring a claim in the Court of Federal Claims "within six years after such claim first accrues." 28 U.S.C. § 2501. Section 2501's six-year limitation is jurisdictional. *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1355 (Fed. Cir. 2006) ("[W]e are unwilling to disturb the well-settled law that section 2501 creates a jurisdictional condition precedent for suit in the Court of Federal Claims, which may not be waived by the parties."), *aff'd*, 552 U.S. 130 (2008). Plaintiffs bear the burden of establishing subject-matter jurisdiction. *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015). Whether a court has subject-matter jurisdiction is a question of law we review de novo with subsidiary fact findings

we review for clear error. *Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1289 (Fed. Cir. 2006); *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003). Under the clear error standard, we defer to the trial court's "findings of fact, unless there is a 'definite and firm conviction that a mistake has been made.'" *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1341 (Fed. Cir. 2021) (quoting *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008)).

A claim accrues "when all the events have occurred which fix the liability of the Government" and the plaintiff "was or should have been aware" that the claim existed. *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)); *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). In some cases, the events that give rise to liability may take place over extended periods of time rather than at a discrete instance. In such cases, the accrual date is determined according to the stabilization doctrine, which accounts for the difficulty of ascertaining a precise time "when the property is taken by a gradual physical process rather than a discrete action undertaken by the Government." *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011). Pursuant to this doctrine, where "the damages from a taking only gradually emerge, e.g., as in recurrent flooding, a litigant may postpone a suit for a taking until 'the situation becomes stabilized' and 'the consequences of inundation have so manifested themselves that a final account may be struck.'" *Nw. La. Fish*, 446 F.3d at 1290–91 (citation omitted); *see also Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir. 1987) (holding the "extent of the [tree damage due to flooding] was not ascertainable until 1984" even though trees began to show damage in 1979); *United States v. Dickinson*, 331 U.S. 745, 749 (1947) ("The source of the entire claim—the overflow due

to rises in the level of the river—is not a single event; it is continuous.").

The Government argues the stabilization doctrine is inapplicable here because the effects of the 2004 Changes (i.e., the 2007 flood event itself) manifested "immediately, not gradually," unlike cases involving flooding leading to erosion or uncontrollable aquatic plant growth. Appellant's Opening Br. at 58–59. This argument misses the mark. What's important to the accrual inquiry is not only when the effects of the damage are known or should have been known but also when "all events which fix liability have occurred." *Nw. La. Fish*, 446 F.3d at 1290 (quoting *Boling*, 220 F.3d at 1370). "[I]t is the uncertainty surrounding the permanent nature of the taking, and not the uncertainty surrounding the ultimate extent of the[] damage, that is critical in determining whether the situation has stabilized." *Boling*, 220 F.3d at 1372. Here, the events fixing the Government's liability are recurring floodings over several years that rise to a taking of a permanent flowage easement on Plaintiffs' lands. In the flooding context, we rejected the argument that a "takings claim accrued immediately upon the first inundation of the property because at that point, the frequency and permanency of the flooding were still undeterminable." *Mildenberger*, 643 F.3d at 945 (citing *Dickinson*, 331 U.S. at 749). If Plaintiffs brought a tort claim for a single flood in 2007, then the statute of limitations may have run from the date of that single flood event. But that is not the case here.[3] We conclude

[3] The Government argues the trial court erroneously treated the flooding as a continuous event instead of a single flood in 2007 based on the decision in *Barnes v. United States*. Appellant's Opening Br. at 61–63 (citing 538 F.2d 865, 874 (Ct. Cl. 1976)). This argument rests on the same erroneous analysis discussed below. *See infra* Section II.A.

that the Court of Federal Claims properly analyzed this according to the stabilization doctrine.

The Government also challenges the Court of Federal Claims' stabilization findings, specifically that the events fixing liability "continued past 2007, into 2014" and that Plaintiffs reasonably did not know and should not have known that the 2004 Changes caused the taking of a permanent easement. *See Phase II*, 151 Fed. Cl. at 595–96. It also argues, even if the claims did not accrue in 2007, then the trial court's December 31, 2014 accrual date is unsupported by the record. Because these findings are not clearly erroneous, we reject the Government's argument.

First, the Court of Federal Claims' finding that the claims did not stabilize in 2007 (i.e., that the events fixing liability were ongoing) is supported by the court's findings that the modifications and their effects on the River were ongoing and dynamic. The Government does not dispute that the Corps' modifications to the River continued into 2014. *Phase I*, 136 Fed. Cl. at 669 ("Corps studies explain that as of 2014, the Corps had undertaken 1,697 dike notching actions, 354 major modification actions, 63 dike lowering actions, 36 dike extension actions, 39 side-channel chute actions, 20 revetment chute actions, 14 backwater actions, and 3 channel widening actions."); *Phase II*, 151 Fed. Cl. at 595–96. Assuming these modifications causally contributed to the flooding of Plaintiffs' property, which we address below, that the modifications continued until at least 2014 supports the trial court's finding that the taking had not stabilized in 2007. The modifications to the River's water flow and its effects were ongoing, dynamic, and complex. *Phase I*, 136 Fed. Cl. at 702–05 (describing evidence of gradual changes to river topography and other characteristics); *Phase II*, 151 Fed. Cl. at 596–97; *see, e.g.*, *Nw. La. Fish*, 446 F.3d at 1290 ("The harm in this case [aquatic plant growth] . . . did not occur (i.e., was not fixed) until well after" the water level reached maximum height.). This conclusion is supported by models

comparing the River's water flow between 2005 and 2013. *Phase II*, 151 Fed. Cl. at 595.

Second, the Government's arguments that Plaintiffs reasonably knew or should have known by 2007 that the 2004 Changes resulted in a taking of a permanent flowage easement are inapt. *See* Appellant's Opening Br. at 54, 58–61. The effects of ESA-mandated changes were not immediately apparent for purposes of stabilization. The nature of the taking is a permanent flowage easement by *recurring* flooding. It is reasonable that Plaintiffs did not know from a single flood the existence, let alone the extent, of the pattern of new and recurring flooding that would result in a permanent taking. *See Boling*, 220 F.3d at 1370 ("[T]he key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken."); *Dickinson*, 331 U.S. at 748–49 (holding statute of limitation did not run from first flooding event). The trial court credited testimony that Plaintiffs did not know the cause of the flooding until years after 2007. *Phase II*, 151 Fed. Cl. at 595. This testimony is supported by the fact that the cause and effects of the recurring flooding are difficult to ascertain "given the complex nature of the hydrology of the River." *Id.* Further, some Plaintiffs did not even experience flooding in 2007, and the Government does not explain how those Plaintiffs' claims could have accrued in 2007. *See Phase I*, 136 Fed. Cl. at 736–37 (finding Corps' actions caused flooding in 2008 and 2010), 746–47 (finding Corps' actions caused flooding in 2010 and 2013). The Government also improperly relies on the foreseeability of the taking. The accrual inquiry examines whether Plaintiffs knew or should have known the events fixing liability occurred, not whether they could have predicted such events would occur. *Mildenberger*, 643 F.3d at 946 ("[C]laimants are not required to sue when it is still uncertain whether the gradual process will result in a permanent taking.").

Third, we reject the Government's argument that the trial court's December 31, 2014 accrual date is arbitrary

because it is not related to any physical event. *See* Appellant's Opening Br. at 59–61. When a reasonable plaintiff knew or should have known that his claim stabilized does not need to correspond identically with the physical event giving rise to liability. Instead, *Northwest Louisiana Fish* makes clear the knowledge requirement is separate from (though obviously related to) the requirement that the events establishing liability have occurred.[4] 446 F.3d at 1290 ("The correct standard recites that accrual occurs when the harmed party knows or should have known of their existence *and* all events which fix the government's alleged liability have occurred." (emphasis added) (citation and quotation marks omitted)). Here, Plaintiffs did not learn of the full scope of the River and System Changes and their effects on flooding until several years of recurring flooding. At that point, Plaintiffs consulted experts to confirm their suspicions about the cause of the flooding and filed suit within a few months of confirmation from those experts. *See Phase II*, 151 Fed. Cl. at 595–96. This causation and damages knowledge derived from expert opinions based on analysis of recurrent flooding during the period from 2007 to 2014, which necessarily could not have been provided in 2007, did not arise until 2014. The trial court's finding that Plaintiffs did not reasonably know that a compensable taking had occurred until that date is thus not clearly erroneous. In short, even though stabilization may

---

[4] At least one other area of federal law similarly bases claim accrual on dates other than the physical events they are tethered to, including considering the parties' reasonable efforts to seek expert technical advice. For example, for an injured patient seeking damages for medical malpractice under the Federal Tort Claim Act, the time for a plaintiff to understand the claimed injury and seek medical advice regarding its cause may be considered in accrual. *See United States v. Kubrick*, 444 U.S. 111, 123 (1979).

occur before “damages are complete and fully calculable,” *Mildenberger*, 643 F.2d at 946, the trial court’s accrual date is not clearly erroneous given the complex nature of the flooding, its effects here, the relevant time period, and the time Plaintiffs needed to consult experts to establish causation. *See Phase II*, 151 Fed. Cl. at 596.

In sum, we hold the trial court properly applied the stabilization doctrine to this case and did not clearly err in finding that the taking had not accrued until December 2014. The stabilization doctrine is a “practical matter and not a technical rule of law” designed for precisely these circumstances: where the causes and effects of a taking are varied and may take time to manifest. *Dickinson*, 331 U.S. at 749. We affirm the Court of Federal Claims’ exercise of jurisdiction and its determinations that Plaintiffs’ claims accrued December 31, 2014.

### B. Takings Framework

The Fifth Amendment’s Takings Clause guarantees that private property shall not be taken “for public use, without just compensation.” U.S. CONST. amend. V, cl. 4. If the government “physically acquires private property,” then there is a physical taking to which a *per se* rule applies. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). We assess *per se* takings according to a straightforward rule: “The government must pay for what it takes.” *Id.* (citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002)). This is true regardless of the size, invasiveness, or intermittent nature of the physical occupation. *See id.* at 2075 (“[P]hysical invasions constitute takings even if they are intermittent as opposed to continuous.”); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 438 (1982) (holding that requiring landlords to install cables and cable boxes to the outside of apartment buildings, while occupying relatively little space, was a taking); *United States v. Causby*, 328 U.S. 256, 259 (1946) (holding taking occurred where

Army occupied airspace above plaintiff's land for limited periods of takeoff and landing).

In *Arkansas Game & Fish II*, the Supreme Court clarified that temporary flooding can be a taking and established a multi-factor test for determining if temporary government induced flooding is a taking rather than a mere trespass. 568 U.S. at 38–39. The trial court determined it "appropriate to apply the *Arkansas Game & Fish* factors for the taking of a permanent flowage easement by intermittent flooding" because, in its view, the parties agreed it was appropriate to apply those factors to determine if the permanent intermittent flooding was a taking. *Phase II*, 151 Fed. Cl. at 592–93 & n.23. Though it is not clear that the parties agreed the multi-factor test announced in *Arkansas Game & Fish II* is the correct legal framework for this permanent taking,[5] "[w]e are not bound to accept, as controlling, stipulations as to questions of law." *Sanford's Est. v. Comm'r of Internal Revenue*, 308 U.S. 39, 51 (1939) (citing *Swift & Co. v. Hocking Valley Railway Co.*, 243 U.S. 281, 289 (1917)). The proper legal framework is a question of law the court may decide.[6]

---

[5] Plaintiffs assumed, without conceding, that all of *Arkansas Game & Fish II*'s factors applied to permanent, though intermittent, flooding simply as a "belt-and-suspenders" approach to its analysis, arguing it would prevail *even if* those factors applied. ECF No. 690 at Tr. 3389:5–3391:8; *see* Oral Arg. at 34:40–35:08 (Government stating the parties "have assumed [the factors] apply"), available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-1849_11012022.mp3.

[6] To be clear, we find no factual error in the Court of Federal Claims' application of the *Arkansas Game & Fish II* factors and determine Plaintiffs' prevail under that framework. There are, however, hundreds of remaining plaintiffs whose cases have been stayed pending this

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but retains the independent power to identify and apply the proper construction of governing law.").

*Arkansas Game & Fish II*'s multi-factor test does not determine whether a permanent taking has been effected by government action that will foreseeably produce intermittent invasions by flooding without identifiable end into the future. "In this case, however, both parties agree that if the court finds that a taking occurred, that taking is permanent." *Phase II*, 151 Fed. Cl. at 585. Rather, such action is a *per se* taking. *Arkansas Game & Fish II* involved *temporary* intermittent flooding that occurred during a seven-year period that ended when the government ceased its flood-inducing actions. 568 U.S. at 26–28; *see Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1366 (Fed. Cir. 2013) (*Arkansas Game & Fish III*) (decision on remand from Supreme Court, explaining that the issue was whether a "temporary taking" had occurred); *Milton v. United States*, 36 F.4th 1154, 1163 (Fed. Cir. 2022) (citing *Arkansas Game* approach only for "temporary taking," not for "permanent taking"). The Supreme Court held "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings

---

adjudication. In these circumstances, it makes good sense for us to address the proper legal framework for permanent, rather than temporary, intermittent flooding. *See PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001) (addressing issue on appeal where factual record did not need development, the issue is one of law, and judicial efficiency favored addressing the merits). Our failure to address this issue would waste judicial resources and unnecessarily burden the parties on remand.

Clause inspection." 568 U.S. at 38. It added that when determining whether a temporary flooding is a taking instead of a trespass, courts should consider duration, foreseeability, character of the land, severity, and the reasonable, investment-backed expectations of the property holder. *Id.* at 38–39. The Court repeatedly noted that *permanent* physical occupations, including intermittent flooding, fall on the side of the "bright line[]" of a taking and distinguished them from *temporary* invasions. *Id.* at 31–33 (collecting cases regarding "permanent physical occupation of property" and "intermittent but inevitably recurring overflows"); *see id.* at 38–39. That intermittent (as opposed to continuous) yet permanently recurring occupations are *per se* takings is not a new concept—"There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other." *United States v. Cress*, 243 U.S. 316, 328 (1917); *see Nollan v. California Coastal Comm'n*, 483 U.S. 825, 832 (1987) (stating appropriation of easement was a "permanent physical occupation . . . where individuals are given a *permanent* and continuous right to pass to and fro, . . . even though no particular individual is permitted to station himself permanently upon the premises" (emphasis added)).

The trial court accepted based on the parties' stipulation that the flooding in this case is permanent, not temporary, in nature. *Phase II*, 151 Fed. Cl. at 592–93. In short, the Government has not ceased and does not plan to cease flooding Plaintiffs' lands. To the extent *Arkansas Game & Fish II*'s narrow holding and reiteration of the well-established principle that *permanent* yet intermittent physical invasions are *per se* takings is not enough, the Supreme Court's decision in *Cedar Point*, issued *after* the trial court decision in this case, makes that abundantly clear. It stated that the "approach in *Arkansas Game and Fish*

*Commission* reflects *nothing more* than an application of the traditional trespass-versus-takings distinction to the unique considerations that accompany *temporary* flooding." 141 S. Ct. at 2078–79 (emphases added); *id.* at 2075 ("[P]hysical invasions constitute takings even if they are intermittent as opposed to continuous."). In contrast to the temporary intermittent flooding at issue in *Arkansas Game & Fish II*, *Cedar Point* explained that permanent intermittent flooding is a physical taking subject to a *per se* rule. *Id.* at 2071 (citing *Cress*, 243 U.S. at 327–28). The "government likewise effects a physical taking when it occupies property–say by recurrent flooding as a result of building a dam. These sorts of physical appropriations constitute the 'clearest sort of taking,' and we assess them using a simple, *per se* rule: The government must pay for what it takes."[7] *Id.* (citations omitted).

This is not to say that an analysis of whether a permanent taking or a trespass has occurred might not overlap in part with the *Arkansas Game & Fish II* analysis of whether a temporary taking or trespass occurred. But sometimes distinguishing between takings and trespasses will be much simpler. This is such a case. Where the government takes a permanent right of access, akin to an easement in gross, even if used only intermittently, it is unquestionably an appropriation of the owner's right to exclude. It is undisputed that the Corps has permanently burdened Plaintiffs' land with a right to access their land with flood waters.[8] *Phase II*, 151 Fed. Cl. at 585, 592–93, 596. And

---

[7] Moreover, the inapplicability of the *Arkansas Game & Fish II* factors to permanently recurring flooding is supported by the fact that some factors, like duration, are irrelevant in the permanent context.

[8] To the extent stayed Plaintiffs' have not established that flooding will be permanently recurring, the trial court shall determine that where necessary on remand.

as in *Cedar Point*, where California granted union workers "a formal entitlement to physically invade" the farmers' land, 141 S. Ct. at 2080, here the Government has permanently caused recurring physical occupation of Plaintiffs' land by floodwaters. The fact that the floodwaters come and go during the year, i.e., are intermittent, does not negate the existence of a taking. Those considerations "bear only on the amount of compensation." *Id.* at 2074.

In cases that are closer calls than this one, courts must continue to rely on *Arkansas Game & Fish II* and *Ridge Line*. 568 U.S. at 38–39; 346 F.3d at 1355–57; *see Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005). Indeed, while not rigid, the trespass-versus-taking inquiry focuses on whether government actions are "[i]solated physical invasions, not undertaken pursuant to a granted right of access, [which] are properly assessed as individual torts rather than appropriations of a property right." *Cedar Point*, 141 S. Ct. at 2078. For example, up to three flooding events "by themselves" do not qualify as (even a temporary) taking. *Nat'l By-Prod., Inc. v. United States*, 405 F.2d 1256, 1273 (Ct. Cl. 1969) (collecting cases); *see Ridge Line*, 346 F.3d at 1357 ("[I]solated invasions, such as one or two floodings . . . do not make a taking . . . but repeated invasions of the same type have often been held to result in an involuntary servitude." (quoting *Eyherabide v. United States*, 345 F.2d 565, 569 (Ct. Cl. 1965))); *see also Cary v. United States*, 552 F.3d 1373, 1381 (Fed. Cir. 2009) (collecting cases distinguishing permanent and intermittent flooding from isolated incidents). In sum, this inquiry essentially distinguishes a physical appropriation from an "occupancy that is transient and relatively inconsequential," such as a "truckdriver parking on someone's vacant land to eat lunch." *Hendler v. United States*, 952 F.2d 1364, 1377 (Fed. Cir. 1991).

Accordingly, *Arkansas Game & Fish II*'s multi-factor test does not apply to permanently recurring flooding. Instead, such flooding that foreseeably or intentionally

results from government action is a categorical physical taking. *See Ridge Line*, 346 F.3d at 1355–56. To be clear, we do not alter or amend our trespass-versus-takings jurisprudence or question the applicability of *Arkansas Game & Fish II* to temporary floodings. *Cedar Point*, 141 S. Ct. at 2078 ("[O]ur holding does nothing to efface the distinction between trespass and takings. Isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right."). Nor do we establish a hardline rule for establishing what is a permanent or recurring flooding. We simply reinforce the principle that the permanent appropriation of a flowage easement is "clear enough" to be on the side of a *per se* taking and not a trespass. *See Hendler*, 952 F.2d at 1371.

### C. Causation

The causation inquiry in this case requires us to assess the proper temporal baseline for measuring whether the 2004 Changes caused the flooding on Plaintiffs' properties. The causation analysis depends on which "but for" world the effects of the 2004 Changes are measured against: the one predating the Mainstem System and BSNP under the 1944 FCA or the world with the Mainstem System and BSNP as it existed between 1967 and 2004. The but for world with the Mainstem System and BSNP, i.e., comparing the circumstances after the 2004 Changes to the circumstances right before those changes, is the proper one for assessing causation.

The Court of Federal Claims determined the proper inquiry for causation was to compare "the 'but for' world before the Corps began to undertake significant actions to return the River to a more natural state in 2004 [with] the current post-2004 world" that reflects the Corps' 2004 Changes. *Reconsideration Decision*, 142 Fed. Cl. at 232. Applying that baseline, the trial court found the 2004 Changes "led to more increased and more severe flooding

than would have occurred had these Changes not been made." *Phase I*, 136 Fed. Cl. at 697. Approximately one month after the trial court rendered its Phase I decision, we issued *St. Bernard Parish*. In *St. Bernard Parish*, we reversed a trial court's determination that the government caused a taking by flooding because it had built a navigation channel that "create[d] a risk of flooding"—a determination we held to violate causation principles because "*subsequent* government action designed to mitigate that risk" was wholly "ignored" in the plaintiff's proof of a taking. 887 F.3d at 1364 (emphasis added). Based on that decision, the Government filed a motion for reconsideration, even though what the Government seeks to build into the "but for" world here is not government flood-reducing actions *after* the challenged government flood-increasing action (as in *St. Bernard Parish*), but, instead, government flood-reducing actions that were taken *before*—indeed, a very long time before—the challenged government flood-increasing actions. The trial court denied the motion, determining *St. Bernard Parish* did not undermine its causation analysis, explaining that, under the legal authority that governs this distinct situation, the proper baseline for the causation analysis was the world just before the 2004 Changes, and not before the Mainstem System and BSNP projects, because the 2004 Changes were "outside the contemplation of the Corps" when the much earlier Mainstem System and BSNP were planned. *Reconsideration Decision*, 142 Fed. Cl. at 232.

The Government argues the trial court's baseline is wrong, Appellant's Opening Br. at 15–18, 26–34, because it did not "consider both [flood] risk-increasing and [flood] risk-decreasing government actions." *See St. Bernard Parish*, 887 F.3d at 1365. The Government argues the proper analysis is to compare the current world (i.e., with the 2004 flood risk-increasing action) to the but for world where the Corps never improved the River under the 1944 FCA (i.e., without the Mainstem System and BSNP). Plaintiffs

respond that the trial court properly compared the current post-2004 River to that which existed right before the Government modified the Mainstem System and BSNP to return the River to its natural state. Resp. Br. and Cross-Appeal Br. at 30–47. They argue *St. Bernard Parish* does not apply because of the *Hardwicke* exception, which *St. Bernard Parish* itself recognizes as addressing the situation where "[flood] risk-reducing government action *preceded* the [flood] risk-increasing action," in which case "the [flood] risk-reducing action would only be considered in assessing causation if the risk-increasing action was 'contemplated' at the time of the [flood] risk-reducing action." 887 F.3d at 1367 n.14 (quoting *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490–91 (Ct. Cl. 1972)) (emphasis added). And under the *Hardwicke* exception, itself well-founded in Supreme Court authority, the trial court's causation standard is correct, they argue, because the 2004 Changes would not have been contemplated when the FCA was enacted in 1944. Resp. Br. and Cross-Appeal Br. at 47–49. Plaintiffs are correct that the *Hardwicke* exception applies and that the Court of Federal Claims did not clearly err in applying it to this case.

In determining whether the effects of the Mainstem System and BSNP are excluded from assessing whether the 2004 Changes caused flooding on Plaintiffs' properties, we examine whether a reasonable property owner at the time the taking occurred would have understood the 2004 Changes to be "probably within the scope of the project [i.e., the 1944 FCA] from the time the Government was committed to" the project. *See United States v. Miller*, 317 U.S. 369, 377 (1943); *Hardwicke*, 467 F.2d at 490 (quoting *United States v. Reynolds*, 397 U.S. 14, 18 (1970)). There is no bright line rule for determining whether an action was probably within the scope of the project. *Reynolds*, 397 U.S. at 21 (stating *Miller*'s "application to any particular set of facts requires discriminating judgment"). Satisfying the *Miller* rule does not require that the 2004 Changes

were explicitly part of the original plans for the 1944 FCA. *Id*. The Government's representations regarding the scope of the project, the foreseeability of the action, and the amount of time that has passed between the original action, i.e., the 1944 FCA, and the action allegedly giving rise to liability, i.e., the 2004 Changes, are also relevant. The Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits consider some or all of these factors. *See United States v. 62.17 Acres of Land, More or Less, in Jasper Cnty.*, 538 F.2d 670, 680 (5th Cir. 1976) (listing factors); *United States v. Crance*, 341 F.2d 161, 165–66 (8th. Cir. 1965) (determining government's second alleged taking was within scope of first taking because recreational areas adjacent to dam were "contemplated . . . from [the project's] inception" and government did not make any representations to contrary); *United States v. Eastman*, 528 F. Supp. 1177 (D. Oregon 1981), *aff'd and opinion adopted*, 714 F.2d 76 (9th Cir. 1983); *United States v. 49.01 Acres of Land, More or Less, Situated in Osage Cnty.*, 669 F.2d 1364, 1369 (10th Cir. 1982) (stating that "[l]ength of time between commencement of a project and condemnation of property may be a factor in determining reasonableness of a landowner's belief" that their property was not within scope of project); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting Fifth Circuit decisions issued prior to September 30, 1981).

The Government argues that under *Hardwicke*, if the government provides flood protection to any land, then "an eventual return to the pre-project status quo" *must* be contemplated. Appellant's Opening Br. at 31; Oral Arg. at 6:57–8:04. In other words, the Government argues it may *always* reinundate land with flooding (or at least increase the risk of flooding) as long as at some point in time it decreased the risk of flooding to that land. That position is contrary to *Miller*. It fails to acknowledge that *Miller* (and thus *Hardwicke*) provide that the 2004 changes, if uncontemplated as within the scope of the 1944 FCA, may be

assessed for causation without regard to the effects of the Mainstem System and BSNP. If the 2004 Changes that caused flooding were not "within the scope of the [1944 FCA]" that provided flood protection, then the Government is not immune from liability for flooding Plaintiffs' land by virtue of having constructed the Mainstem System and BSNP in the first place. *Miller*, 317 U.S at 377; *see Hardwicke*, 467 F.2d at 393; 3 Nichols on Eminent Domain § 8A.01[11.B] (2022) ("Even though the condemnee's land may have experienced an appreciation in value as a result of a proposed public improvement, the condemnee may be able to recover the enhanced value if the condemnee can establish that his or her property was outside the scope of the government's project at the time the government initially committed to the project."). The Government's proposed rule also ignores the Fifth Amendment's roots in both principles of fairness and equity and doctrines of property law. *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 631 (1961); *United States v. Fuller*, 409 U.S. 488, 490 (1973); *see Arkansas Game & Fish II*, 568 U.S. at 31 ("The Takings Clause is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (quotation marks omitted)). In short, *Miller* and *Hardwicke* teach that if the government provides value to landowners by virtue of a first project, it cannot subsequently take property under the scope of a second project not contemplated by the first project without providing just compensation. The Court of Federal Claims did not err in applying *Hardwicke* and *Miller* to this case.

Nor did the Court of Federal Claims clearly err in finding that a reasonable property owner, at the time the Government took a permanent flowage easement, would have understood the 2004 Changes, which were required to comply with the ESA, to not have been contemplated as part of the Mainstem System and BSNP flood-control projects completed by 1967 pursuant to the 1944 FCA. The Corps'

primary objectives for its actions under the FCA were for flood control, even to the detriment of other objectives. The "United States expected people to be protected from flooding along the River following the construction of the Mainstem System and BSNP." *Phase II*, 151 Fed. Cl. at 591. Indeed, based on these flood-control expectations, agricultural production increased and developers moved in. J.A. 50,681 (National Academy of Sciences report); J.A. 52,886 (National Park Service report). Though wildlife and recreation were considered as part of the flood control program, before 2004, they were prioritized below flood control. *See Ubbelohde*, 330 F.3d at 1027.

Further, because the 2004 Changes were antithetical to the original FCA priorities, it stands to reason the Corps, and certainly property owners, would not have contemplated eliminating the flood control functions of the BSNP by reverting its vast physical modifications.[9] Indeed, the flooding caused by the 2004 Changes would not have occurred but for the separate, intervening obligations Congress enacted under the ESA. It was not until after significant intervention by the FWS, which the Corps resisted, that the Corps implemented the 2004 Changes. In other words, under the 1944 FCA, the Corps never contemplated reconnecting the River to its floodplain after disconnecting it. It follows *a fortiori* that a reasonable property owner would not have expected the Corps to do so.

---

[9] While the FCA gives the Corps discretion in the management of the River, the Government does not dispute flood control is the FCA's and 1979 Master Manual's top priority while other considerations are secondary. *See* Oral Arg. at 4:26–43. The Eighth Circuit has held the 1979 Master Manual to be binding on the Corps. *Ubbelohde*, 330 F.3d at 1028–30; *see Mo. River Sys. Litig.*, 421 F.3d at 628 n.6. The Government provides no reason why we should determine differently.

This case is analogous to *United States v. 172.80 Acres of Land, More or Less, Situated in Mercer Cnty.*, 350 F.2d 957 (3d Cir. 1965). In *Mercer County*, the Corps built a dam and condemned nearby land for recreational and public facilities. *Id.* at 957. The government successfully negotiated with the plaintiffs for a flowage easement over about 20 acres of their land and assured them those acres "were the only parts of their land that would be needed for the project." *Id.* at 957–58. Later, the government reversed course and condemned an additional 80 acres, which had increased in value because of the dam and improvements. *Id.* In holding that the plaintiffs were entitled to compensation for the increased value attributable to the government project, the court reasoned "a purchaser contemplating the acquisition and private development of [plaintiffs' property] . . . after . . . initiation of the reservoir project could reasonably anticipate that he would be able to devote the land to its highest economic use, enjoying advantages inherent in the proximity of the nearby government development without serious apprehension that his land would soon be condemned." *Id.* at 959. Similarly here, Plaintiffs "could reasonably anticipate" that their lands, which were free of annualized flooding for decades, would not be intermittently flooded for purposes of wildlife protection based on the Government's intervening and unrelated actions. *See id.*

Contrary to the Government's arguments on appeal, *St. Bernard Parish* is distinguishable from this case. *St. Bernard Parish* recognized that under *Hardwicke*, "if the risk-reducing government action preceded the risk-increasing action, the risk-reducing action would only be considered in assessing causation if the risk-increasing action was 'contemplated' at the time of the risk-reducing action." 887 F.3d at 1367 n.14 (quoting 467 F.2d at 490–91). The 2004 Changes that increased the risk of flooding were not contemplated under the 1944 FCA that decreased the risk of flooding. And unlike here, *St. Bernard Parish* involved

a first government action that increased flooding risk before a second government action reduced the risk of flooding. *Id.* at 1367. The trial court properly held *St. Bernard Parish* does not alter the causation analysis in this case. The trial court properly evaluated the relevant government actions. We therefore see no error in the trial court's ruling on this issue.

D. Relative Benefits

Finally, the parties dispute the applicability to this case and the scope of the so-called "relative benefits" doctrine, which states: "if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty." *United States v. Sponenbarger*, 308 U.S. 256, 266–67 (1939). After Phase I of the present case, the Government moved to amend its answer to include a relative benefits defense. *See Ideker Farms, Inc. v. United States*, 146 Fed. Cl. 413, 414–15 (2020) (*Motion to Amend Order*). The trial court denied the motion, reasoning, *inter alia*, that the 2004 Changes were for different purposes and not contemplated in the construction of the Mainstem System and BSNP and that a relative benefits defense was thus unavailable. *Id.* at 421–23. The Government, mirroring its causation argument (rejected above), contends that the relative benefits doctrine bars Plaintiffs' claims because the harm of the Corps' 2004 Changes are outweighed by the benefits of the Mainstem System and BSNP. *See* Appellant's Opening Br. at 42. Plaintiffs respond that the relative benefits doctrine is inapplicable because, *inter alia*, it does not take into account the benefits conferred by *all* government actions. Resp. Br. and Cross-Appeal Br. at 49–52. We agree with Plaintiffs.

The relative benefits doctrine "is closely related to, but distinct from, the issue of causation." *Alford v. United States*, 961 F.3d 1380, 1383 (Fed. Cir. 2020). As with

causation, not "all government benefits must be considered under the relative benefits doctrine." *Id.* at 1386. Specifically, the relative benefits doctrine focuses on the benefits and detriments of the government actions under the same program. *See Sponenbarger*, 308 U.S. at 261–62, 266–67 (analyzing only benefits and detriments of 1928 actions while excluding benefits and detriments of 1883 Eads plan); *see Jackson v. United States*, 230 U.S. 1, 6–7 (1913) (describing government's flood protection history relevant to *Sponenbarger*); *see also Alford*, 961 F.3d at 1384 (finding decision to raise lake level and flood plaintiffs' land caused less damage than if Corps allowed levee system to be breached); *Bartz v. United States*, 633 F.2d 571, 578 (Ct. Cl. 1980) (analyzing harms of dam operation causing raised water levels on adjacent farms against benefits of control at all other periods of same dam); *Accardi v. United States*, 599 F.2d 423, 430 (Ct. Cl. 1979) (analyzing harm of river flow with and without single dam in operation).

The 2004 Changes and the Mainstem System and BSNP were different projects under different programs spread out over decades and directed to different purposes. Just as the Court in *Sponenbarger* analyzed the benefits and detriments of the 1928 flood control without regard to the benefits of the 1883 Eads plan, we conclude that the benefits of the 1944 FCA should not be weighed against the detriments of the 2004 Changes. *See Sponenbarger*, 308 U.S. at 261–62, 266–67. We also find this case to be critically different from *Alford,* where plaintiffs would have "been far worse off" and "suffered more serious damage" from flooding if the government had not engaged in the alleged taking of raising the lake's water level to prevent a levee breach. *See* 961 F.3d at 1385–86. Plaintiffs here did not benefit in any way from the 2004 Changes. Moreover, the 2004 Changes were directed to mitigating environmental and wildlife degradation while the Mainstem System and BSNP were directed to mitigating flooding risks. *See id.* at 1384 ("The relative benefits doctrine considers . . .

only government activities *directed* to mitigating the type of problem that caused the damage." (emphasis added)). In this case, considering the Mainstem System and BSNP along with the 2004 Changes would nullify our application of *Miller* and *Hardwicke* because it would consider the effects of actions that were outside the scope of the project and excluded for purposes of causation. We see no error in the trial court's application of the relative benefits doctrine.

The Court of Federal Claims had jurisdiction over this case and properly applied the causation and relative benefits framework. We also clarify that permanent recurring floodings are *per se* takings. We therefore affirm the trial court's findings.

## II. PLAINTIFFS' CROSS-APPEAL

Plaintiffs cross-appeal, arguing the trial court erred in two respects. First, they argue the Court of Federal Claims improperly rejected Plaintiffs' claims for crop damages. Second, they argue the trial court clearly erred in finding the Government's actions did not cause the flooding of their lands in 2011, which coincided with periods of extreme runoff and flooding. We agree on both grounds.

### A. Crop Damages

After finding the Corps caused recurring flooding on Plaintiffs' land, the trial court analyzed whether Plaintiffs' claims for lost crops and other property were compensable. *Phase II*, 151 Fed. Cl. at 606–608. It held "crop losses and lost profits based on reduced yields, damage to structures, damages to equipment, flood prevention expenses, and flood reclamation expenses" are "consequential damages that are an indirect result of the taking of the flowage easement" and therefore non-compensable. *Id.* at 607. The trial court, however, awarded Plaintiff Ideker Farms "severance damages" (i.e., expenses for "mitigating damages

caused by the taking") for costs of repairing a levee in 2010. *Id.* at 608.

Plaintiffs argue their lost crops are compensable under the Fifth Amendment because the diminution of property value is a separate compensable interest from the destruction of their crops. Specifically, while the flowage easement awarded by the trial court compensates Plaintiffs for the taking caused by *future* flooding, it does not compensate them for *past* damages. Resp. Br. and Cross-Appeal Br. at 72–74 (citing *Arkansas Game & Fish III*, 736 F.3d at 1370). The Government responds that the trial court did not err because crop losses occurring prior to a taking date result from a trespass, not a taking. Appellant's Reply Br. and Cross-Appeal Resp. Br. at 42–46 (citing *Barnes*, 538 F.2d at 874).

The Fifth Amendment protects private property "without any distinction between different types." *Horne v. Dep't of Agric.*, 576 U.S. 350, 358–59 (2015) (citation omitted). "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Id.* (citation omitted). Just compensation requires putting the property owner "in as good a position pecuniarily as if his property had not been taken." *Olson v. United States*, 292 U.S. 246, 255 (1934). As a result, courts must determine whether the Government appropriated a property interest and ensure the owner is compensated for that interest in awarding damages. Damages are not limited to the "time of the alleged taking" and include "past, present, and prospective" damages. *Ridge Line*, 346 F.3d at 1359. We measure "the fair market value of [the] property at the time of the taking." *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) (alteration in original) (citation omitted). The parties do not dispute that crops and other equipment are property under the Fifth Amendment. The parties dispute only whether crops and other equipment damages are consequential damages.

Damages collateral to those caused by the government's physical appropriation of a property right are consequential damages not within the scope of the Fifth Amendment. *See Mitchell v. United States*, 267 U.S. 341, 345 (1925) ("If the business was destroyed, the destruction was an unintended incident of the taking of land."). The line between direct and consequential damages is drawn where the "owner's relation . . . to the physical thing" ends and "other *collateral* interests which may be incident to his ownership" begin. *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) (emphasis added). This includes, for example, lost profits, loss of goodwill, and the cost of moving into a new facility. *Id.* The government is responsible only for losses to the owner's bundle of rights as distinguished from losses to other interests, including value generated from the owner's use of property.

Plaintiffs' crops and other personal property destroyed by flooding are compensable under the Fifth Amendment. The Court of Federal Claims determined damages "above and beyond the value of the flowage easement" were an "indirect result of the taking of the flowage easement." *Phase II*, 151 Fed. Cl. at 607. The Government-induced flooding, however, *directly* took both a permanent flowage easement on Plaintiffs' land and destroyed Plaintiffs' crops.[10] In

[10] Even though state law generally determines the scope of the property interest, *Cedar Point*, 141 S. Ct. at 2075–76; *cf. Tyler v. Hennepin Cnty.*, 143 S. Ct. 1369, 1375 (2023) (explaining that other sources of law may govern what "property" is protected from takings), whether the crops are considered a part of the value of the real estate or separate personal property under state law, their value must be paid to the owners. 2 Nichols on Eminent Domain § 5.03 (2022) ("It does not matter whether the annexations were affixed by operation of nature, as in the case of trees, herbage, water, mines, or minerals, or by artificial means,

other words, the loss of the Plaintiffs' crops was not merely an injury collateral to the loss of their land; though the same government action caused both, it was a separate and independent loss of compensable property in its own right. Moreover, the value of crops physically appropriated is distinguishable from revenues Plaintiffs expected from unplanted seeds that were *not* destroyed by the flooding. *See* Oral Arg. at 32:57–33:10. Plaintiffs do not claim compensation consequential to the taking of an easement—rather, they seek compensation for the government's appropriation of two distinct property interests.

The cases the Government cites are inapposite. *Barnes* does not control and conflicts with the Court of Federal Claims' findings. *Barnes* excluded from compensation crop damages that occurred after the first government-induced flood and before the stabilization date four years later, reasoning "crop damages sustained prior to the date of taking . . . are the product of tortious invasions" and not a taking. 538 F.2d at 873–74. *Barnes*' conclusion that damages occurring during stabilization are not subject to taking liability is premised on the legal rule that "[g]overnment-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort." *Id.* at 870, 874 (citing *Sanguinetti v. United States*, 264 U.S. 146 (1924)). *Arkansas Game & Fish II* repudiated that rule in reversing our holding that a taking occurs only

---

such as buildings, fences, or other structures. In both cases, if they are acquired by eminent domain, compensation must be paid to the owner."); *see Horne*, 576 U.S. at 355, 370 (holding farmers must be given "fair market value" of raisins government regulation required the farmers to set aside for "reserve raisins"); *United States v. 131.68 Acres of Land, More or Less, Situated in St. James Parish*, 695 F.2d 872, 875–76 (5th Cir. 1983) (collecting cases awarding crop damages).

when flooding is "a permanent or inevitably recurring condition, rather than an inherently temporary situation."[11] *See Arkansas Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1378 (Fed. Cir. 2011) (*Arkansas Game & Fish I*) (citing *Barnes*, 538 F.2d at 868–69, 872), *rev'd and remanded*, 568 U.S. 23. On remand in *Arkansas Game & Fish III*, we awarded damages for trees destroyed by temporary, intermittent government-induced floodings that occurred over a seven-year period. 736 F.3d at 1370. There is no material distinction between the destroyed crops here and the damaged timber we held compensable in *Arkansas Game & Fish III*. *Id.* at 1367–69. Indeed, the Court of Federal Claims determined the taking began "in 2007[] when flooding attributable to" the Corps' actions began. *Phase II*, 151 Fed. Cl. at 597–98. Nor is there any meaningful distinction between the crops destroyed by flooding and the levee destroyed by the same flooding that the trial court awarded damages for.[12]

---

[11] The Government argues *Barnes* is still good law because *Arkansas Game & Fish II* never mentioned *Barnes* nor answered whether damages occurring during stabilization are compensable. *See* Appellant's Reply Br. and Cross-Appeal Resp. Br. at 43. While the Government is correct *Arkansas Game & Fish II* did not expressly cite *Barnes*, it nevertheless fatally undermined *Barnes*' rationale. 568 U.S. at 38 (stating limited holding was that temporary flooding is not exempt from takings). Precedent is not ironclad until the Supreme Court explicitly says otherwise—"It is established that a later panel can recognize that the court's earlier decision has been *implicitly* overruled as inconsistent with intervening Supreme Court authority." *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (emphasis added).

[12] It is unclear whether any Plaintiff continues to pursue losses to personal property other than crops. *See* Resp.

Similarly, the Government's argument that awarding crop damages separate from the permanent easement would constitute non-compensable lost profits misapprehends the distinction between the crops and the land they grow on. *See Phase II*, 151 Fed. Cl. at 607; Appellant's Reply Br. and Cross-Appeal Resp. Br. at 45. Just because lost profits from operating a business are not compensable does not mean that the underlying property of a business is not compensable if destroyed or otherwise taken. The former, but not the latter, is merely incidental to the taken property.

Of course, that lost crops are compensable does not resolve the question of the quantum of damages. That question depends upon the nature of the crops themselves. For mature crops, like other forms of property, just compensation is simply the market value of the crops. Measuring immature crops requires more work because it "not customary to buy or sell growing crops." *United States v. 576,734 Acres of Land, More or Less, in Montgomery Cnty.*, 143 F.2d 408, 409 (3d Cir. 1944). The lack of a customary market for immature crops does not mean the Government is absolved of its constitutional obligation to provide "just" compensation.[13] *See generally United States v.*

---

Br. and Cross-Appeal Br. at 72 (mentioning "damages to physical structures" in passing); Cross-Appeal Reply Br. at 21 (discussing damage to "farm structures"); *Phase I*, 136 Fed. Cl. at 747–49 (stating Plaintiff Ideker Farms' grain bins and irrigation equipment were destroyed or damaged). To the extent any Plaintiff seeks such damages, the trial court should apply the guidance discussed here.

[13] The trial court suggested mature crops are compensable while immature crops are not. *Phase II*, 151 Fed. Cl at 608 n.30 (citing *Barnes*, 572 F.2d at 874). But, as explained, *Barnes* excluded immature crops because they

*Commodities Trading Corp.*, 339 U.S. 121, 123 (1950) ("But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards."). Takings liability is not so easily avoided based on such formalities. *Cedar Point*, 141 S. Ct. at 2076 (stating state-law formalities do not preclude liability). On remand, the trial court should calculate the value of immature crops based on the "probable yield at harvest had the crop not been destroyed" multiplied by its "market value at maturity minus costs of further cultivation, harvesting, and marketing" that the farmer did not incur. *St. James Parish*, 695 F.2d at 875–76 (collecting cases); *Daily v. United States*, 116 Ct. Cl. 723, 731 (1950); *Montgomery Cnty.*, 143 F.2d at 409.

It was erroneous to exclude crop damages occurring between 2007 and 2014 from the damages calculation. We therefore vacate the Court of Federal Claims' determination that Plaintiffs' claims for lost crop damages were not compensable and remand for further fact finding consistent with this opinion.

B. 2011 Flooding

Plaintiffs next argue the Court of Federal Claims erred in finding the Government did not cause flood damages in 2011. In many respects, the flooding in 2011 was unique compared to the flooding in other years. Most notably, the volume of runoff in the River basin in 2011 was the most in over a century. The trial court found that the Corps' "System releases in 2011 were not part of the single purpose" of protecting endangered species and that Plaintiffs therefore could not establish the 2011 flooding was caused by the 2004 Master Manual's release requirements. *Phase I*, 136

---

were destroyed prior to the date of taking, a fact not present here. *See* 572 F.2d at 874.

Fed. Cl. at 678, 691, 692–93. Because the trial court clearly erred in both findings, we vacate and remand for further factfinding.

Regarding the court's "single purpose" analysis, the trial court found the 2011 releases had "nothing to do with ESA compliance." *Id.* at 691. This finding is premised on the narrow view that the decisions to release water in 2011 were not based on benefiting endangered species. *Id.* at 691–92. Even if that were true, this does not consider the effects of the 2004 Changes in the first place, which could have impacted the severity of the flood damage in 2011. The trial court also failed to consider, despite the record rainfall, whether the Corps' actions increased the severity or duration of the 2011 flooding compared to what was attributable to record rainfall.[14] Given the voluminous record and the parties' agreement that remand is appropriate based on our affirmance of the other legal issues in this case, we need not address the remaining arguments. *See* Oral Arg. at 37:45–38:59, 43:44–44:14. We vacate and remand.

## Conclusion

We have considered the parties' remaining arguments and find them unpersuasive. For the reasons given above, we affirm the Court of Federal Claims' judgment with respect to Plaintiffs' takings claims. We vacate the trial court's denial of crop damages and its finding that the Government did not causally contribute to the 2011 flooding

---

[14] The parties dispute whether Plaintiffs presented, and thus preserved, an argument concerning the apportionment of damages alleged to be attributable to the 2004 Changes as opposed to the excessive runoff in 2011. On remand, the Court of Federal Claims should consider, on a plaintiff-by-plaintiff basis, whether such an argument was raised and preserved.

and remand for further consideration consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

COSTS

Costs awarded to Plaintiffs-Cross-Appellants.